THE INDORSEMENT CASES.

GEORGE W. SMITH v. ALEXANDER DUNLAVY.

E. M. GLENN ET AL. v. STEPHEN D. FOOTE.

—— NEAVITT v. —— BAKER.

ATKINSON & CHAPPELL v. WILLIAM H. COOKE.

WILLIAM M. SLEDGE v. ASA E. STRATTON.

ATKINSON & CHAPPELL v. WILLIAM H. COOKE.

GEORGE W. HOOKER v. ELIZA HORTON.

By the act of 20th January, 1840, section 2, the congress of Texas repealed all the laws of force, with the exception of certain acts therein enumerated, and introduced the common law of England, so far as it is not inconsistent with the constitution or the acts of congress then in force, to be the rule of decision in the republic. (Paschal's Dig., Arts. 804, 978, Notes 396, 418.)

It is enough to say that neither the laws, statutes, nor the customs of any nation, with the exception of the common law as modified by our statutes, can have any force or validity as such.

The laws, rules, and regulations relative to bills of exchange, or what is known as the law merchant, have no force in this state, but such instruments are governed by our own statutes.

The two principal acts on the subject of bills of exchange and promissory notes are the acts of 1840 and 1848. (Paschal's Dig., Arts. 220–226, 229–235.)

The 1st section of the act of 1840 (Paschal's Dig., Art. 220) contained certain provisions that are repealed by the 7th section of the act of 1848, (Paschal's Dig., Art. 235,) and which are not re-enacted, and of course not in force since the repeal.

The repealed section (Paschal's Dig., Art. 220) is as follows: "It shall not be necessary for the owner or holder of a bill of exchange, promissory note, check, draft, or other mercantile negotiable instrument, to have any of those instruments protested for non-acceptance or non-payment; nor shall it be necessary to give notice of such dishonor to any drawer, indorser, or assignor of the same; and every such party shall, without any protest or notice whatever, be held responsible as security for the final payment of every such instrument: *Provided, however*, That in all cases in which either a protest or a notice was hitherto necessary, the party that would have been released from responsibility, by a failure to make such protest or to give such notice, shall hereafter be released from all responsibility, unless the owner or holder of such instrument shall use due diligence to collect the same; and every holder or owner shall be adjudged not to have used due diligence who shall not have instituted a suit against the drawer or maker of such instrument before the first term of the district court after the right of action accrued, or shall not institute suit before the second term of said court, and also show good cause why he did not institute his suit before the first term." The act of 1848 is entitled "An act prescribing the mode of establishing the liabilities of drawers and indorsers of bills of exchange and promissory notes."

The 1st section (Paschal's Dig., Art. 229) is as follows: "The holder of any bill of exchange or promissory note, assignable or negotiable by law, may secure and fix the liabilities of any drawer or indorser of such bill of exchange and every indorser of such promissory note without protest or notice, by instituting suit against the acceptor of such bill of exchange or against the maker of such promissory note before the first term of the district court to which suit can be brought after the right of action shall accrue, or by instituting suit before the second term of said court after the right of action shall accrue, and showing good cause why suit was not instituted before the first term next after the right of action accrued." The 4th section of the same act provides, that the holder of any such bill of exchange or promissory note may also secure and fix the liability of any drawer or indorser of such bill of exchange or promissory note for the payment thereof, without suit against the acceptor, drawer, or maker, by proving such bill or note to be regularly protested by some notary public of any county for non-acceptance or non-payment, and giving notice of such protest to such drawer or indorser, according to the usage and custom of merchants. (Paschal's Dig., Art. 229, Note 290.)

The 6th section of the act extended the provisions of the 4th section to contracts between merchant and merchant, their factors and agents only. (Paschal's Dig., Art. 234, Note 295.)

On comparing the 1st section of the act of 1840 (repealed by section 7 of the act of 1848, Paschal's Dig., Arts. 220, 229) with sections 1 and 4 of the act of 1848, on the same subject, it will be seen that the act of 1840 expressly provided in reference to indorsers, that "every such party shall, without any protest or notice whatever, be held responsible, as security, for the final payment of every such instrument," while the act of 1848 does not admit that the indorser is security, but provides the two methods in which the "holder may secure and fix the liabilities of the indorser," and virtually providing that, unless the liabilities of the indorser are "secured and fixed," as provided, he is released. To say that the indorser is liable, unless "fixed," as provided, would be equivalent to denying that the 1st section of the act of 1840 was repealed.

This act of 1848 continued uninterrupted until the 7th of December, 1861, when an act was passed suspending the collection of debts and liabilities on bills of exchange and promissory notes until the 1st of January, 1864, or six months after the close of the war. (Paschal's Dig., Arts. 5130, 5144.)

The effect of the law of 11th January, 1862, was to so change the 6th section of the law of 1848, that the 4th section of the law of 1848 became applicable to all negotiable paper. (Paschal's Dig., Arts. 232, 234, Notes 293, 295; Smith v. Harbert, 30 Tex., 670.)

After the 11th January, 1862, and until the courts were opened, in 1865, the only way of fixing the liability of an indorser was by proving the indorsed note "to be regularly protested by some notary public of any county for non-acceptance or non-payment, and giving notice of such protest to such drawer or indorser." (Paschal's Dig., Art. 232, Note 293.)

The law making the indorser responsible as surety was repealed by the 7th section of the act of 20th March, 1848. (Paschal's Dig., Arts. 220, 235, Note 288.)

These appeals were from several different counties, viz: Colorado, Washington, and Wharton, and the cases were tried before Hons. BENJAMIN SHROPSHIRE, GEORGE W. SMITH, and JOHN A. BUCKHOLTS, district judges.

The notes all fell due on or about the 1st day of January, 1862. In the case of Glenn & Campbell v. Foote, the note matured August 1, 1862; and in this case the maker and one indorser made no defense, and judgment went against them by default. There were no protests for non-payment, and no efforts to fix the liability of the indorsers by suits until after the close of the war, in 1865. The question was, were such indorsers liable? The holders of

such notes assumed that the war acts, known as the stay laws, prohibited suits pending the war, and that the same acts dispensed with the necessity of suing in order to charge indorsers. (Paschal's Dig., Arts. 5125, 5140, 5130, 5134, Note 1124.) This was to assume that the laws made in aid of the rebellion were of binding force, or else that they were a *vis major*, which favored plaintiffs, but not defendants. The subject had been fully discussed in Smith v. Harbert, 30 Tex., 670.

Some of the judgments were reversed and some sustained, according as the court below had decided for or against the liability of the indorsers.

The war being over, and the stay laws out of the way, the result of the decisions is to settle the law, as the legislature must always have intended that drawers and indorsers may be made liable, either by timely suits against makers and acceptors, or else by protest and notice; and this rule applies to all kinds of negotiable paper.

*George Quinan*, for the holders of the notes, relied upon the stay law and the 6th section of the XIth ordinance of the convention. (Paschal's Dig., Art. 4631a.)

*Hill & Hill*, for the holders, insisted that, because the notes fell due on the 1st and 2d January, 1861, the cases were distinguishable from that of Smith v. Harbert, 30 Tex., 669.

*John W. Harris*, for the indorsers, insisted upon the statute about bills, notes, &c.

The cases were also argued by *Cooke & Collier* and by *Robert Foard*.

MORRILL, C. J.—The legislature of 1840 passed an act repealing all laws in force prior to 1st September, 1836,

with certain exceptions therein mentioned, and on the same day declared the common law of England to be the rule of decision. What is meant by "the rule of decision," we do not pretend to say, and we have cited the act (Arts. 804, 978) for the purpose of calling attention to the fact, that in the adjudication of causes the ante-statute law of England forms the substratum, and the constitution and laws of the United States, together with the constitution and laws of this state, the superstructure, of our system of jurisprudence. The laws, statutes, and customs of any country, state, or nation, with the above exception, can have no force or validity as such. The laws, rules, or regulations relative to bills of exchange, promissory notes, &c., in force in this state, are our own statutes on this subject, inasmuch as by the common law of England a chose in action was not assignable. (Story on Bills, § 17.) What is known as the mercantile law, and which accompanied the emigrants of Europe to this continent as a part of their inheritance, and which is now acted upon and received with the same binding force as a statute in most of the United States, has no validity or force in this state, except so far as it has become statute law, because it was so declared by the thorough-sweeping act above recited. (Art. 804.)

The two principal acts on the subject of bills of exchange and promissory notes are the acts of 1840 and 1848. (Paschal's Dig., Arts. 220, 226, 229, 235.)

The 1st section of the act of 1840 contained certain provisions that are repealed by the 7th section of the act of 1848, (Art. 235,) and which are not re-enacted, and of course not in force since the repeal.

The repealed section is as follows:

"It shall not be necessary for the owner or holder of a bill of exchange, promissory note, check, draft, or other mercantile negotiable instrument, to have any of those instruments protested for non-acceptance or non-

payment; nor shall it be necessary to give notice of such dishonor to any drawer, indorser, or assignor of the same, and every such party shall, without any protest or notice whatever, be held responsible as security for the final payment of every such instrument: *Provided, however*, That in all cases in which either a protest or a notice was hitherto necessary, the party that would have been released from responsibility by a failure to make such protest, or to give such notice, shall hereafter be released from all responsibility, unless the owner or holder of such instrument shall use due diligence to collect the same, and every holder or owner shall be adjudged not to have used due diligence who shall not have instituted a suit against the drawer or maker of such instrument before the first term of the district court after the right of action accrued, or shall not institute such suit before the second term of said court, and also show good cause why he did not institute his suit before the first term." (Paschal's Dig., Art. 220.)

The act of 1848 was entitled "An act prescribing the mode of establishing the liabilities of drawers and indorsers of bills of exchange and promissory notes," and, as has already been said, with some alterations, which will be noticed, contains the law that now governs us.

The 1st section (Paschal's Dig., Art. 229) is as follows: "The holder of any bill of exchange or promissory note, assignable or negotiable by law, may secure and fix the liabilities of any drawer or indorser of such bill of exchange, and every indorser of such promissory note, without protest or notice, by instituting suit against the acceptor of such bill of exchange, or against the maker of such promissory note, before the first term of the district court to which suit can be brought after the right of action shall accrue, or by instituting suit before the second term of said court after the right of action shall accrue, and showing good cause why suit was not instituted before the first term next after the right of action accrued."

The 4th section of the same act provides that "The holder of any such bill of exchange or promissory note may also secure and fix the liability of any drawer or indorser of such bill of exchange or promissory note for the payment thereof, without suit against the acceptor, drawer, or maker, by procuring such bill or note to be regularly protested by some notary public of any county for non-acceptance or non-payment, and giving notice of such protest to such drawer or indorser, according to the usage and custom of merchants." [Paschal's Dig., Art., 232, Note 293.]

The 6th section of the act extended the provisions of the 4th section to contracts between merchant and merchant, their factors and agents, only.

On comparing the 1st section of the act of 1840 (repealed by the 7th section of the act of 1848) with the 1st and 4th sections of [the act of] 1848 on the same subject, it will be seen that the act of 1840 expressly provided, that "every such party (indorser) shall, without any protest or notice whatever, be held responsible, as security, for the final payment of every such instrument;" while the act of 1848 does not admit that the indorser is security, but provides the two methods, in which the "holder may secure and fix the liabilities of the indorser," and virtually providing that, unless the liabilities of the indorser are "secured and fixed," as provided, he is released. To say that the indorser is liable, unless "fixed," as provided, would be equivalent to denying that the 1st section of the act of 1840 was repealed.

This act of 1848 continued uninterrupted till the 7th December, 1861, when an act was passed suspending the collection of debts and liabilities on bills of exchange and promissory notes till 1st January, 1864, or six months after the close of the war. (Paschal's Dig., Art. 5125.)

One of the consequences of the passage of this act was the prohibition of holders of promissory notes, which were not made by merchant to merchant, to fix an indorser, and

unless the liabilities of the indorser should be fixed, he would be released. Consequently, at the same session of the legislature, on the 1st January, 1862, the 6th section of the act of 1848, (Art. 234,) was so changed that the 4th section was made applicable to bills of exchange and promissory notes of all kinds. After the 11th January, 1862, and until the courts were opened, in 1865, the only way of fixing an indorser was by procuring the indorsed note "to be regularly protested by some notary public of any county for non-payment, and giving notice of such protest to the indorser." [Paschal's Dig., Art. 232.]

The appellee insists that, because the note fell due on the 1st January, 1862, and at a time when the laws then in force did not authorize the holder of a note to fix the liability of an indorser in any way, therefore the indorser was liable to pay the note. This would be plausible if the act of 1840, making the indorser responsible as security, had not been repealed, as hereinbefore stated. And, besides, if the holder had used due diligence in having the note protested as soon as he was able, he could have fixed the liability of the indorser. The maxim that the law favors the vigilant properly applies in this case.

We cannot see that this case differs in any material point from Smith v. Harbert, [30 Tex., 670,] decided at the last term of this court. Wherefore the judgment is

REVERSED AND REMANDED.

# INDEX.

## AB INITIO.

1. To the *ab initio* plea it was replied, that the municipal laws of the state, not in conflict with the constitution and laws of the United States, remained in force during the rebellion, and the present provisional government succeeded it in the administration of criminal justice. (Paschal's Dig., Note 1162, pp. 904, 905.) *Thompson* v. *The State*, 166.

2. All laws passed to aid the rebellion were void. The law authorizing fines and forfeitures to be paid in that currency was in aid of the rebellion, and void. (Texas v. White & Chiles, 25 Tex. Supp., 467.) *Boone* v. *The State*, 557.

## ABATEMENT.

### VARIANCE.

1. The statute requires the place of holding the court to be stated in the writ, and it also requires the sheriff to serve the defendant with a copy. (Paschal's Dig., Arts. 1431, 1433.) *Whittenberg* v. *Newton*, 474.

2. The statute is also equally mandatory in requiring a plea in abatement, except a plea to the jurisdiction of the court, or where the truth of the plea appears of record to be sworn to. (Paschal's Dig., Art. 1, Note 221.) *Id.*

3. An error in the copy of the writ is not reached by a motion appending a copy of the writ, and saying that no copy was served upon him. The fact should be sworn to. *Id.*, 475.

4. The "records" are the books and papers of the court. The copy served is not a record within the meaning of article 1 of Paschal's Digest. *Id.*

5. The defendant cannot be heard after arraignment to aver that he is not indicted by his true name. (Paschal's Dig., Art. 2937.) *Wilcox* v. *The State*, 587.

6. The appellant, against whom a judgment had been rendered for assault and battery, appealed, and died pending the appeal. The whole proceeding abates. (Paschal's Dig., Art. 18, Note 229; Gibbs v. Belcher, 30 Tex., 79.) *Harrison* v. *Moseley*, 608.

## ABSENCE.

### DIVORCE AND ALIMONY, 3.

1. No personal judgment can be rendered against a non-resident without actual personal service of the citation or writ upon the party. In

ABSENCE (*continued.*)

order to acquire jurisdiction through the property, where the party is non-resident or absent from the state, there are certain essential prerequisites prescribed by statute to be performed before the jurisdiction actually attaches, so as to authorize an adjudication of the court upon the rights of parties. There must be an affidavit made, bond and security given to the absent party, the impetration of the writ of attachment, and its actual levy and return by the minister:al officer of the court, before the jurisdiction attaches in a proceeding *in rem.* (Paschal's Dig., Art. 25, Note 233.) *Herrington* v. *Williams,* 448.

2. Where none of these requirements had been complied with, no valid judgment could have been rendered either against the land or the person of the administrator and heir. He was in no proper sense a party to the litigation, actually or constructively. *Id.*

ACCOUNT BOOKS.

1. The best evidence of accounts which it is in the power of the party to produce, by ordinary or extraordinary means, shall be exhausted before books of account are admissible. *Werbiskie* v. *McManus,* 116.

2. Besides the oath of the party touching the correctness of his books, it shall be proved by others, who are acquainted with the party, among his neighbors and customers, for fair dealing, that his reputation as an honest man and correct book-keeper is untarnished. (Paschal's Dig., p. 601, Note 832.) *Id.,* 117.

ADMINISTRATOR.

ESTATES.

FIDUCIARY TRUSTS.

VENDOR'S LIEN, 2.

1. If the authority of an executor or administrator be denied, he must produce the letters of administration, duly signed and sealed, or else the certificate of the clerk that such letters have issued. (Paschal's Dig., Art. 1286.) *Werbiskie* v. *McManus,* 116.

2. The payment of the stamp duty required by the act of Congress is a prerequisite to the grant of administration, without which the letters are void. (Int. Rev. Pamph. of 1867, p. 129.) *Id.*

3. An administrator may sue to recover the land of his intestate, for the law so requires; but, *non constat,* that the administrator, who has never had possession of land, may be sued as a mere fiduciary. (Paschal's Dig., Art. 1324, Note 500.) *Barrett* v. *Barrett's Adm'r.,* 344.

4. If the administrator be in possession, he may be sued as a trespasser. *Id.*

5. By the 112th section of the administration law all the estate of the intestate vests immediately in his heirs, and the control of the administrator is only over the property which is subject to the payment of debts, and it can only be exercised under the orders of the court. (Paschal's Dig., Art. 1373, Note 517.) *Id.*

6. Where the plaintiff declared against an administrator as such, aver-

ADMINISTRATOR (*continued.*)

ring that he (the plaintiff) was entitled to a tract of land, and the administrator answered that the plaintiff's deed had never been recorded, and that credit had been given to the intestate on the faith of the same land, and the heirs were not made parties, the issues made were wholly immaterial, and the verdict determined nothing. *Barrett* v. *Barrett's Adm'r.*, 344.

ADMINISTRATOR'S SALE.

VENDOR'S LIEN.

1. To constitute an administrator's sale, there must be a vendor and vendee, as well as a consideration; and where the administrator sells and buys, the sale is a nullity. *Hamblin* v. *Warnecke*, 91.

2. In all sales made by an executor or an administrator he acts under the decretal order of the probate court, and the purchaser at his own peril is required to ascertain the grounds and authority of the fiduciary, not from his declarations at the time of the sale, but from the orders of the court and the statutes of the state in regard to his special duties in the premises. *Hamilton* v. *Pleasants*, 638.

3. The administrator could make no terms with purchasers at such sales which the orders of the court or the laws of the land did not warrant. Of the nature of such orders and the provisions of the law the purchaser had the same means of knowing and understanding as the administrator. If the law therefore did not warrant a sale for Confederate money, the declaration of the administrator at the time of the sale, that the sale was made for Confederate money, could not operate as a fraud upon the purchaser. *Id.*

ADMISSIONS.

CONFESSIONS.

ADULTERY.

HOMICIDE, 10.

AFFIDAVIT.

ATTACHMENT, 1, 2.

ALCALDE.

BOUNDARIES, COLONIES.

ALIEN ENEMIES.

SEQUESTRATION.

ALIENS.

ANNEXATION.

1. By the common law an alien could not maintain an action to recover real property. *Barrett* v. *Kelly*, 477.

2. An alien might acquire land, but he held it subject to the will of the government, and upon his death the property reverted to the government. *Id.*

ALIMONY.

    DIVORCE AND ALIMONY.

ANNEXATION.

    1. The annexation of Texas to the United States in 1845 removed all objections to a citizen of the United States on account of alienage. *Barrett* v. *Kelly*, 477.

    2. Prior to annexation Texas might have forfeited the lands belonging to alien citizens, but after annexation no such right existed against citizens of the United States. (Paschal's Dig., Art. 43, Notes 153, 159, 237.) *Id.*

APPEAL.

    ARBITRATION, 4.

    COUNTY COURT, 3–6.

    JURISDICTION.

    WRIT OF ERROR.

    1. When the state appeals from a judgment quashing an indictment, unless the defendant enter into recognizance, the supreme court has no jurisdiction, and the appeal will be dismissed. (Paschal's Dig., Art. 3187, Note 771.) *The State* v. *Bledsoe*, 39.

    2. When a defendant appeals in a case of misdemeanor, he must either be committed to jail or enter into a recognizance to appear before the district court to abide the judgment of the supreme court. (Paschal's Dig., Art. 3186, Note 770.) *Adler* v. *The State*, 61.

    3. The requirements of the recognizance are prescribed in article 263 of the code; therefore it must state the time, place, and the offense, as well as the court in which the party is required to appear. (Paschal's Dig., Art. 2731, div. 3, Note 708; Payne v. The State, 30 Tex., 397; Wilson v. The State, 25 Tex., 171.) *Id.*

    4. Where the defendant was convicted of an offense and appealed, but the recognizance did not state the offense, nor any offense known to the law, this court has no jurisdiction and the appeal was dismissed. (Paschal's Dig., Art. 2731, Note 708; Horton v. The State, 30 Tex., 191.) *Breeding* v. *The State*, 94.

    5. The statute requires forty days after the perfection of an appeal or writ of error as the least time in which the party is required or permitted to file the record. The party is also allowed two years from the rendition of the judgment to prosecute error. (Paschal's Dig., Art. 4615, Note 1026.) *Kernaghan* v. *Hall*, 129.

    6. A showing that the party applied for the record, but the clerk had no time to prepare it, is no sufficient excuse for not filing it in time. *Id.*

    7. Whether the judgment be that the defendant go hence, &c., or that the plaintiff recover, &c., or that a new trial be refused, this last act is a final judgment, and, if the defendant appeal from that, he may bring in review the whole record. *Kennedy* v. *Morrison*, 207.

    8. Where an appeal was sent from Medina (which was assigned to the session of the supreme court at Austin) to the session at Galveston, it was, on the motion of the attorney general, dismissed. *Goodside* v. *The State*, 566.

APPEARANCE.

ATTACHMENT, 7.

As the third maker of the note had died, the payee was not forced to cite his legal representative, but the legal representative had a right to appear with the other defendants, and have the validity of the note adjudicated; and her voluntary appearance was a waiver of and dispensed with the necessity of a citation. *Womack* v. *Shelton*, 592.

ARBITRATION.

1. Where a case had been referred to arbitration, and the arbitrators reported their award, which the court refused to enter; but, on the petition of the defendant, recited that, because of gross mistakes, both of fact and law, the award was set aside and the matter ordered to proceed *de novo*, it was such a final judgment as gave jurisdiction by appeal to this court. *King & Co.* v. *Grey*, 22.

2. The umpire, whether selected by the parties or the clerk, is authorized to act as an arbitrator. (Paschal's Dig., Art. 65, Note 248.) *Id.*

3. Where, after a long session of the arbitrators, one of them withdrew from further attendance and the others made the award, it is a fair presumption that the withdrawal was because of disagreement, and the award was sustained. *Id.*

4. Where the parties did not reserve the right of appeal in the submission, and the court refused to enter the award, this court examined the facts, and, finding that the award was sustained by the evidence, reversed the judgment and rendered judgment upon the award. *Id.*

ASSAULT WITH INTENT TO MURDER.

Article 493 of the Penal Code thus defines assault with intent to murder: If any person shall assault another with intent to murder, he shall be punished by confinement in the penitentiary not less than two years nor more than seven years. If the assault be made with a bowie knife or dagger, the punishment shall be doubled." (Paschal's Dig., Art 2155, Note 666.) To deliberately shoot a man with a six-shooter three times and wound him is an offense within the statute. *Gonzales* v. *The State*, 495.

ASSIGNMENT.

The obligee or assignee of any bond or written instrument may transfer to another, by written assignment, all his interest in the same, and, in order to hold the assignor liable, the assignee must use due diligence to collect the same. (Paschal's Dig., Art. 222, Note 285.) An account which had been allowed by an administrator, and approved by the chief justice, is a *quasi* judgment, and assignable within the meaning of this act. *McDonough* v. *Tutt*, 199.

ASSIGNMENT OF ERRORS.

PRACTICE IN SUPREME COURT, 16.

XXXI—45

ATTACHMENT.

RECONVENTION, 3.

1. If the petition clearly set forth the cause of indebtedness against the defendant, from which the amount claimed is clear, and the plaintiff swear to the truth thereof, the attachment ought not to be quashed for want of the averment that the "defendant is justly indebted," in a specified amount, either in the petition or affidavit. (Paschal's Dig., Arts. 138, 142, Notes 257, 259.) *Morrison* v. *Kennedy*, 207.

2. The petition filed under oath must show clearly the amount due, and whether it be justly due or not does not depend upon the sworn statement, but upon the proofs. *Id.*

3. Where the defendant had given special bail in an attachment proceeding, and judgment went against the defendant, the court had to decide, as a final act, whether judgment should be rendered against the sureties, and the refusal to so render was final, from which the plaintiff could appeal. (Paschal's Dig., Arts. 152, 153.) *Id.*

4. When the property is attached, the defendant may release it by giving a delivery bond, as provided in the 12th section of the act, or by giving special bail for the amount of the debt, as provided for in the 14th section. (Paschal's Dig., Arts. 150, 152.) *Id.*

5. The 14th section reads as follows: "Any person against whose property an attachment has issued, his agent or attorney, may at any time before final judgment, upon giving special bail, with good and sufficient sureties, for the amount of the debt and interest, recover possession of the property so attached from the person in whose hands it may be; but the giving such special bail shall be deemed an appearance of the defendant, and the suit shall thereupon proceed as in ordinary cases; but if the plaintiff recover, he shall have judgment against all the obligors in the bail bond." (Paschal's Dig., Art. 152.) The defendant can easily replevy, which is not an appearance; or he may give bail under this section, which is as much so as the acknowledgment of service. *Id.*

6. Where the plaintiff in attachment had acquired a lien by a levy, other creditors could not intervene upon the mere ground that the defendant was insolvent, and hence they were entitled to a *pro rata* division with the attaching creditor. The law favors the diligent. (Paschal's Dig., Art. 149, Note 262. *Harrison* v. *Harwood*, 650.

7. A motion was made in the court below to quash and dismiss the attachment for various reasons; some, for matters alleged to be apparent upon the face of the attachment; others, for irregularities in the execution of the levy by the ministerial officer. Among the first enumerated, were, that causes for the attachment were stated and sworn to, both in the petition and the affidavit; that the affidavit was made, the bond approved, and the attachment was issued and attested by the deputy clerk, though in the name of the principal clerk; that the attachment was for a different amount from that claimed in the petition; and that the attachment had performed its office when an appearance had been secured. Neither of these grounds is sustained by the facts in the record nor by

ATTACHMENT (*continued.*)

the law. It is no valid objection, that the party swore to the petition and made a written affidavit besides. If good cause were stated in the petition or the affidavit, it was sufficient to warrant the issuance of the writ of attachment. (Paschal's Dig., Arts. 142, 214, Notes 257, 259.) *Harrison* v. *Harwood*, 650.

8. A large discretion is left to the officer by the statute, in fixing the valuation of the property levied upon. The policy of the law is simply to hold the property impounded until final judgment for the ultimate satisfaction of the debt. (Paschal's Dig., Art. 149, Note 262.) *Id.*, 651.

9. There is a difference between the mere wrongful suing out of an attachment (upon a ground which may not exist) and the suing it out with malice. If the defendant take the first ground, he should plead upon the bond. If upon the latter, he may rely upon all the incidental injuries. *Id.*

10. The wrongful suing out an attachment, and the malice with which it may be done, are different causes of action. The one would be an action *ex contractu;* the other, an action *ex delicto.* The one would survive to the administrator or executor; the other would die with the person. With the greatest latitude allowed in our pleading, this court has repeatedly recognized the distinction here taken. This court has heretofore ruled that the malicious suing out of the writ and the mere wrongful suing it out are separate and distinct grounds of defense; and under an answer setting forth one of the grounds proof cannot be introduced establishing the other. (Paschal's Dig., Art. 3446, Note 797, p. 565.) *Id.*

ATTORNEY AND CLIENT.

1. Where a defendant had not been served, but an attorney appeared for him, so far as to object to the evidence on account of variance, and to force a plaintiff to take a nonsuit, the nonsuit discharged that party who was only indorser, and released the attorney from further duty and power in the cause, unless he obtained the express assent of his client to renew the litigation. And an agreement of the attorney to allow judgment to go against the client, not served, did not bind the latter. *Hoffman* v. *Cage*, 595.

2. The court cannot recognize the existence of the relation of attorney and client until the court had acquired jurisdiction over the party, or the attorney exhibits a warrant of authority. *Id.*

AWARD.

ARBITRATION.

BAIL.

AB INITIO.
BAIL BOND.
HOMICIDE, 10.

1. To justify a denial of bail there must be that evidence of deliberate malice, or those circumstances which prove murder in the first degree. (Paschal's Dig., Art. 2267, Note 672.) *Ex parte William Cooper*, 185.

BAIL (*continued.*)

2. Where the defendant had given bail before a magistrate, and was afterwards indicted and taken into custody, upon an application to be discharged on *habeas corpus* the bond is not before the court. *Ex parte Mosby*, 567.

3. Where the killing was without provocation or extenuating circumstances, it was the result of formed design, and bail was properly refused. (Paschal's Dig., Art. 2267, Note 672.)  *Moore* v. *The State*, 572.

BAIL BOND.

AB INITIO.

BAIL.

1. A bail bond must contain all the substantial requisites in the 264th article of the Code of Criminal Procedure. (Paschal's Dig., Arts. 2732, 2759, Notes 707, 712.)  *Tierney* v. *The State*, 40.

2. Unless a bail bond recite the offense of which the principal is accused it cannot be the foundation of a judgment of forfeiture. (Paschal's Dig., Art. 2732, Note 709.)  *The State* v. *Miller*, 564.

3. The sheriff has no authority to exact a bond of one who voluntarily surrendered himself.  He should take the prisoner before an examining court.  *Id.*

BAILEE.

1. Where cotton was delivered to a bailee to sell at a limited price in Confederate money, and the bailee, failing to get the price, converted it to his own use, the measure of damages (under the peculiar circumstances) was the value of the cotton at the time and interest upon that value until the trial.  *Hatcher* v. *Pelham*, 201.

2. Where a party deposited a promissory note with a bailee, without any instructions to collect it, and the bailee afterwards received from the maker payment in the treasury notes of the Confederate States, it did not discharge the maker.  *Ransom* v. *Alexander*, 443.

3. Admitting that the bailee was an agent, he was only authorized to receive payment in lawful currency; no other payment will bind the principal.  *Id.*

4. The Confederate notes were an illegal and treasonable currency, and the attempted payment in such was known to the debtor to be an illegal act.  *Id.*

5. The defendant received the notes after his return in 1866.  He remarked to his agent that he would have no difference with him; but that if the defendant did not make it right, as the bailee had told him he must do, he should always think he ought.  This is no acquiescence.  An acquiescence, where there was no consideration for it, would have to be very affirmatively proved.  *Id.*

BILLIARD TABLE.

1. If a billiard table be kept for "occupation," the occupation was subject to the license tax imposed by the statute; because those "pursuing

BILLIARD TABLE (*continued.*)

any occupation, trade, or profession" are by the constitution subject to a license tax. (Paschal's Dig., p. 942, Art. VII, sec. 27.) *Tarde* v. *Benseman*, 277.

2. Trade or profession imports a profitable pursuit, and, if the billiard table was kept for amusement and not for profit, it was not subject to taxation. *Id.*

3. The use for which a billiard table was kept ought to have been left to the jury. *Id.*

BILLS, NOTES, &c.

ASSIGNMENT.

INDORSERS.

RAILROADS, 1, 2.

1. Where the petition showed that a note, payable to H. or bearer, was transferred, for a valuable consideration, by delivery before due, it matters not if the payee indorsed it after due, so far as the plea of failure of consideration is concerned. (Paschal's Dig., Art. 221, Note 284.) *Davis* v. *Wilson*, 136.

2. When the liability of the drawer and indorser had not been fixed by protest or timely suit against the acceptors, they were not liable; and, having been sued with the acceptors, there should have been a discontinuance against them, and it was error to take judgment against the acceptors without making any disposition of the cause as to these parties not liable. *Young* v. *Davidson*, 153.

3. It would seem that it is error to sue acceptors, who are liable as a firm, in different suits, and to take separate judgments against them; and it is certainly error to take a separate judgment against one acceptor and a joint judgment against all. *Id.*

4. On the 11th of January, 1862, the 3d section of the act of 20th March, 1848, which authorized the fixing of the liability of indorsers by protest, was in force, without any regard to whether the paper was between merchant and merchant or not, because the 6th section of said act had been repealed so far as the character of the parties to the paper was concerned. (Paschal's Dig., Arts. 232, 234, Notes 292, 295; and see Smith v. Harbert, 30 Tex., 670.) *Green* v. *Elson & Templeman*, 159.

5. Unless the liability of an indorser has been fixed by bringing suit against the maker, as required by the 1st section of the act of March 20, 1848, he cannot be made liable. (Paschal's Dig., Art. 229, Note 290.) *Griffith* v. *Gary*, 163.

6. A note which omits the word dollars, but inserts the numbers, means dollars. *Petty* v. *Fleishel & Smith*, 169.

7. Where a note is payable in currency, and the defendant makes default, it is proper to take judgment for the face of the note in dollars, without a writ of inquiry to find the value of the currency. *Id.*

8. The failure of a mortgagee to contest the administrator's sale of mortgaged property is a sufficient consideration for a note. *Bender* v. *Pryor*, 341.

BILLS, NOTES, &c. (*continued.*)

9. Where the defendant proved that the consideration of a note was Confederate money, and therefore void, and the proof was that it was given for horses, about the value of which there was no proof, the court (the case was tried by the judge) did right to find the law and the facts for the plaintiff. *Hailey* v. *Pollard,* 604.

10. A note payable twelve months after a treaty of peace between the Confederate States and the United States cannot be recovered upon the simple averment that it is due and has not been paid. (Shaw v. Trunsler, 30 Tex., 390.) *Thompson* v. *Houston,* 610.

11. In a suit upon a note it is not necessary to state where either the note or the indorsement was made. *Wexel* v. *Cameron, Grier & Co.,* 614.

12. A promissory note is a written engagement by one person to pay another person therein named, absolutely and unconditionally, a certain sum of money, at a time therein specified. (Paschal's Dig., Art. 220, Note 283.) *Id.*

13. Where the maker resided beyond the limits of the state, and the indorser was sued at the first term of the court after the note matured, he was *held* to be liable; and also that it was unnecessary to decide upon the effect of the special indorsement or the necessity of a government stamp thereto. *Id.*

14. Where the defendant is sued upon a negotiable note, he cannot plead in reconvention, and recover against the holder the balance of an open account against the original payee of the note, even though he detained it after it became due. "Discounts against the assignor" do not mean that the assignee is liable for any balance over and above the amount of the note. (Paschal's Dig., Art. 221, Note 284.) *Reese* v. *Teagarden,* 642.

15. The laws, rules, and regulations relative to bills of exchange, or what is known as the law merchant, have no force in this state, but such instruments are governed by our own statutes. *The Indorsement Cases,* 693.

16. The two principal acts on the subject of bills of exchange and promissory notes are the acts of 1840 and 1848. (Paschal's Dig., Arts. 220–226, 229–235.) *Id.*

17. The 1st section of the act of 1840 (Paschal's Dig., Art. 220) contained certain provisions that are repealed by the 7th section of the act of 1848, (Paschal's Dig., Art. 235,) and which are not re-enacted, and of course not in force since the repeal. *Id.,* 694.

18. The repealed section (Paschal's Dig., Art. 220) is as follows: "It shall not be necessary for the owner or holder of a bill of exchange, promissory note, check, draft, or other mercantile negotiable instrument, to have any of those instruments protested for non-acceptance or non-payment; nor shall it be necessary to give notice of such dishonor to any drawer, indorser, or assignor of the same; and every such party shall, without any protest or notice whatever, be held responsible as security for the final payment of every such instrument: *Provided, however,* That in all cases in which either a protest or a notice was hitherto necessary, the party that would have been released from responsibility, by a failure

BILLS, NOTES, &c. (*continued.*)

to make such protest or to give such notice, shall hereafter be released from all responsibility, unless the owner or holder of such instrument shall use due diligence to collect the same; and every holder or owner shall be adjudged not to have used due diligence who shall not have instituted a suit against the drawer or maker of such instrument before the first term of the district court after the right of action accrued, or shall not institute suit before the second term of said court, and also show good cause why he did not institute his suit before the first term." *The Indorsement Cases*, 694.

19. The act of 1848 is entitled "An act prescribing the mode of establishing the liabilities of drawers and indorsers of bills of exchange and promissory notes." *Id.*

20. The 1st section (Paschal's Dig., Art. 229) is as follows: "The holder of any bill of exchange or promissory note, assignable or negotiable by law, may secure and fix the liabilities of any drawer or indorser of such bill of exchange and every indorser of such promissory note without protest or notice, by instituting suit against the acceptor of such bill of exchange or against the maker of such promissory note before the first term of the district court to which suit can be brought after the right of action shall accrue, or by instituting suit before the second term of said court after the right of action shall accrue, and showing good cause why suit was not instituted before the first term next after the right of action accrued." The 4th section of the same act provides, that the holder of any such bill of exchange or promissory note may also secure and fix the liability of any drawer or indorser of such bill of exchange or promissory note for the payment thereof, without suit against the acceptor, drawer, or maker, by proving such bill or note to be regularly protested by some notary public of any county for non-acceptance or non-payment, and giving notice of such protest to such drawer or indorser, according to the usage and custom of merchants. (Paschal's Dig., Art. 239, Note 290.) *Id.*

21. The 6th section of the act extended the provisions of the 4th section to contracts between merchant and merchant, their factors and agents, only. (Paschal's Dig., Art. 234, Note 295.) *Id.*

22. On comparing the 1st section of the act of 1840 (repealed by section 7 of the act of 1848, Paschal's Dig., Arts. 220, 229) with sections 1 and 4 of the act of 1848, on the same subject, it will be seen that the act of 1840 expressly provided, in reference to indorsers, that "every such party shall, without any protest or notice whatever, be held responsible, as security, for the final payment of every such instrument," while the act of 1848 does not admit that the indorser is security, but provides the two methods in which the "holder may secure and fix the liabilities of the indorser," and virtually providing that, unless the liabilities of the indorser are "secured and fixed," as provided, he is released. To say that the indorser is liable, unless "fixed," as provided, would be equivalent to denying that the 1st section of the act of 1840 was repealed. *Id.*, 695.

23. This act of 1848 continued uninterrupted until the 7th of December,

BILLS, NOTES, &c. (*continued.*)

1861, when an act was passed suspending the collection of debts and liabilities on bills of exchange and promissory notes until the 1st of January, 1864, or six months after the close of the war. (Paschal's Dig., Arts. 5130, 5144.) *The Indorsement Cases,* 695.

24. The effect of the law of 11th January, 1862, was to so change the 6th section of the law of 1848, that the 4th section of the law of 1848 became applicable to all negotiable paper. (Paschal's Dig., Arts. 232, 234, Notes 293, 295; Smith v. Harbert, 30 Tex., 670.) *Id.*

25. After the 11th January, 1862, and until the courts were opened, in 1865, the only way of fixing the liability of an indorser was by proving the indorsed note "to be regularly protested by some notary public of any county for non-acceptance or non-payment, and giving notice of such protest to such drawer or indorser." (Paschal's Dig., Art. 232, Note 293.) *Id.*

26. The law making the indorser responsible as surety was repealed by the 7th section of the act of 20th March, 1848. (Paschal's Dig., Arts. 220, 235, Note 288.) *Id.*

BILLS OF EXCEPTION.

PRACTICE IN THE SUPREME COURT, 19–25.

1. Where there was an exception to excluding the deposition of a certain witness, the bill of exceptions must show the materiality of the evidence. (Paschal's Dig., Art. 217, Note 280.) *Rose* v. *San Antonio and Mexican Gulf Railroad Company*, 49.

2. Where there was neither statement of facts, bill of exceptions, nor assignment of errors, the judgment was affirmed. *Gibbs* v. *Anthony*, 157.

BOUNDARIES.

SURVEYS, 1–6.

BOUNDARIES, COLONIES.

A grant executed by the alcalde of Austin's colony, the land lying above the Nacogdoches and San Antonio road, is not void for want of power in the officers, although the said road was the northern boundary of Austin's colony; that the land was within the jurisdiction of the officers who issued the grant has been settled in Hancock v. McKinney, 7 Tex., 348; Pyron v. Jackson, 11 Tex., 391; and Martin v. Parker, 26 Tex., 253. *Barrett* v. *Kelly*, 476.

BURGLARY.

1. Article 734 of the Penal Code reads as follows: "If a house be entered in such manner as that the entry comes within the definition of burglary, and the person guilty of such burglary shall, after so entering, commit theft, or any other offense, he shall be punished for burglary, and also for whatever other offense is so committed." Paschal's Dig., Art. 2370.) An indictment which stated that the defendant broke and entered, &c., with intent to commit a larceny, is not bad for duplicity. *Wilcox* alias *Nichols* v. *The State*, 586.

BURGLARY (*continued.*)

    2. To charge that the defendant entered the house of one person and stole the goods of another is not bad for duplicity. *Wilcox* alias *Nichols* v. *The State*, 685.

CARRIERS.

    CRIMINAL CODE, 1, 2.

CATTLE.

    ESTRAYS.

CERTIORARI.

    1. If a petition for *certiorari* state a case which shows that the plaintiff had no legal defense, it is proper to dismiss the petition. *Davis* v. *Wilson*, 136.

    2. Where the petition showed that a note, payable to H. or bearer, was transferred, for a valuable consideration, by delivery before due, it matters not if the payee indorsed it after due, so far as the plea of failure of consideration is concerned. (Paschal's Dig., Art. 221, Note 284.) *Id.*

    3. If a *certiorari* be issued without bond, the proceeding would be illegal; but if there has been an effort to give bond, the court should allow the applicant to execute a sufficient bond. (Paschal's Dig., Art. 468, Note 331.) *Edmiston* v. *Edwards*, 172.

    4. The constitution of 1866 gives to the district court power to issue the writ of *certiorari* and all other writs necessary to their general supervision and control over inferior tribunals. (Paschal's Dig., Art. IV, sec. 6, p. 935.) But the legislature intended that an appeal should be the usual remedy. *Wallerath* v. *Kapp*, 359.

    5. The writ of *certiorari* is not strictly a writ of right in the sense that a party has an absolute right to have it issued for his benefit, but it is issued in the sound discretion of the court, and the court has the same right to dismiss it if it be wanting in merits. *Id.*

    6. The act regulating the writ of *certiorari* requires a bond, but it is not necessary that the bond should contain a seal. (Paschal's Dig., Art. 468, Note 331.) LINDSAY, J., dissenting, held that the scroll or seal was only dispensed with in private instruments, not in judicial proceedings. *Courand* v. *Vollmer*, 398

CHARGE OF THE COURT.

    HOMICIDE, 1.

    INSTRUCTIONS.

    PRACTICE, 1.

    1. Where the accused had provoked a fight, in which he got worsted, at fisticuffs, and on rising from the ground snatched his pistol and shot his antagonist, who was unarmed, it was not error to charge the jury that, if they believed the defendant killed the deceased in a sudden and unexpected fight, without previous malice, and with no time for deliberation, and no previously formed design, he is guilty of murder in the second degree. (Paschal's Dig., Art. 2267, Note 672.) *Anderson* v. *The State*, 440.

CHARGE OF THE COURT (*continued.*)

2. If such a charge be subject to criticism, it is yet correct when taken in connection with a clear and unchallenged charge which defined all the degrees of homicide. *Anderson* v. *The State*, 440.

3. It is a common but an erroneous practice in homicide for the judge to charge the jury upon the whole law of homicide. All charges ought to be founded on the special facts in each case, and the law expounded in the charge hypothetically upon the facts, in all their varying aspects, as conducing to establish the guilt or innocence of the prisoner. (Paschal's Dig., Arts. 3059, 3060, Notes 744, 745.) *Cocker* v. *The State*, 498.

4. Where the charge was too favorable to the appellant, he has no cause to complain. *Id.*

5. The charge of the court must be in writing if the defendant object to its being verbal. (Paschal's Dig., Art. 3067, Note 747.) *Clark* v. *The State*, 575.

6. The judge is not allowed to express any opinion in his charge as to the weight of the evidence. (Paschal's Dig., Art. 3059, Note 744.) *Id.*

7. A charge which in substance assumes that he who received a blow for words spoken may not return the blow in self-defense is erroneous. *Harrison* v. *Moseley*, 608.

CHEROKEE COUNTY.
    County Treasurer, 2.

CHILDREN.
    Descent and Distribution.
    Wills, 7.

CITIZENS.
    Aliens.

CIVIL RIGHTS.
1. The 1st section of the "civil rights" law gives negroes equal rights with whites to give evidence, and they are competent witnesses. (Paschal's Dig., Art. 5382.) *Ex parte Warren*, 143.

2. By the reconstruction laws the government of Texas is "provisional," and "subject in all respects to the paramount authority of the United States;" and, the commanding general having ordered that there should be no distinction on account of color as to witnesses, the court can make no distinction. (Paschal's Annot. Const., p. 282, § 3; p. 286, preamble, &c.) *Id.*

CLERK'S COSTS.
    Costs.
    Sheriff, 3.

CLERKS.
    Appeals, 5, 6.
    Attachment, 8.
    Deputy Clerk.

COMMISSION MERCHANTS.
FACTORS AND COMMISSION MERCHANTS.

COLONIZATION LAWS.
The colonization law of Texas and the statutes of the state recognize the right to use water for irrigation purposes. (Paschal's Dig., Arts. 574, 584, 4523, 3945–3952.) *Tolle* v. *Correth*, 362.

COLONIES.
BOUNDARIES, COLONIES.

COMMON LAW.
LAWS, 1.
LIEN, 1.
SEALS AND SCROLLS.
1. The common-law rules of interpretation are necessarily modified by our peculiar statutes. *Paul* v. *Ball*, 10.
2. In adopting the common law, Texas has not adopted any English statute in aid of that system. (Paschal's Dig., Art. 978, Note 418.) *Id.*
3. The 13th section of the IVth article of the constitution of the republic reads as follows: "The congress shall, as early as practicable, introduce, by statute, the common law of England, with such modifications as our circumstances, in their judgment, may require; and in all criminal cases the common law shall be the rule of decision." (Paschal's Dig., Art. IV, sec. 13, Note 138, p. 34.) And the 1st section of the act of 30th January, 1840, reads as follows: " The common law of England (so far as it is not inconsistent with the constitution or the acts of congress now in force) shall, together with such acts, be the rule of decision in this republic, and shall continue in full force until altered or repealed by congress." (Paschal's Dig., Art. 978, Note 418.) The whole system of the common law of England was not adopted by this act, but simply that portion of it which related to the rule of decision. (Foster v. Champlin, 29 Tex., 22.) *Courand* v. *Vollmer*, 397.
4. Before the revolution, on the 2d of March, 1836, the Mexican civil law and the decrees of Mexico and Coahuila and Texas were the rule of action, and these laws remained in force until repealed. *Id.*
5. The common-law act substituted the common law of England in place of the civil law as a rule of decision, and for this only; not as a rule of practice, except when something was to be decided. *Id.*
6. No English statute was ever enforced in this state except such as have been re-enacted. *Id.*
7. The English common law required a bond to be under seal, but this had no application to a bond in Texas. *Id.*
8. There are three important eras in the jurisprudence of Texas: first, the laws of Mexico, which were in force until the revolution in 1836; second, the constitution of 1836, and the statutes introduced prior to 1840, together with the Mexican laws not thereby repealed; third, the common law, introduced by the act of 20th of January, 1840. (Paschal's Dig., Arts. 804, 978, Notes 396, 418.) *Barrett* v. *Kelly*, 477.

COMMON LAW (continued.)

9. This common-law act enabled aliens to come to Texas with their household goods. *Barrett* v. *Kelly*, 477.

10. By the common law an alien could not maintain an action to recover real property. *Id.*

11. An alien might acquire land, but he held it subject to the will of the government, and upon his death the property reverted to the government. *Id.*


COMMUNITY PROPERTY.

1. Where C. and wife settled, as colonists, upon a tract of land in Peters' colony, and made improvements and continued to reside upon it until the death of the wife, in 1848, they acquired such property in the land as created a community interest; and, upon the death of the wife, her interest descended to her children, as her heirs. (Paschal's Dig., Art. 4642, Note 1049.) *Cannon* v. *Murphy*, 405.

2. The title at the death of the wife being inchoate, and the husband, after her death, having perfected the title, by obtaining the certificate of the colony commissioner, and having located upon the land and surveyed, he held the title as a "married man," in trust, for himself and the heirs of the wife; and the purchaser of the whole from the husband took subject to the descent cast upon the children. (Paschal's Dig., p. 76, § 1, Note 215; Arts. 813, 814, 818, Notes 400, 401.) *Id.*

3. By the act of 1856, (Paschal's Dig., Arts. 4646–4652,) upon the death of either husband or wife, the survivor is empowered "to manage, control, and dispose of the community property, and to sue and be sued with regard to the same," under certain circumstances. And where the widow appeared and pleaded, and asked that judgment should only be rendered against her as surety, it is presumed that Mrs. Lane had complied with the requirements of the statute before she made her personal appearance in the cause, especially as there is nothing in the record to show that she was not thus authorized to act. *Womack* v. *Shelton*, 593.


CONDITIONAL SALE.
VENDOR'S LIEN.


CONFEDERATE MONEY.
BAILEE.
CURRENT MONEY.
FIDUCIARY TRUSTS.
VOID LAWS.

1. A note by which the defendant promised to pay "three hundred seventy-five dollars" in Confederate bonds is void. *Prigeon* v. *Smith*, 171.

2. Where cotton was delivered to a bailee to sell at a limited price in Confederate money, and the bailee, failing to get the price, converted it to his own use, the measure of damages (under the peculiar circumstances) was the value of the cotton at the time and interest upon that value until the trial. *Hatcher* v. *Pelham*, 201.

CONFEDERATE MONEY (*continued.*)

3. Confederate treasury notes were promises of the Confederate States to pay a certain number of dollars therein mentioned to bearer, within a specified time, after a treaty of peace between the Confederate States and the United States, and as such they were intended to aid the rebellion, were in violation of the constitution of the United States, and were illegal and void. *Goodman* v. *McGehee*, 252.

4. Confederate money, whether it forms the consideration on the part of the obligor or obligee, is illegal. *Id.*, 253.

5. Where a party deposited a promissory note with a bailee, without any instructions to collect it, and the bailee afterwards received from the maker payment in the treasury notes of the Confederate States, it did not discharge the maker. *Ransom* v. *Alexander*, 443.

6. The Confederate notes were an illegal and treasonable currency, and the attempted payment in such was known to the debtor to be an illegal act. *Id.*

7. The tender of Confederate treasury notes for a fine and costs, during the rebellion, did not entitle the party to his discharge. (Paschal's Dig., Arts. 3167, 3167a, Note 766a.) *Boone* v. *The State*, 557.

8. Where the defendant proved that the consideration of a note was Confederate money, and therefore void, and the proof was that it was given for horses, about the value of which there was no proof, the court (the case was tried by the judge) did right to find the law and the facts for the plaintiff. *Hailey* v. *Pollard*, 604.

9. Where the action was for money had and received, the defendant may show the character of funds in which it was received; and, if in Confederate notes, that fact may be shown. *Rogers & Oliver* v. *Patterson*, 605.

10. A note payable twelve months after a treaty of peace between the Confederate States and the United States cannot be recovered upon the simple averment that it is due and has not been paid. (Shaw v. Trunsler, 30 Tex., 390.) *Thompson* v. *Houston*, 610.

CONFEDERATE POWER.

ORDINANCE.

CONFEDERATE STATES.

CONFEDERATE MONEY, 10.

No compliance with a law, rule, or act, designed to aid in the establishment of the independence of the Confederate States, can furnish any defense against a lawful demand. *Ransom* v. *Alexander*, 443.

CONFESSION OF JUDGMENT.

Article 1477 of Paschal's Digest reads as follows: "Any person, for a *bona fide* debt, may, without process, appear in person, or by attorney, and confess judgment for such debt; but in such cases a petition shall always be filed, and the justness of the debt sworn to by the person in whose favor the judgment is confessed, and when confessed by attorney

CONFESSION OF JUDGMENT (*continued.*)

the warrant of attorney shall be filed." This statute has no reference to a case where process has been regularly served and defense filed. It was intended to avoid fraud. *Schroeder* v. *Fromme*, 602.

CONFESSIONS.

1. Articles 661 and 662 of the Code of Criminal Procedure only admit confessions to be used against the accused where they have been freely made, without compulsion or persuasion; and if the accused was in prison the rule is given in the statute. (Paschal's Dig., Arts. 3126, 3127, 2d ed.) *Greer* v. *The State*, 129.

2. If under a threat a party show the stolen property, his confession that he stole it should not be used against him, unless it be also proved that it was his voluntary confession before a magistrate, or else made after he was cautioned that it might be used against him. (Paschal's Dig., 2d ed., Art. 3127, Note 761.) *Id.*

3. The confessions of a co-defendant, given under torture, that he aided the killing, and his subsequent plea of guilty of murder in the second degree, prove nothing against those who do not confess. *Ake* v. *The State*, 416.

CONSIDERATION.

BAILEE.

CONFEDERATE MONEY.

CONTRACT, 1, 2.

1. Where an administrator sold land to which there was no other title than the location of a rejected and fraudulent certificate, the plea of failure of consideration ought to have been sustained. (Paschal's Dig., Art. 227, Note 288.) *Roehl* v. *Pleasants*, 45.

2. The principle of *caveat emptor* in judicial sales has no application to such a case. It was simply a question of justice, where the estate parted with nothing and the purchaser got nothing. (Paschal's Dig., Art. 1333, Note 499.) *Id.*

3. Neither fraud nor mistake, the suppression of truth nor the suggestion of a falsehood, were matters of inquiry. The law having made it penal to deal in such certificates, to locate them, or survey them, and the constitution having perpetually barred them as claims against the government, the courts cannot respect the sales of them by any person under any proceeding or for any purpose. (Paschal's Dig., p. 65, secs. 20, 21, Note 197; p. 71, Art. XI, secs. 1, 2, Note 208.) *Id.*

4. A promise to pay a railroad company a sum of money when it shall have constructed the road from L. to V., and kept the same in operation, conveying passengers and freight between said points for the period of one year, is for a valuable consideration and binding. *Rose* v. *The San Antonio and Mexican Gulf Railroad Company*, 49.

5. The party making the promise is bound to nothing until the promisee, within a reasonable time, engages to do, or else does, or begins to do, the thing which is the condition of the first promise. Until such

CONSIDERATION (*continued.*)

engagement or such doing the promisor may withdraw his promise, because there is no mutuality, and therefore no consideration for it. But after an engagement on the part of the promisee, which is sufficient to bind him, then the promisor is bound also, because there is now a promise for a promise, with entire mutuality of obligation. So, if the promisee begin to do the thing in a way which binds him to complete it, here also is a mutuality of obligation. But if without any promise whatever the promisee does the thing required, then the promisor is bound on another ground. The thing done is itself a sufficient and a completed consideration, and the original promise, to do something if the other party would do something, is a continuing promise until the other party does the thing required of him. (1 Pars. on Cont., book II, chap. 1, sec. 9, pp. 375, 376, ed. of 1857.) *Rose* v. *The San Antonio and Mexican Gulf Railroad Company,* 49.

6. If the benefit accrue to him who makes the promise, or if any loss or disadvantage accrue to him to whom it is made, at the request or on motion of the promisor, although without benefit to the prisoner, in either case the consideration is sufficient to sustain assumpsit. (Paschal's Dig., Art. 220, Notes 283, 290.) *Id.*

7. The failure of a mortgagee to contest the administrator's sale of mortgaged property is a sufficient consideration for a note. *Bender* v. *Pryor,* 341.

8. The defendant received the notes after his return in 1866. He remarked to his agent that he would have no difference with him; but that if the defendant did not make it right, as the bailee had told him he must do, he should always think he ought. This is no acquiescence. An acquiescence, where there was no consideration for it, would have to be very affirmatively proved. *Ransom* v. *Alexander,* 443.

9. Where the defendant proved that the consideration of a note was Confederate money, and therefore void, and the proof was that it was given for horses, about the value of which there was no proof, the court (the case was tried by the judge) did right to find the law and the facts for the plaintiff. *Hailey* v. *Pollard,* 604.

CONSOLIDATION.

1. To justify a consolidation of the suits, under article 1451 of Paschal's Digest, they must be between the same parties, the causes of action must be the same, and the subjects must be such as could be joined. *Raymond* v. *Cook,* 374.

2. A claim case under the statute (Paschal's Dig., Art. 5310, Note 1155) cannot be consolidated with an injunction suit, though all the parties in the injunction suit (save the wife of one defendant in the execution) are parties to the execution. But if, after the consolidation, the claimant dismiss the claim suit without objection, the erroneous consolidation is no longer in the record, the claim bond is no longer before the court, and the cause must be tried upon its equities. *Id.*

## 720 INDEX.

### CONSTITUTION OF TEXAS.
COMMON LAW.
COUNTY COURT, 2, 6.
HOMESTEAD, 1, 5.
STAY LAW, 4.

### CONSTITUTION OF THE UNITED STATES.
AB INITIO.
CONFEDERATE MONEY, 3.
SLAVERY.

### CONSTITUTIONAL LAW.
SLAVERY.

### CONSTRUCTION OF STATUTES.
BILLS, NOTES, &c.
LICENSE.

1. Two statutes, strictly in *pari materia*, enacted at the same session, are considered as one statute, and must be construed together; and each must be upheld, unless their provisions are absolutely repugnant to each other. And repeals by implication are not favored. *Napier* v. *Hodges*, 287.

2. There is no repugnancy between the act of 27th October, 1866, and that of 6th November thereafter. In the first, it was intended to guard against the abuses of the privilege of retailing, by requiring a bond with stringent conditions, and making it a misdemeanor for their violation. In the second, the main object seems to have been to raise revenue upon the subject of taxation, which it was supposed by the legislature would in all probability prove a profitable source of revenue. *Id.*

### CONTINUANCE.

1. Where an affidavit for a continuance neither shows justification nor such facts as would reduce the killing to a lower degree of homicide, to overrule it is no error. (Paschal's Dig., Art. 2987, Note 736.) *Halbert* v. *The State*, 357.

2. Unless an exception be taken to the overruling a motion for a continuance, this court cannot properly revise the action upon the affidavit. (Paschal's Dig., Arts. 1503, 2987, Notes 595, 736.) *Cocker* v. *The State*, 498.

3. A motion for a continuance, to get witnesses to prove words of provocation, preceding an aggravated assault, was properly overruled. (Paschal's Dig., Art. 2986, Note 736.) *Boone* v. *The State*, 557.

### CONTRACT.
BAILEE.
BILLS, NOTES, &c.
CONFEDERATE MONEY.
MORTGAGE.

1. Where W. had agreed to deliver one hundred bales of cotton at a warehouse, for which F. & Co. promised to pay him 20 cents a pound,

CONTRACT (*continued.*)

W. had no right to demand payment as the cotton was delivered, but it was his duty to deliver the whole at the warehouse of the third party, and not until then had he the right to demand payment. *Kenigsberger* v. *Wingate*, 42.

2. Where a party is legally bound to perform a contract, which he refuses to perform for reasons which he had no right to exact, and a third person executes to him a note for no other consideration except to secure the performance of an obligation already binding, the note is without consideration and not recoverable. *Id.*

3. A promise to pay a railroad company a sum of money when it shall have constructed the road from L. to V., and kept the same in operation, conveying passengers and freight between said points for the period of one year, is for a valuable consideration and binding. *Rose* v. *The San Antonio and Mexican Gulf Railroad Company*, 49.

4. The party making the promise is bound to nothing until the promisee, within a reasonable time, engages to do, or else does, or begins to do, the thing which is the condition of the first promise. Until such engagement or such doing the promisor may withdraw his promise, because there is no mutuality, and therefore no consideration for it. But after an engagement on the part of the promisee, which is sufficient to bind him, then the promisor is bound also, because there is now a promise for a promise, with entire mutuality of obligation. So, if the promisee begin to do the thing in a way which binds him to complete it, here also is a mutuality of obligation. But if, without any promise whatever, the promisee does the thing required, then the promisor is bound on another ground. The thing done is itself a sufficient and a completed consideration, and the original promise, to do something if the other party would do something, is a continuing promise until the other party does the thing required of him. (1 Pars. on Cont., book II, chap. 1, sec. 9, pp. 375, 376, ed. of 1857.) *Id.*

5. If the benefit accrue to him who makes the promise, or if any loss or disadvantage accrue to him to whom it is made, at the request or on motion of the promisor, although without benefit to the promisor, in either case the consideration is sufficient to sustain assumpsit. (Paschal's Dig., Art. 220, Notes 283, 290.) *Id.*

6. If any part of the entire consideration for a promise, or any part of an entire promise, be illegal, whether by statute or at common law, the whole contract is void, and every executory contract, the consideration of which is illegal on either side, is void. *Goodman* v. *McGehee*, 252.

7. Parol evidence to show that a contract is founded on an illegal consideration is admissible. *Id.*, 253.

8. If a contract be illegal, it may be avoided by a proper plea, even though it be a specialty, and the illegality be not apparent on the face of the instrument. [LINDSAY, J., concurred, but said: "I cannot agree that a contract, the consideration or performance of which is illegal, is void."] *Id.*

9. A party who introduces a merchant into market, and by letter says, xxxi—46

CONTRACT (*continued.*)

"any favor you may show Mr. R., in introducing him to the different houses, so as he may be able to fill his orders, will be highly appreciated by him, and will be indorsed by me for the amount of his purchases," is liable, as guantor, to those who acted upon the letter, if he be duly informed that his guaranty was accepted, and of the amount advanced upon the guaranty. *Wheeler, Geiger & Co.* v. *Mayfield,* 395.

10. An agreement to erect a hotel upon the lot purchased of the plaintiff is no consideration for a parol contract to forbear suit for ten years. *Hogan* v. *Crawford,* 633.

11. Where the defendant objected to a witness, to prove damages in not finishing work according to contract, on the ground that an architect was to determine the measure of damages, and the architect had not been called, but the contract only stipulated that the payments should be made on the certificate of the architect that he approved the work, the objection to the evidence was not well taken. *Bledsoe* v. *Gonzales County,* 636.

CONVEYANCES.

1. Where the wife voluntarily joins her husband in a conveyance of the homestead, from that time it ceases to be the homestead. (Paschal's Dig., Art. 1003, Note 427.) *Houghton* v. *Marshall,* 196.

2. The vendees of the homestead stand in the same relation to the original vendor as the husband and wife who conveyed stood. And if there be a balance due, the vendee, upon discharging it, becomes the absolute owner. *Id.*

3. A voluntary deed from a husband to his wife is void as to existing creditors and as to subsequent creditors: certainly as to co-sureties, who pay the existing debt. (Paschal's Dig., Art. 3878, Notes 906–909.) *Raymond* v. *Cook,* 374.

4. Where a voluntary conveyance is intentionally made to defraud creditors, it seems perfectly reasonable that it should be held void as to all subsequent as well as prior creditors on account of ill faith; as to subsequent creditors, the fraudulent intention must be proved. *Id.*

CORPORATIONS.

COUNTIES.

RAILROADS.

COSTS.

SHERIFF.

1. Although the clerk's costs are taxed upon an execution, between suitors he is not a party to such execution, nor has he any right to control it. *De la Garza* v. *Carolan,* 388.

2. A clerk may demand security for costs, and, upon the termination of suits, he may issue executions in his own favor, for his costs, against the parties liable; and in such executions he is entitled to summary motions. (Paschal's Dig., Arts. 3781, 3796, 3831, 5106.) *Id.*

COSTS (*continued.*)

3. The plaintiff and defendant in all suits are immediately and directly liable to the clerk for the costs incurred by them respectively. *De la Garza* v. *Carolan*, 388.

COUNTIES.

1. Under the 1st and 2d sections of the act to incorporate the several counties of the state, passed 11th May, 1846, (Paschal's Dig., Arts. 1044, 1045, Note 430,) the chief justice has no right to bring a suit in his own name for the use of the county. *De la Garza* v. *Bexar County*, 484.

2. See the facts as to the form, which was held to be a suit in the name of the chief justice, and not in the name of the county. *Id.*

COUNTY COURT.

ADMINISTRATOR, 3–6.

ESTATES.

1. The county court can only order a sale of property where it is necessary to pay debts. *Hamblin* v. *Warnecke*, 91.

2. As the homestead is exempt from forced sale by the 22d section of the 7th article of the constitution, neither the county court nor a court of general jurisdiction has the right to order a forced sale of it. (Paschal's Dig., p. 65, Note 198.) *Id.*

3. Under the 21st section of the act of 1866, organizing the county courts and conferring on them limited jurisdiction in certain cases, the right of appeal is given to the district court. (Acts 11th Leg., p. 48, sec. 21.) But the appeal had to be prosecuted within ten days, or a better excuse given than that the party did not know the result of the suit. *Wallerath* v. *Kapp*, 359.

4. The constitution of 1866 gives to the district court power to issue the writ of *certiorari* and all other writs necessary to their general supervision and control over inferior tribunals. (Paschal's Dig., Art. IV, sec. 6, p. 935.) But the legislature intended that an appeal should be the usual remedy. *Id.*

5. The writ of *certiorari* is not strictly a writ of right in the sense that a party has an absolute right to have it issued for his benefit, but it is issued in the sound discretion of the court, and the court has the same right to dismiss it if it be wanting in merits. *Id.*

6. The county court act limits appeals coming from the county court, through the district court to this court, to controversies amounting to $200 and over. (Acts of 1866, sec. 21, p. 48.) *Id.*

COUNTY TREASURER.

1. The 9th section of the act of 13th May, 1846, reads as follows: "The county treasurer shall receive and may retain in his hands such commission, not exceeding five per centum, upon the amount received and disbursed by him, as the county court in their discretion may allow." (Paschal's Dig., Art. 1103.) The maximum the treasurer can charge is five per cent., and the county court can curtail this amount. *Crossland* v. *Cherokee County*, 141.

COUNTY TREASURER (*continued.*)

    2. The act organizing the county of Cherokee gave the county commissioners exclusive control of the funds received from the sale of lots. *Crossland* v. *Cherokee County*, 141.

CRIMINAL CODE.

    INDICTMENT.
    GAMING.
    LICENSE.
    RAPE.

    1. Article 772 of the Penal Code reads as follows: "If any carrier, to whom money, goods, or other property shall have been delivered, to be carried by him; or if any other person, who shall be intrusted with such property, shall embezzle or fraudulently convert to his own use any such money, goods, or property, either in the mass, as the same were delivered, or otherwise, he shall be deemed guilty of theft, and shall be punished as prescribed by articles 756 or 757, according to the amount of the value so embezzled or misapplied." (Paschal's Dig., Art. 2423.) *Held*, that where money was delivered to the wife of the accused, to be carried to a third party, which money the husband converted to his own use and failed to pay on demand, he was guilty of theft within the meaning of this article. *De Gaultie* v. *The State*, 32.

    2. But the indictment having charged that De G. stole the money from the "*person*" of B., proof that the money was delivered to the wife in New Orleans to hand to H. in Houston does not sustain the charge of theft from the person. *Id.*, 33.

    3. The facts only constituted a breach of trust at common law; being a purely statutory offense, the *allegata* and *probata* should agree. *Id.*

    4. To deliberately shoot at a man with a six-shooter three times and wound him is an offense within the statute. *Gonzales* v. *The State*, 495.

    5. There are certain houses denominated "public houses," and there are certain places considered as "public places" in the statute. If either of such "houses" or "places" is averred in the indictment, the allegation is sufficient. But if the houses or places mentioned in the indictment are not designated and charged as enumerated in the code, then sufficient facts must be stated and averred to show, by the charge itself, that the place designated is a "public place." (Paschal's Dig., Art. 2044, Note 640.) *The State* v. *Fuller*, 559.

    6. The 392d article of the Penal Code declares the punishment for fornication. But articles 293, 294, and 295 are confined to adultery alone; and fornication is nowhere defined in the code. (Paschal's Dig., Arts. 2022–2025.) *The State* v. *Foster*, 578.

    7. No person can be punished unless the offense is defined and the penalty affixed by the written law of the State. (Paschal's Dig., Art. 1605.) *Id.*

CRIMINAL LAW.

    CRIMINAL CODE.

CRIMINAL PROCEDURE.

    BAIL BOND.

    CHARGE OF THE COURT.

    CONFESSIONS.

    CONTINUANCE.

    DYING DECLARATIONS.

    FORFEITED RECOGNIZANCE, 1–3.

    INDICTMENT, 9.

1. When the state appeals from a judgment quashing an indictment, unless the defendant enter into recognizance the supreme court has no jurisdiction, and the appeal will be dismissed. (Paschal's Dig., Art. 3187, Note 771.) *The State* v. *Bledsoe*, 39.

2. When a defendant appeals in a case of misdemeanor, he must either be committed to jail or enter into a recognizance to appear before the district court to abide the judgment of the supreme court. (Paschal's Dig., Art. 3186, Note 770.) *Adler* v. *The State*, 61.

3. The requirements of the recognizance are prescribed in article 263 of the code; therefore it must state the time, place, and the offense, as well as the court in which the party is required to appear. (Paschal's Dig., Art. 2731, div. 3, Note 708; Payne v. The State, 30 Tex., 397; Wilson v. The State, 25 Tex., 171.) *Id.*

4. Where the defendant was convicted of an offense and appealed, but the recognizance did not state the offense, nor any offense known to the law, this court has no jurisdiction, and the appeal was dismissed. (Paschal's Dig., Art. 2731, Note 708; Horton v. The State, 30 Tex., 191.) *Breeding* v. *The State*, 94.

5. The 609th article of the Code of Criminal Procedure reads as follows: "If the jury shall find any person guilty of murder, they shall also find by their verdict whether it is of the first or second degree; and if any person shall plead guilty to an indictment for murder, a jury shall be summoned to find of what degree of murder he is guilty, and, in either case, if they shall find the offense of murder to be of the second degree, they shall also find the punishment." Where the indictment was in the general form, charging the offense of murder, and the verdict was, "We the jury find the defendant guilty," it was not a response to this article, (Paschal's Dig., Art. 2268,) and should have been set aside. *Isbell* v. *The State*, 138.

6. To justify a denial of bail there must be that evidence of deliberate malice, or those circumstances which prove murder in the first degree. (Paschal's Dig., Art. 2267, Note 672.) *Ex parte Cooper*, 185.

7. As it would be proper to detain the accused until an indictment could be procured to suit the facts, the case was remanded to give an opportunity for an affidavit, should that be desired. (Paschal's Dig., Art. 2976.) *Marshall* v. *The State*, 471.

8. By the 726th article of the Code of Criminal Procedure notice of appeal must be given and entered of record in open court. (Paschal's Dig., Art. 3190, Note 772.) *Hicklin* v. *The State*, 492.

9. Article 1490 of Paschal's Digest was intended to apply to all cases

CRIMINAL PROCEDURE (*continued.*)

of appeal, criminal as well as civil, and there is to be found in the Code of Criminal Procedure no provision changing its terms or provisions when applied to criminal cases. On the contrary, the rules of practice in criminal cases seem to require its observance. (Paschal's Dig., Arts. 3193, 3196, 3197, 3198, Note 773. *Hicklin* v. *The State*, 492.

10. In this case the recognizance for appeal did not comply with the 263d article of the code, but only with the 722d article. (Paschal's Dig., Arts. 2731, 3186, Notes 708, 770.) [And see this point decided in The State v. Stout, 28 Tex., 327; Horton v. The State, 30 Tex., 191; Payne v. The State, 30 Tex., 397; Bennett v. The State, 30 Tex., 446.] *Id.*

11. The tender of Confederate treasury notes for a fine and costs, during the rebellion, did not entitle the party to his discharge. (Paschal's Dig., Arts. 3167, 3167a, Note 766a.) *Boone* v. *The State*, 557.

CURRENT MONEY.

1. Where the defendant himself requested the court to charge the jury that they would find the meaning of the words "current money," and, if the deposit was Confederate money, they would find the value of the same and render a verdict accordingly, the defendant will not be heard to complain that the court had given a charge of similar import. *Ziegler* v. *Stefanek*, 29.

2. The court does not judicially know that a certificate of deposit dated May 12, 1862, for $300, deposited in "current money," meant Confederate treasury notes. *Id.*

DAMAGES.

1. In a suit upon a warranty of a chattel, the measure of damages is ordinarily the purchase-money and interest, and the fact that the payment was made in another chattel at an agreed price is the same as if made in money. *Goss* v. *Dysant*, 186.

2. Where, in consideration of a tract of land sold, the defendant gave his note for four thousand pounds of picked cotton, which he failed to pay, the measure of damages was the highest market value of the cotton from the maturity of the note until the day of trial. (Paschal's Dig., Note 283, p. 144.) *Brasher* v. *Davidson*, 190.

3. If in suing out an attachment the plaintiff was not actuated by malice towards the defendant, nor other motive than a desire to secure the payment of the debt sued upon, the rule of damages, if the attachment be dissolved, is the damages actually sustained. (Paschal's Dig., Art. 3446, Note 797.) *Clark* v. *Wilcox*, 322.

DEMURRER.

Where no notice is taken of the demurrer, it is presumed to be abandoned. *Myers* v. *The State*, 173.

DEPOSITIONS.

1. Where depositions had been taken in Mexico by "a vice commercial agent," the objection goes to "the manner of taking depositions," and it

DEPOSITIONS (*continued.*)

must be in writing. (Paschal's Dig., Art. 3742, Note 851.) *Pauska* v. *Daus*, 67.

2. The object of the rule is to prevent technical objections and surprise. *Id.*, 68.

DEPUTY CLERK.

The deputy clerk, *ex virtute officii*, may perform all official acts in the name of the principal clerk which the principal himself can perform in discharging the duties of clerk. Where duties are imposed upon the clerk by statutes, not necessarily belonging to his office as clerk, the rule is different. (Paschal's Dig., Arts. 142, 496, 501.) *Harrison* v. *Harwood*, 651.

DESCENT AND DISTRIBUTION.

HEIRS.

Where a grandfather died intestate, a distributive share of his estate passed to his two grandchildren, born of a deceased daughter. Where one of these children died, leaving only its father and its brother (or sister) surviving, its interest descended and passed in equal proportions to that father and brother (or sister.) And when the other child died its moiety of the distributive share in the grandfather's estate passed absolutely to the surviving father, thus substituting him to all the rights of the descendants of the daughter of R. J. Chandler, deceased. *Chandler* v. *Copeland*, 151.

DISCOUNT AND SET-OFF.

RECONVENTION.

DISTRICT COURT.

ABATEMENT.

CONFESSION OF JUDGMENT.

CONTINUANCE.

NON EST FACTUM.

PROCESS.

RECONVENTION.

SERVICE.

WRIT OF ERROR.

1. Where the cause of action accrues upon the performance by the payee, the statute of limitation did not run until the completion of such condition. (Paschal's Dig., Art. 4604, Note 1017. *Rose* v. *San Antonio and Mexican Gulf Railroad Company*, 49.

2. Where there was an exception to excluding the deposition of a certain witness, the bill of exceptions must show the materiality of the evidence. (Paschal's Dig., Art. 217, Note 280.) *Id.*

3. Articles 661 and 662 of the Code of Criminal Procedure only admit confessions to be used against the accused where they have been freely made, without compulsion or persuasion; and if the accused was in prison

DISTRICT COURT (*continued.*)

the rule is given in the statute. (Paschal's Dig., Arts. 3126, 3127, 2d ed.) *Greer* v. *The State*, 129.

4. If under a threat a party show the stolen property, his confession that he stole it should not be used against him, unless it be also proved that it was his voluntary confession before a magistrate, or else made after he was cautioned that it might be used against him. (Paschal's Dig., 2d ed., Art. 3127, Note 761.) *Id.*

5. A petition based upon a note should aver who executed or made and delivered it. (Paschal's Dig., Art. 1427, Note 537.) *Belcher* v. *Wilson*, 139.

6. The 140th section of the district court act, in reference to the service of a writ of error, reads as follows: "And if the party is a nonresident of the state or cannot be found, the citation may be served on the attorney of record." (Paschal's Dig., Art. 1495, Note 587, p. 371.) The fact to authorize service on the attorney must be averred in the petition. The mere fact that the defendant cannot be found is not enough. *McLamore* v. *Heffner*, 189.

7. The statute requires the petitioner to plainly and distinctly set forth the cause of action. If the party sue in his representative character, he must aver such facts as show his authority. (Paschal's Dig., Art. 1427, Notes 526, 527.) *Beal* v. *Batte*, 371.

8. The statute requires the place of holding the court to be stated in the writ, and it also requires the sheriff to serve the defendant with a copy. (Paschal's Dig., Arts. 1431, 1433.) *Whittenberg* v. *Newton*, 474.

9. A defendant may be examined as a witness against himself, but not against his co-defendant. (Paschal's Dig., Art. 3754, Note 857.) *Rogers & Oliver* v. *Patterson*, 605.

10. The 1st section of the act of 1846, to regulate proceedings in the district court, declares that "no person who is an inhabitant of this state shall be sued out of the county where he has his domicil," with eleven exceptions. (Paschal's Dig., Art. 1423, Note 533.) Where it was clearly proved that the defendant's domicil was in the county of N., and he was sued in the county of C., the fact that he did business in the county of C. did not give jurisdiction, and the plea should have been sustained. *Blucher* v. *Milsted*, 621.

DIVORCE AND ALIMONY.

1. In a divorce case the jury found the facts which constituted a good cause for divorce and the marriage, but the court refused to enter a decree of divorce. The supreme court reversed the judgment, and upon the verdict and the evidence rendered a decree of divorce, and also for the partition of the property between the parties. *Rice* v. *Rice*, 175.

2. The divorce having been granted on the part of the wife, the court decreed one-half of the community property to the wife, including the homestead, and the other half to their only child. This was error. Whether the husband could thus be divested of all title in the community property or not, it was error to deprive him of all interest in the com-

DIVORCE AND ALIMONY (*continued.*)

munity property. (Paschal's Dig., Art. 3451, Note 801.) *Craig* v. *Craig*, 203.

3. In a divorce suit the service was by publication. The return of the sheriff did not show that the citation was published four successive weeks; but the court took jurisdiction, tried the case, granted the divorce, and rendered a judgment for costs. On this judgment the land in controversy was sold, and the defendant derived that title. Six years afterwards the court allowed the sheriff to amend his return, and five years later the court dismissed the divorce suit: *Held*, that the divorce judgment was void, and the sheriff's sale gave no title. *Perdew* v. *Davis*, 488.

4. The 8th section of the act of 6th January 1841, concerning divorce and alimony, reads as follows: "If the wife, whether complainant or defendant, has not a sufficient income for her maintenance during the pendency of the suit for a divorce, the judge may allow her a sum for her support proportional to the means of the husband, until a final decree shall be made in the case." (Paschal's Dig., Art. 3456, Note 802.) Where an order for alimony was made under this section, with which the husband failed to comply, and at the trial the jury found against the wife's application for a divorce, an execution cannot be issued to enforce the allowance. *O'Haley* v. *O'Haley*, 502.

5. The order for alimony is stated on the ground that the wife's complaint is true; if the jury find against her, the order and all its consequences fall to the ground. *Id.*

DOMICIL.

DISTRICT COURT, 10.

DYING DECLARATIONS.

1. The admissibility of dying declarations is too firmly established to be called in question. At common law, when a person expects to die from wounds inflicted, and is in constant expectation of dissolution, his declarations as to the circumstances of his injuries have been constantly received as competent evidence. *Benavides* v. *The State*, 579.

2. The 660th article of the Code of Criminal Procedure, in relation to dying declarations, states no new rule. (Paschal's Dig., Art. 3125, Note 759.) It is only necessary to establish the four requisites of the statute: Approaching death; voluntary statement without persuasion, not in answer to interrogatories; and sound mind. *Id.*

EMANCIPATION.*

SLAVERY.

* This note ought to have appeared in the history of the case: "I asked Mr. Lincoln what would be the *status* of that portion of the slave population in the Confederate States which had not then (31st January, 1865) become free under his proclamation; or, in other words, what effect that proclamation would have upon the entire black population? Would it be held to emancipate the whole, or only those who had, at the time the war ended, become actually free under it?

"Mr. Lincoln said that was a judicial question. How the courts would decide it he

EMBEZZLEMENT.
  CRIMINAL CODE, 1–3.

EQUITABLE TITLE.
  EQUITY.

EQUITY.

1. Mistakes, as well as frauds, are of equitable jurisdiction.  *Emerson* v. *Navarro*, 334.

2. Mistakes of law are always relievable in a court of equity.  *Id.*

3. Where a party sold a third of a league survey, both parties believing that the survey contained that quantity, but the survey lapped upon an older title, so that there was a failure of title for over two hundred acres, the vendee had the right to recover back the purchase-money in proportion to the loss.  *Id.*

4. An equitable claimant to land who is not in possession has no right to invoke the aid of a court of equity to quiet his title and remove the cloud cast over it by other claimants.  *Herrington* v. *Williams*, 448.

5. To authorize a bill *quia timet*, or a bill of peace, the party must not only hold the legal title, but he must be in actual possession of the land or some part of it, and have some reasonable grounds of the apprehension of the disturbance of that right and of that possession by other parties. *Id.*

6. There is no doubt a person in possession, holding the legal title, may be entitled to a decree for the release of all mere equitable titles set up by adversary claimants. The reason is, that equity, acting upon the maxim, it must follow the law wherever conscience is not violated, will not deprive an innocent purchaser of any legal advantage which he may have obtained in the business and negotiations of life.  *Id.*

7. Although our system authorizes the blending of the principles of law and of equity in administrative justice, it neither requires nor sanctions the blending of various and contradictory rights and causes of action in the same suit.  *Id.*, 449.

---

did not know, and could give no answer. His own opinion was, that as the proclamation was a *war measure*, and would have effect only from its being an exercise of the war power, as soon as the war ceased, it would be inoperative in the future. It would be held to apply only to such slaves as had come under its operation while it was in active exercise." (The War between the States, by Alexander H. Stevens, vol. II, pp. 610, 611.)

Mr. Seward confirmed this view, and produced the XIIIth constitutional amendment, then just published. "He said this was done as a *war measure*. If the war were then to cease, it would probably not be adopted by a number of states sufficient to make it a part of the constitution; but presented the case in such a light as clearly showed his object to be, to impress upon the minds of the commissioners, that if the war should not cease, this, as a war measure, would be adopted by a sufficient number of states to become a part of the constitution, and, without saying it in direct words, left the inference very clearly to be perceived by the commissioners that his opinion was, if the Confederate States would abandon the war, they could of themselves defeat this amendment by voting it down as members of the Union. The whole number of States, it was said, being thirty-six, any ten of them could defeat this proposed amendment." (*Id.*, 611.) The history of that conference, so far as it has been published officially, is printed in the same volume, Appendix R, p. 791, *et seq.*

EQUITY (*continued.*)

8. Since the adoption of the registry acts of the state, a junior equity in land, acquired by purchase for a valuable consideration without notice, actual or constructive, may be used offensively to evict a tenant in possession under a prior equity. For, although a party plaintiff in an action of trespass to try title is required to recover upon the strength of his own title, yet it may be the strength of an equitable as well as of a legal title. *Herrington* v. *Williams*, 449.

9. Where an equitable title had been recorded in the county of F., in which the land was situated, but it was afterwards cut off into the county of C., the record was notice to a subsequent purchaser at administrator's sale. *Id.*

10. Purchasers at sheriffs' sales are charged with notice of recorded equitable covenants to convey by the defendants in execution. *Id.*

11. It is matter of very grave doubt whether the probate court, which derives all its authority from the statutes, is vested with power to order the sale of an equity, which is a mere chose in action. The statutes provide that the probate court may order the sale of property belonging to the estate for the payment of debts. And the administrator may enforce by suit the claims of the estate to property, and recover possession of it. And certainly a mere title bond has to be enforced by the courts of the country, unless the obligor choose voluntarily to discharge such an obligation. It may be well doubted, therefore, whether such an equity is the subject of sale under an order of the probate court. *Id.*

12. An equitable claimant may give notice of his title by registration. (Paschal's Dig., Art. 4989.) But this creates no new rule of litigation between mere equitable claimants. *Id.*

13. " Where the purchase is of a mere equity, which owes its existence to a court of chancery, and cannot be enforced without its assistance, all reasons for departing from the general maxim, no one can transfer to another a greater or more right than he has, is at an end; and the right acquired by a vendee under the sale is necessarily limited to that of the vendor. In other words, equity deals with the purchaser of an equitable title as the law deals with the purchaser of a legal title, and regards the purchase as incapable of either defeating rights or creating them. When, therefore, a purchaser buys an equitable estate with a knowledge of its real character, and without obtaining the legal title, he can found no claim on the mere fact of the purchase, and must stand or fall by the title of the vendor." In this condition is the purchaser at the administrator's sale in this case. He purchased, to say the most of it, an equitable title, and took it subject to all existing equities. *Id.*

14. The intestate of the administrator had passed the equitable title out of himself for at least two hundred acres of the land, and, whether it had descended by a regular transmission to the tenant in posession or not, it was sufficient for him, as a shield of defense to his possession, to show upon the trial that the prior and better equity had passed out of the intestate in his lifetime, and was lodged elsewhere than in the keeping of the purchaser at the administrator's sale. *Id.*

EQUITY (*continued.*)

15. In an action of trespass to try title an equitable title may be wielded as a weapon of defense as well as of offense. *Herrington* v. *Williams*, 450.

16. Where the plaintiff sued upon a note for $1,800, and the defendant pleaded that the consideration was the loan of Confederate treasury notes, but the record showed that afterwards a judgment, "by consent of parties," was rendered for $475, the court refused to disturb the judgment, and failed to consider the petition to enjoin it. *Schroeder* v. *Frömme*, 602.

17. Where the court is clearly satisfied that the equity of the case has been reached, the verdict will not be disturbed. *Atkinson* v. *I. N. & M. A. Wilson*, 643.

ERROR.

WRITS OF ERROR.

ESTATES.

1. A claim against an estate, which has been presented to the administrator and rejected, is evidence, not of the truth of the claim, but of the fact that the claim has been rejected, so as to authorize suit. (Paschal's Dig., Art. 1310, Note 484.) *Goss* v. *Dysant*, 186.

2. The claims against estates of deceased persons, required to be sworn to by the 49th section of the act of 1848, are "claims for money." (Paschal's Dig., Art. 1309, Note 483.) *Simpson* v. *P. & E. Reily & Co.*, 298.

3. Where a creditor had presented his account against an estate, making no reference to any mortgage or lien, which account was allowed and approved, and afterwards the creditor presented a petition to have a lien declared, (see statement of the case,) it was *held*, that the previous allowance of the claim for money gave the county court jurisdiction of a hypothecation of collateral securities and of a constructive mortgage on land and chattels. *Id.*

4. The 59th section of the act of 1848 (Paschal's Dig., Art. 1319, Note 493) negatives the idea that a mortgage is a claim for money; it refers to a claim secured by a mortgage, which claim has been allowed; not which mortgage has been allowed. *Id.*

5. The administrator is required to make all proper defenses, and he can plead *non est factum*, or any other plea that would defeat the request of the plaintiff. *Id.*

ESTRAYS.

1. In an indictment for using estrays it is necessary to aver that it was done "without complying with the laws regulating estrays." (Paschal's Dig., Art. 2441, Note 693.) *The Estray Cases*, 205.

2. By the acts of 25th February and 7th December, 1863, the estray laws were suspended "during the war, and until six months after a treaty of peace shall be concluded." (Paschal's Dig., Arts. 3701, 3702. See

ESTRAYS (*continued*.)

the Estray Cases, 28 Tex., 632, and 30 Tex., 515.) *Clark* v. *The State*, 574.

3. The court judicially knows when the war ceased in Texas. The formal surrender of the belligerent force in this state took place on the 28th of May, 1865. The six .months had not elapsed on the 15th of September, 1865, when this offense of "taking up" and "using" an estray is alleged to have been committed. *Id.*

4. Notwithstanding the law of estraying was suspended, the penal statute against "taking up" and "using" an estray, coming within the meaning of an estray, was not suspended and held in abeyance along with the methods of proceeding provided for estraying. *Id.*, 575.


EUNUCH.

A gelding is not a horse, but a eunuch. *Jordt* v. *The State*, 571.


EVIDENCE.

ESTRAYS, 4.
HOMICIDE, 5–9.
INTERROGATORIES.
MORTGAGE, 2.
VENDOR'S LIEN, 1.

1. The court does not judicially know that a certificate of deposit dated May 12, 1862, for $300, deposited in "current money," meant Confederate treasury notes. *Ziegler* v. *Stefanek*, 29.

2. Where a woman was indicted for *crim. con.* with a man, the declarations of the seducer are but hearsay evidence, and should not be admitted. *Spencer* v. *The State*, 64.

3. The seducer is not a competent witness against the woman seduced. *Id.*

4. Where depositions had been taken in Mexico by "a vice commercial agent," the objection goes to "the manner of taking depositions," and it must be in writing. (Paschal's Dig., Art. 3742, Note 851.) *Pauska* v. *Daus*, 67.

5. The object of the rule is to prevent technical objections and surprise. *Id.*, 68.

6. If the authority of the executor or administrator be denied, he must produce the letters of administration, duly signed and sealed, or else the certificate of the clerk that such letters have issued. *Werbiskie* v. *McManus*, 116.

7. The best evidence of accounts which it is in the power of the party to produce, by ordinary or extraordinary means, shall be exhausted before books of account are admissible. *Id.*

8. Beside the oath of the party touching the correctness of his books, it shall be proved by others who are acquainted with the party, among his neighbors and customers, for fair dealing, that his reputation as an honest man and correct book-keeper is untarnished. (Paschal's Dig., p. 601, Note 832.) *Id.*, 117.

EVIDENCE (*continued.*)

9. Parol evidence to show that a contract is founded on an illegal consideration is admissible. *Goodman* v. *McGehee*, 252.

10. Where the calls in a deed are clear and explicit, and the monuments can be found by the ordinary rules of interpretation, parol proof cannot be allowed to vary the legal import of the words and to change the natural position of the lines called for. *Müller* v. *Landa*, 265.

11. Parol evidence is admissible to explain a writing which needs explanation, and when the evidence is consistent with the writing it is unobjectionable. *Bender* v. *Pryor*, 341.

12. Where the plaintiff declared upon an original partnership contract, which he set out in words, and added the averment that it had been so altered as to make it terminate a year sooner than was intended, and the defendant in his answer admitted the facts and terms of partnership, except as to the alteration, the defendant would have been entitled to read the contract without proving its execution; but, having introduced one of the subscribing witnesses to prove its existence and contents, and offered his own affidavit to prove its destruction by fire, the court rightly excluded the parol evidence, *Ricks* v. *Wofford*, 411.

13. The real issue was as to the alteration of the contract; and, the plaintiff having averred his own possession of it and its destruction, parol evidence of its contents, under the circumstances, was inadmissible. *Id.*

14. The admissibility of dying declarations is too firmly established to be called in question. At common law, when a person expects to die from wounds inflicted, and is in constant expectation of dissolution, his declarations as to the circumstances of his injuries have been constantly received as competent evidence. *Benavides* v. *The State*, 579.

15. The 660th article of the Code of Criminal Procedure, in relation to dying declarations, states no new rule. (Paschal's Dig., Art. 3125, Note 759.) It is only necessary to establish four requisites of the statute: Approaching death; voluntary statement without persuasion, not in answer to interrogatories; and sound mind. *Id.*

16. Where the accused attempted to escape immediately after the offense was perpetrated, it is a circumstance against him. *Id.*

17. Evidence offered by accused, which is so improbable as to raise a presumption of fabrication, is a circumstance in favor of guilt. *Id.*

18. Where the evidence established murder in the first degree, it is not error, of which the accused can complain, that the court charged the jury that they might find the defendant guilty of murder in the second degree or of manslaughter. *Id.*

19. A defendant may be examined as a witness against himself, but not against his co-defendant. (Paschal's Dig., Art. 3754, Note 857.) *Rogers & Oliver* v. *Patterson*, 605.

20. Where the action was for money had and received, the defendant may show the character of funds in which it was received; and if in Confederate notes, that fact may be shown. *Id.*

21. In suits upon lost notes or bonds, the rules of evidence recognized

EVIDENCE (*continued.*)

by the common law and in equity have not been changed by the statutes of this state, except in the case of recorded instruments, private instruments filed in the office of some alcalde or judge of Texas previous to the 1st Monday in February, 1837, and instruments or notes filed in some suit brought upon them in some other court of the state; in all of which cases certified copies are constituted original evidence. (Paschal's Dig., Arts. 3706, 3715-3718, Notes 832, 839-842) In all other respects the rules of evidence in regard to them continue the same, both in equity and at the common law. *Scherer* v. *Upton.* 617.

22. The jurisdiction being blended in our system, if the rule of evidence in either be applicable, the courts are authorized to appropriate it *sub modo.* *Id.*, 618.

23. Where the petition described the note and averred its loss by the agent, and the agent swore to the petition, and the defendant did not deny the sworn petition, but pleaded failure of consideration, no further proof of the execution of the note was required. *Id.*

24. There can be no question that oral evidence may be relied upon in some cases to change or modify or even to set aside written agreements. It may readily be conceded that a new and distinct agreement may be established by parol, as having been entered into as a substitute for the original written contract. Doubtless it may be established by parol, after performance, that the time of performance was enlarged, or the place of performance changed, or actual performance was actually waived. *Hogan* v. *Crawford*, 633.

25. Even a suppletory agreement may be proved by parol. But in all such cases, it must appear that each novation or new obligation was founded upon a good and sufficient consideration, to affect in any manner the original contract in writing. *Id.*

EXECUTIONS.

Costs.

Exemptions.

Sheriff, 2-5.

EXEMPTIONS.

Homestead.

Where the plaintiff claimed that three hundred bushels of corn was the only property he had, and insisted that it was exempt from forced sale because it was necessary for the "one year's provision" of his family, but failed to state of whom or of what that family consisted, the petition contained no such equity as entitled the party to an injunction, and it was rightly dissolved. (Paschal's Dig., Arts. 3798, 3802a.) *Swisher* v. *Hancock*, 262.

FACTORS AND COMMISSION MERCHANTS.

1. Whether commission merchants and warehousemen are liable for losses by fire depends upon the question of prudence, diligence, and good faith. (Paschal's Dig., Art. 3803, Note 888.) *Vincent* v. *Rather*, 77.

**FACTORS AND COMMISSION MERCHANTS** (*continued.*)

2. Where cotton is sent to a commission house for sale, the consignee is held to an implied contract to store in a safe manner and to sell to the best advantage. *Vincent* v. *Rather*, 77.

3. Where a commission house advertises that they will store cotton consigned to them in a fire-proof warehouse, they are liable if they store in a wooden warehouse which is exposed to fire and less safe. *Id.*

4. It is no answer to a charge of want of diligence that, by mistake of the railroad, the cotton was sent to a wrong house and was stored in a less safe place, if, upon the discovery of the mistake, the consignees took control of the cotton, but did not remove it to their own fire-proof house. *Id.*

5. Nor will a custom of the merchants of the city not to remove cotton sent to the wrong house by mistake prevail against the general laws governing bailees and factors. *Id.*

**FAILURE OF CONSIDERATION.**
CONSIDERATION.
FRAUDULENT CERTIFICATE.

**FAMILY.**

1. The homestead is the sanctuary of the family; not merely of the head, but of all its members, whether consisting of husband, wife, and children, or any other combination of human beings, living together in a common interest and having a common object in their pursuits and occupations. *Wilson* v. *Cochran*, 685.

2. If the property belong to one or all of the family so living together, it is not subject to forced sale. *Id.*

3. "Family" is used in its comprehensive sense, and embraces a collective body of persons, living together in one house, or within a curtilage, in legal phrase. It embraces the household, composed of parents and children, or other relations, or domestics and servants. *Id.*

4. A single man, who had sometimes occupied a house and lot as a sleeping-place, never having servants or any person connected with him residing on it, and who had rented out the place when the execution was levied, had no claim as a family, and the property was subject to forced sale. *Id.*

**FEDERAL COURT.**

A judgment rendered in the circuit court of the United States operates as a lien upon all land situated within the district, whether the same be in the county where the judgment was rendered or not. *Branch* v. *Lowery*, 96.

**FEES.**
COSTS.

FEME COVERT.
> HUSBAND AND WIFE.
> MARITAL RIGHTS.
> MARRIED WOMEN.

FIDUCIARY TRUSTS.
> An administrator who, in his fiduciary character, received Confederate treasury notes from a debtor of the estate, which the creditors refused to receive, was held to have made himself liable for such debt. But, as he had not thereby discharged the debtors from whom he collected, the judgment of the district court was reversed and the cause remanded. *Kleberg* v. *Bonds*, 611.

FIELD NOTES.
> SURVEY.

FINAL JUDGMENT.
> JUDGMENT.

> 1. The final judgment is the last or conclusive judgment, which settles the rights of the parties. *Kennedy* v. *Morrison*, 207.

> 2. Whether the judgment be that the defendant go hence, &c., or that the plaintiff recover, &c., or that a new trial be refused, this last act is a final judgment; and, if the defendant appeal from that, he may bring in review the whole record. *Id.*

FORFEITED RECOGNIZANCE.
> BAIL.

> 1. The court will presume that a judgment *nisi* was taken in accordance with the statutory requirements, unless it otherwise appear. Some legal cause, such as death, sickness, or failure of the grand jury to indict, must be shown why the defendant did not make his personal appearance as required by his bond. (Paschal's Dig., Art. 2884.) *Thompson* v. *The State*, 166.

> 2. The recitation that the defendant is charged with murder is a good bond or recognizance, although the degree of murder be not stated. (Paschal's Dig., Art. 2732, Notes 708, 709.) *Id.*

> 3. Where one of the defendants was dead when the recognizance was forfeited and the judgment *nisi* entered, it was not error to dismiss as to such deceased party. *Id.*

FORNICATION.
> The 392d article of the Penal Code declares the punishment for fornication. But articles 293, 294, and 295 are confined to adultery alone, and fornication is nowhere defined in the code. (Paschal's Dig., Arts. 2022–2025.) *The State* v. *Foster*, 578.

FRAUD.
> 1. The last clause of the statute of frauds, as to the possession of chattels carrying the title, (Paschal's Dig. Art. 3876, Note 909,) is universal in its application to personal property. *Gay* v. *Hardeman*, 245.

> XXXI—47

FRAUD (*continued.*)

2. It was error to charge that if the deed of the intestate had not been duly registered it conveyed no title to the grantee which could defeat the right of subsequent creditors without notice. (Paschal's Dig., Arts. 997, 3875, 3876, 3877.) *Barrett* v. *Barrett's Adm'r*, 343.

3. It is not necessary to the validity of a deed that it should be registered. The title passes by the execution of the deed, and it cannot be defeated except for fraud. The record of the deed rebuts the presumption of fraud, and if the deed be voluntary, it is void as to subsequent creditors; but if made for a valuable consideration, and the purchaser has acted in good faith, no moral principle can be invoked for interference with the title of the purchaser. *Id.*

4. The true rule is, that the legal inference and presumption of fraud in favor of creditors at large, who have acquired no lien, are swept away, and such creditor is compelled to establish the fraud, if any exist, by actual proof. *Id.*

5. A voluntary deed from a husband to his wife is void as to existing creditors and as to subsequent creditors; certainly as to co-sureties, who pay the existing debt. (Paschal's Dig., Art. 3878, Notes 906–909.) *Raymond* v. *Cook*, 374.

6. Where a voluntary conveyance is intentionally made to defraud creditors, it seems perfectly reasonable that it should be held void as to all subsequent as well as prior creditors, on account of ill-faith; as to subsequent creditors, the fraudulent intention must be proved. *Id.*

FRAUDULENT CERTIFICATE.

CONSIDERATION.

It is not necessary that the rightful owner shall be guilty of fraud in permitting such use of his property. He more properly comes under the classification of the rule that, where one or two innocent persons must suffer, he who trusted most should suffer most. *Neale* v. *Sears*, 105.

GAMING.

CRIMINAL CODE, 5.

Article 409 of the Penal Code reads as follows: "If any person shall play at any game with cards at any house for retailing spirituous liquors, storehouse, tavern, inn, or any other public house, or in any street, highway, or other public place, or in any outhouse where people resort, he shall be fined not less than $10 nor more than $25." (Paschal's Dig., Art. 2044, Note 610.) The charge that the playing was at "a public house" is too indefinite.

GELDING.

A gelding is not a horse, but a eunuch. *Jordt* v. *The State*, 571.

GOLD AND SILVER.

CONFEDERATE MONEY.

## GUARANTOR AND GUARANTY.

A party who introduces a merchant into market, and by letter says, "any favor you may show Mr. R., in introducing him to the different houses, so as he may be able to fill his orders, will be highly appreciated by him, and will be indorsed by me for the amount of his purchases," is liable, as guarantor, to those who acted upon the letter, if he be duly informed that his guaranty was accepted, and of the amount advanced upon the guaranty. *Wheeler, Geiger & Co.* v. *Mayfield*, 395.

## GUARDIAN AND WARD.

1. Where the administrator of an estate sold land (at administrator's sale) and took a note, with personal securities and a mortgage on the land, to secure the payment, as required by the statute, (Paschal's Dig., Art. 1333, Note 499,) and the note was turned over to the heir as part of his inheritance, the guardian had no right to release the mortgage, cancel the note, and to take new and inferior security. *Smith* v. *Dibrell*, 239.

2. It is the duty of guardians to collect the debts due their wards and to recover the property to which they have claim or title, and to account to them for all rents, profits, and revenues; to lend money on mortgage, under the approval of the county court, &c. (Paschal's Dig., Art. 3906.) *Id.*

3. In equity the dealing of guardians with the estates of their wards is vigilantly watched; and while contracts and arrangements made by them for the interest of the ward, without the sanction of law, will be approved, yet, if such arrangement be to the detriment of the ward, the court will set it aside, or the ward may disregard it when he attains his majority. *Id.*

4. Where the mortgage had been released, and a new security taken which could not be enforced, the court reversed the judgment and ordered the petition to be amended so as to foreclose the original mortgage. *Id.*

## HABEAS CORPUS.

[See the facts on which the court held a homicide to be excusable, and discharged the prisoner on *habeas corpus*.] *Ex parte Warren*, 143.

## HEIRS.

DESCENT and DISTRIBUTION.

1. It is impossible to adjudicate upon the title of land held by an intestate without making the heirs upon whom the descent was cast parties. *Barrett* v. *Barrett's Adm'r*, 344.

2. Upon the death of an intestate the legal title to his land vests directly in his heirs, subject only to the equitable control of the personal representative for the purposes of administration. *Id.*

## HEREDITAMENTS.

Where the defendant owned the land upon which there was a spring he had the right to use the water for the purposes of irrigation, provided he restored it back to its natural channel before it reached the

HEREDITAMENTS (*continued.*)

lands of the adjoining proprietor; and if the stream was thus weakened so as to damage the adjoining proprietor, the defendant was not liable for such damage.  *Tolle* v. *Correth*, 362.

HIRING SLAVES.

SLAVES.

Where a note was given for the hire of a slave, an escape of the slave, whereby the hirer lost his services, did not entitle the hirer to deduction, unless the owner was in default, or guilty of some concealment of the slave, or other wrong.  *Scherer* v. *Upton*, 618.

HOMESTEAD.

1. As the homestead is exempt from forced sale by the 22d section of the 7th article of the constitution, neither the county court nor a court of general jurisdiction has the right to order a forced sale of it.  (Paschal's Dig , p. 65, Note 198.)  *Hamblin* v. *Warnecke*, 91.

2. Where a party is indebted for the balance of the consideration-money agreed to be paid for his homestead, and a judgment is rendered against him as a garnishee, the mere judgment does not discharge the indebtedness.  *Houghton* v. *Marshall*, 196.

3. Where the wife voluntarily joins her husband in a conveyance of the homestead, from that time it ceases to be the homestead.  (Paschal's Dig., Art. 1003, Note 427.)  *Id.*

4. Whether the wife is bound by a deed of trust, so as to authorize a forced sale of the homestead, will only be decided when the issue is necessarily presented.  *Buchanan* v. *Hart*, 647.

5. The 22d section of the VIIth article of the constitutions of 1845 and 1866 reads as follows: "The legislature shall have power to protect by law from forced sale a certain portion of the property of all heads of families.  The homestead of a family, not to exceed two hundred acres of land, (not included in a town or city,) or any town or city lot or lots, in value not to exceed $2,000, shall not be subject to forced sale for any debts hereafter contracted, nor shall the owner, if a married man, be at liberty to alienate the same, unless by the consent of the wife, in such manner as the legislature may hereafter point out."  (Paschal's Dig., pp. 65–941.)  This protection requires no aid from the legislature.  It is against all invasion by our legal process.*  *Wilson* v. *Cochran*, 677.

---

*The 15th section of the XIIth article of the constitution of 1869 reads as follows: "The legislature shall have power, and it shall be their duty, to protect by law from forced sale a certain portion of the property of all heads of families.  The homestead of a family, not to exceed two hundred acres of land, (not included in a city, town, or village,) or any city, town, or village lot or lots, not to exceed $5,000 in value at the time of their destination as a homestead, and without reference to the value of any improvements thereon, shall not be subject to forced sale for debts, except they be for the purchase thereof, for the taxes assessed thereon, or for labor and materials expended thereon; nor shall the owner, if a married man, be at liberty to alienate the same, unless by the consent of the wife, and in such manner as may be prescribed by law."

HOMESTEAD (*continued.*)

6. The homestead is the sanctuary of the family; not merely of the head, but of all its members, whether consisting of husband, wife, and children, or any other combination of human beings, living together in a common interest and having a common object in their pursuits and occupations. *Wilson* v. *Cochran*, 677.

7. If the property belong to one or all of the family so living together, it is not subject to forced sale. *Id.*

8. Family is used in its comprehensive sense, and embraces a collective body of persons, living together in one house, or within a curtilage, in legal phrase. It embraces the household, composed of parents and children, or other relations, or domestics and servants. *Id.*

9. A single man, who had sometimes occupied a house and lot as a sleeping-place, never having servants or any person connected with him residing on it, and who had rented out the place when the execution was levied, had no claim as a family, and the property was subject to forced sale. *Id.*

10. The act of 2d February, 1860, reads as follows: " The homestead in a town or city, exempt from forced sale, is hereby declared to be the lot or lots occupied or destined as a family residence, not to exceed in value $2,000 at the time of their destination as a homestead; nor shall the subsequent increase in the value of the homestead, by reason of improvements or otherwise, subject the homestead to forced sale." (Paschal's Dig., Art. 3928.) [This section was re-enacted 10th February, 1866. Paschal's Dig., 2d ed., Art. 3802*a*.] But this statute, which thus enlarges the value of the town or city homestead, is, *pro tanto*, nugatory. *Walker* v. *Darst*, 681.

11. The constitution intended to limit the country homestead to the quantity of two hundred acres, without regard to the value of the land or improvements; the city or town homestead is limited in value to $2,000, including improvements, and the legislature had no power to enlarge it. *Id.*

12. The constitutional provision that the owner of a homestead, if a married man, shall not be permitted to alienate it, without the consent of the wife, in the way pointed out by the legislature, is designed for the protection of the wife, inasmuch as by her consent, in the manner pointed out by the legislature, the homestead can be conveyed as well as any other property. (Paschal's Dig., Art. VII, sec. 22, Note 198, p. 65; Art. 1003, Note 427.) *Welch* v. *Rice*, 688.

13. The wife's general disclaimers in conversation of any interest in the homestead, her agreement to voluntarily separate from her husband, going away, and allowing him to remain upon the homestead until he sold it and abandoned the country, (she never having signed a deed and made her separate acknowledgment, as the law directs,) did not preclude her right to recover against one who knew all the circumstances. (Young v. Van Benthuysen, 30 Tex., 732.) *Id.*

14. The husband and wife cannot by their own or united wills dissolve their marital relations; the wife cannot sell the homestead to the hus-

HOMESTEAD (*continued.*)

band; for while the homestead is his, it remains hers; and if the husband sell without the wife joining, in the manner pointed out by the statute, his sale is void. (Paschal's Dig., Art. 1003, Note 427.) *Welch* v. *Rice,* 688.

HOMICIDE.

> CHARGE OF THE COURT, 1, 2.
>
> LYING IN WAIT.
>
> MANSLAUGHTER.

1. Where there is no evidence of justification of a homicide, it is not error to tell the jury that the law of justification is not applicable. (Paschal's Dig., Arts. 2225–2230.) *Parker* v. *The State,* 132.

2. Where there is sufficient evidence to convict, the verdict will not be disturbed. *Id.*

3. See the evidence for a case where the proof was held to be wholly insufficient to convict the accused, who was present, of any participation in the homicide. *Ake* v. *The State,* 416.

4. Where there was no evidence from which a conspiracy might be inferred, and the facts tended to prove that the homicide was the result of a sudden conflict, murder is not proved. *Id.*

5. Article 612 of the Penal Code reads as follows: "Where a defendant accused of murder seeks to justify himself on the ground of threats against his own life, he may be permitted to introduce evidence of the threats made, but the same shall not be regarded as affording a justification for the offense, unless it be shown that at the time of the homicide the person killed, by some act then done, manifested an intention to execute the threat so made. In every instance where proof of threats has been made, it shall be competent to introduce evidence of the general character of the deceased. Such evidence shall extend only to an inquiry as to whether the deceased was a man of violent or dangerous character, or a man of kind and inoffensive disposition, or whether he was such a person as might reasonably be expected to execute a threat made." (Paschal's Dig., Art. 2270, Note 672.) The court below *held,* that there must be a predicate proved, which establishes that at the time of the homicide the deceased must have done some act manifesting an intention to carry the supposed threats into execution, and that such acts were questions of law for the court, and not of fact for the jury. This was error. *Pridgen* v. *The State,* 420.

6. Whether or not there be any evidence is a question for the judge; its sufficiency for the purpose relied on is for the jury. *Id.*

7. The whole object of proving threats is to ascertain the mind of the prisoner at the very moment of the commission of the homicide; every circumstance which tends to prove this is important, because a murder is a matter of intent, and cannot exist without malice. *Id.*

8. Whether or not the threats are sufficient to establish reasonable fear is a question for the jury. (Rector v. The People, 19 Wend., 589; Howell v. Georgia, 5 Ga., 54.) *Id.*

9. All we decide is, that under the circumstances the appellant was en-

HOMICIDE (*continued.*)

titled to evidence of threats against himself by the deceased, and whether there were any acts done by the deceased at the time of the killing which extenuate or justify is a question of fact for the jury; and it follows as a sequence that the character of the deceased may be proved. (Paschal's Dig., Art. 2270.) *Pridgen* v. *The State*, 421.

10. The 3d section of article 599 of the Criminal Code, defining excusable homicide, reads as follows: "Adultery of the person killed with the wife of the person guilty of the homicide, provided the killing occur as soon as the fact of an illicit connection is discovered." (Paschal's Dig., Art. 2254.) Where the accused had seduced the wife of the deceased, and, the discovery becoming public, the deceased had appealed to the Masonic lodge, of which they were both members, and, in a letter, implored the accused to leave the neighborhood, or else that one or the other of them must die, whereupon the defendant, armed with three pistols and a double-barreled gun, waylaid the deceased and shot him, first saying, "You have threatened my life, I have got you now," the accused could not justify himself under the excuse of threats. (Paschal's Dig., Art. 2270, Note 673.) Such a case is not within the rule of Pridgen v. The State, (*ante* 420.) *Ex parte Mosby*, 566.

HORSE.

A gelding is not a horse, but a eunuch; and an indictment for stealing a horse is not sustained by proof that the accused stole a gelding. *Jordt* v. *The State*, 571.

HUSBAND AND WIFE.

COMMUNITY PROPERTY.

HOMESTEAD, 3, 4, 11, 12.

MARRIED WOMEN.

The 2d and 3d sections of the act of 13th March, 1848, "the better to define marital rights," were thus quoted: The statute (Paschal's Dig., Art. 4641) provides that "All property, both real and personal, of the wife, owned or claimed by her before marriage, and that acquired afterwards by gift, devise, or descent, as also the increase of all lands or slaves thus acquired, shall be the separate property of the wife: *Provided*, That during the marriage the husband shall have the sole management of all such property." Article 4643 provides that "The husband and wife may be jointly sued for all debts contracted by the wife for necessaries furnished herself or children, and for all the expenses which may have been incurred by the wife for the benefit of her separate property." These two articles furnish ample solution for the question proposed. When the statute declares that the wife's property shall remain her separate property, it certainly does not destroy one of the great characteristics of property—its vendible quality—or the right of the wife to acquire other property upon the credit of property owned and possesed. And when the husband, or supposed husband, as in this case, united with her in the

HUSBAND AND WIFE (*continued.*)

execution of a note for the purchase of property, this act was full, ample, and complete proof of the consent required in his "management of the property." *George* v. *Stevens*, 670.

ILLEGAL CONTRACT.

1. A note by which the defendant promised to pay "three hundred seventy-five dollars" in Confederate bonds is void. *Prigeon* v. *Smith*, 171.

2. If any part of the entire consideration for a promise, or any part of an entire promise, be illegal, whether by statute or at common law, the whole contract is void, and every executory contract, the consideration of which is illegal on either side, is void. *Goodman* v. *McGehee*, 252.

3. Parol evidence to show that a contract is founded on an illegal consideration is admissible. *Id.*, 253.

4. If a contract be illegal, it may be avoided by a proper plea, even though it be a specialty, and the illegality be not apparent on the face of the instrument. *Id.*

5. Confederate money, whether it forms the consideration on the part of the obligor or obligee, is illegal. [LINDSAY, J., concurred, but said: "I cannot agree that a contract, the consideration or performance of which is illegal, is void.] *Id.*

IMPROVEMENTS.

TRESPASS TO TRY TITLE.

INDICTMENT.

1. Errors which go to the sufficiency of the indictment may be reached by motion to quash or in arrest of judgment. *Robertson* v. *The State*, 36.

2. An indictment for assault with intent to kill, with a certain gun which defendant attempted to shoot, ought to state that the gun was loaded. (Paschal's Dig., Arts. 2137–2144.) *Robinson* v. *The State*, 170.

3. In an indictment for swindling, under article 773 of the Penal Code, it is necessary to aver that the offense was committed feloniously. (Paschal's Dig., Art. 2425.) *The State* v. *Small*, 184.

4. In an indictment for using estrays, it is necessary to aver that it was done "without complying with the laws regulating estrays." (Paschal's Dig., Art. 2441, Note 693.) *The Estray Cases*, 205.

5. Where there are two counts in an indictment, charging two degrees of the same offense, and the defendant fails to elect on which he will be tried, the jury may find him guilty of the degree charged, and the court will not disturb the verdict. *Bennett* v. *The State*, 303.

6. The 748th article of the Criminal Code reads as follows: "The taking must be wrongful, so that, if the property came into the possession of the person accused of theft by lawful means, the subsequent appropriation of it is not theft; but if the taking, though originally lawful, was obtained by any false pretext, or with an intent to deprive the owner of the value thereof, and appropriate the property to the use and benefit of the person taking, and the same is so appropriated, the offense of theft is

INDICTMENT (*continued.*)

complete." (Paschal's Dig., Art. 2385, Note 684.) An indictment upon this article should aver the fact that the property was delivered with the consent of the owner and the *intent* with which the possession was obtained. *Marshall* v. *The State*, 471.

7. The indictment being in the usual form, omitting the words "without the consent of the owner," it was inadmissible to prove the fraudulent representations by which the defendant got possession of the property. *Id.*

8. In an indictment for theft, the description of the party whose property was stolen by the initials of his christian name is sufficient. The question could only arise as a matter of variance, not upon the sufficiency of the indictment. *The State* v. *Black*, 560.

9. Where all the words in the indictment might be so put together as to make it sufficient, yet if the charge is so inartistically framed as to leave it uncertain who was intended to be killed, it was proper to arrest the judgment. (Paschal's Dig., Arts. 2863, 2866, Note 720.) *The State* v. *Nations*, 561.

10. A gelding is not a horse, but a eunuch; and an indictment for stealing a horse in not sustained by proof that the accused stole a gelding. *Jordt* v. *The State*, 571.

11. Article 734 of the Penal Code reads as follows: "If a house be entered in such manner as that the entry comes within the definition of burglary, and the person guilty of such burglary shall, after so entering, commit theft, or any other offense, he shall be punished for burglary, and also for whatever other offense is so committed." (Paschal's Dig., Art. 2370.) An indictment which stated that the defendant broke and entered, &c., with intent to commit a larceny, is not bad for duplicity. *Wilcox* alias *Nichols* v. *The State*, 586.

12. To charge that the defendant entered the house of one person and stole the goods of another is not bad for duplicity. *Id.*

13. It is sufficient to charge that the christian name is unknown. *Id.*

INDORSER.

BILLS, NOTES, &c.

1. By our statute the maker, the surety, the indorser, and even the guarantor of a promissory note, may all be sued in the same action, and judgment had against the whole of them; which thereupon makes them all principals, and equally bound to the plaintiff for the satisfaction of that judgment. *Tooke* v. *Taylor*, 1.

2. Our statute authorizes suit against the maker and indorser at the same time; but it distinctly recognizes the nature of the contract, according to the law merchant, by interdicting judgment against the indorser, unless judgment be rendered at the same time against the maker. So also as to sureties and guarantors. (Paschal's Dig., Art. 1426, Note 535.) *Id.*

3. The liability of an indorser having been fixed, he is not discharged by a third party becoming guarantor. *Id.*

INDORSER (*continued.*)

4. Where an indorser was sued, but not served, it is immaterial that the judgment by default took no notice of him. *Battle* v. *Eddy*, 368.

5. The note fell due 9th June, 1861; the suit was commenced 25th November, 1861; no citation was issued against the maker until 17th November, 1865, and no citation ever issued against the indorser; the first stay law was passed 7th December 1861, the 2d section whereof excludes parties "who have cases now pending in court." (Paschal's Dig., Art. 5127.) The law did not arrest the process, and the court must presume that the plaintiff countermanded its issuance. The liability of the indorser was not fixed. (Paschal's Dig., Art. 229, Note 290.) *Hoffman* v. *Cage*, 595.

6. The mere institution of the suit, with a suppression of process, does not fix the liability of the indorser. The fixing the liability must have a common-sense interpretation. *Id.*

INJUNCTION.

Where the plaintiff sued upon a note for $1,800, and the defendant pleaded that the consideration was the loan of Confederate treasury notes, but the record showed that afterwards a judgment, "by consent of parties," was rendered for $475, the court refused to disturb the judgment, and failed to consider the petition to enjoin it. *Schroeder* v. *Fromme*, 602.

INNOCENT PURCHASER.

1. It is not necessary that the rightful owner shall be guilty of fraud in permitting such use of his property. He more properly comes under the classification of the rule that, where one or two innocent persons must suffer, he who trusted most should suffer most. *Neale* v. *Sears*, 105.

2. By tacitly assenting to the assumed ownership of property by the person in possession, and thus inducing a lender to treat it as a security, the rightful owner is legally and equitably precluded from asserting his ownership to the detriment of the *bona fide* lender or innocent purchaser. *Id.*

INSTRUCTIONS.

CHARGE OF THE COURT.

PRACTICE, 1.

If the court has already substantially given an instruction asked, it is not error to refuse to repeat it. (Paschal's Dig., Art. 1464, Note 562.) *Clark* v. *Wilcox*, 322.

INTEREST.

1. The amendatory act of 17th December, 1861, gives interest upon open accounts at the rate of eight per centum from the 1st of the following January after they are made. (Paschal's Dig., Art. 3940, Note 930.) *Pauska* v. *Daus*, 68.

INTEREST (*continued.*)

2. If the contract be made in a foreign country, the law of interest will be presumed to be the same as our own, unless the contrary be averred and proved. (Paschal's Dig., Art. 3708, Note 834.) *Pauska* v. *Daus*, 68.

3. Where the contract stipulates a particular rate of interest, (seven *per centum per annum*,) it is not error, of which the defendant can complain, to render judgment at that rate. (Paschal's Dig., Art. 3943, Note 933.) But, the case being before the court, it was reformed, so as to draw eight *per centum*. *Gear* v. *Hart*, 135.

4. In calculating interest, the court followed the rule of adding interest until the first payment to the principal, and deducting the payment from the amount thus produced; and, if the balance exceed $100, the district court had jurisdiction. *Moseley* v. *Farrell*, 613.

INTERLOCUTORY JUDGMENT.

1. An interlocutory judgment is an order between the commencement of the suit and a final judgment. *Kennedy* v. *Morrison*, 207.

2. The court has absolute control of all interlocutory judgments or orders in every case until the final judgment. *Hamilton* v. *Pleasants*, 638.

INTERNAL REVENUE.

1. The stamp required by the act of congress of 1862, now repealed, might as properly be upon the writ of attachment or summons as upon the petition, although the petition is the leading process in the suit. (Paschal's Dig., Arts. 1426, 1431, Note 543.) *Kennedy* v. *Morrison*, 207.

2. The object of the stamp law was to collect fifty cents revenue in every suit. *Id.*

INTERROGATORIES.

1. Although a witness answer interrogatories by a christian name different from that written in the notice and *dedimus*, the answers ought not to be excluded if the defendant filed cross-interrogatories. *Atkinson* v. *Wilson's Adm'rs*, 643.

2. Where the excluded answers could not have changed the result, the judgment will not be reversed because of their exclusion. *Id.*

3. Interrogatories may be so framed as to bring out conversations, even though they may be suggestive of the matters inquired of. *Harrison* v. *Harwood*, 651.

INTERVENOR.

1. Where S. instituted a suit against B., and pending the suit S. died, and his wife Elizabeth, as widow, petitioned to revive as the only heir; whereupon M. claimed the negotiable security declared upon as intervenor, and upon contestation between the widow and the intervenor the right was decided in favor of the intervenor, and thereafter he prosecuted the suit in his own name. He obtained judgment against the defendant, who seems to have proved nothing at the trial. In the absence

INTERVENOR (*continued.*)

of a statement of facts there is no such error as the court can notice. *Bremond* v. *Manley*, 6.

2. If there was error as to the rightful ownership of the draft, that was a matter between the intervenor and the widow, and, she not having appealed, the court cannot see how the defendant, who was the acceptor, was prejudiced. *Id.*, 7.

3. Where L, as administrator of K, brought suit on a note payable to Ks, as executors of the same deceased K, and these executors afterwards intervened, and claimed the note as executors, whereupon the administrator relinquished in favor of the executors, there was nothing of which the defendants could complain, and it was error to dismiss the suit as to the intervenors. *Batchelor* v. *Douglas*, 182.

INTESTATE.

1. An administrator may sue to recover the land of his intestate, for the law so requires; but, *non constat*, that the administrator, who has never had possession of land, may be sued as a mere fiduciary. (Paschal's Dig., Art. 1324, Note 500.) *Barrett* v. *Barrett's Adm'r*, 344.

2. By the 112th section of the administration law all the estate of the intestate vests immediately in his heirs, and the control of the administrator is only over the property, which is subject to the payment of debts, and it can only be exercised under the orders of the court. (Paschal's Dig., Art. 1373, Note 517.) *Id.*

3. It is impossible to adjudicate upon the title of land held by an intestate without making parties of the heirs upon whom the descent was cast. *Id.*

4. It was error to charge that if the deed of the intestate had not been duly registered it conveyed no title to the grantee which could defeat the right of subsequent creditors without notice. (Paschal's Dig., Arts. 997, 3875, 3876, 3877.) *Id.*

5. Upon the death of an intestate the legal title to his land vests directly in his heirs, subject only to the equitable control of the personal representative for the purposes of administration. *Id.*

IRRIGATION.

1. The colonization law of Texas and the statutes of the state recognize the right to use water for irrigation purposes. (Paschal's Dig., Arts. 574, 584, 4523, 3945–3952.) *Tolle* v. *Correth*, 362.

2. Where the defendant owned the land upon which there was a spring he had the right to use the water for the purposes of irrigation, provided he restored it back to its natural channel before it reached the lands of the adjoining proprietor, and if the stream was thus weakened so as to damage the adjoining proprietor, the defendant was not liable for such damage. *Id.*

JUDGMENT LIEN.

1. The statutes of Texas declare that judgments shall operate as a lien upon real estate to the extent of the county in which the judgment is

JUDGMENT LIEN (*continued.*)

rendered. (Paschal's Dig., Arts. 3783, 3953, 3954, Notes 873, 874, 935, 936.) *Branch* v. *Lowery*, 96.

2. A judgment rendered in the circuit court of the United States operates as a lien upon all land situated within the district, whether the same be in the county where the judgment was rendered or not. *Id.*

3. The act of 14th February, 1860, "to prevent judgments from becoming dormant, and to create and preserve judgment liens," was repealed by the act of the 19th November, 1866. (Paschal's Dig., 2d ed., Arts. 3962, 3965; 20 Sess. Acts, 118.) *Walker* v. *Anderson*, 646.

4. Since the repeal of the act authorizing land to be sold under junior judgments, so as to destroy the lien of senior judgments, leaving the plaintiff in execution to contest for the money, the junior judgment is entitled to the proceeds of the sale; but the lien of the first judgment remains unaffected by the sale. (Paschal's Dig., 2d ed., Art. 3964.) *Id.*

JUDGMENTS.

1. A judgment by default, which in general terms directs the sale of a tract of land, without describing it, is void, *pro tanto;* but this does not impair the money judgment, nor is it error of which the defendant can complain. *Gear* v. *Hart*, 135.

2. An interlocutory judgment is an order between the commencement of the suit and a final judgment. *Morrison* v. *Kennedy*, 207.

3. The final judgment is the last or conclusive judgment, which settles the rights of the parties. *Id.*

4. Whether the judgment be that the defendant go hence, &c., or that the plaintiff recover, &c., or that a new trial be refused, this last act is a final judgment, and, if the defendant appeal from that, he may bring in review the whole record. *Id.*

5. If the district court refuse to render judgment against the sureties, the supreme court will reform the judgment, and render it against all the obligors in the special bail bond. *Id.*, 208.

JUDICIAL KNOWLEDGE.

1. The court does not judicially know that a certificate of deposit dated May 12, 1862, for $300, deposited in "current money," meant Confederate treasury notes. *Ziegler* v. *Stefanek*, 29.

2. The court judicially knows that the district courts hold two terms each year. *Griffith* v. *Gary*, 163.

3. The court judicially knows when the war ceased in Texas. The formal surrender of the belligerent force in this state took place on the 28th of May, 1865. The six months had not elapsed on the 15th of September, 1865, when this offense of "taking up" and "using" an estray is alleged to have been committed. *Clarke* v. *The State*, 374.

4. Courts judicially know the public statutes and general laws and customs of their own country. *Thompson* v. *Houston*, 610.

JURISDICTION.

    ABSENCE, 1, 2.

    PRACTICE, 26.

    1. As the statute provides that the suit may be brought before any court of competent jurisdiction, and the general jurisdiction of the district court extends to all cases of escheats and forfeiture, it had jurisdiction of an amount under $100. (Paschal's Dig., Const., Art. IV, p. 57, sec. 10, Note 182.) *Tarde* v. *Benseman*, 277.

    2. There is a distinction between the right to admit proofs, *aliunde*, to show that the supreme court has no jurisdiction, and the same character of proof to show that the court below had no jurisdiction. *Hart* v. *Mills*, 304.

    3. It has been the settled law of this court, ever since the decision in Harris v. Hopton, 5 Tex., 529, that proof, *aliunde*, will be heard touching the question of its own jurisdiction. (Paschal's Dig., Art. 1481, Note 583.) *Id.*

    4. Where B. was in possession of the land sued for, holding under deed, but the legal title was in W., who resided in a different county, the suit was properly brought in the county where the land was situated, and the plaintiff had the right to join W., so as to obtain specific performance against him should he recover against B. And where W. disclaimed all interest and expressed his willingness to convey to whomsoever the best equity belonged, the sufficiency of the service becomes an unimportant matter. *Herrington* v. *Williams*, 448.

    5. The court may obtain jurisdiction by service of process, acknowledgment of service, or voluntary appearance without service. (Paschal's Dig., Arts. 25, 1432, 1433, 1477, Notes 223, 544, 545, 573.) *Womack* v. *Shelton*, 592.


JURY AND JURORS.

    1. Even if it be true that the jury-list has not been made and the jury drawn as required by article 3985 of Paschal's Digest, everything will be presumed in favor of the legality and regularity of the action of the court until the contrary appears. (Tweedy v. Briggs & Yard, *post* 74.) *Pauska* v. *Daus*, 67.

    2. Where the question of the right of negroes to sit upon a jury did not appear otherwise than in a motion for a new trial, it cannot be revised. *Id.*, 68.

    3. When jurymen not on the list are permitted to serve, it will be presumed that the facts which authorized it existed. (Paschal's Dig., Art. 3985.) *Tweedy* v. *Briggs & Yard*, 74.

    4. When no objection was made to the jurors on account of their want of qualifications, such an objection comes too late in this court. *Id.*


JUSTIFICATION.

    CHARGE OF THE COURT, 7.

    HOMICIDE, 5–9.

    ORDINANCE.

LARCENY.

INDICTMENT, 6, 7.

LAWS.

COMMON LAW.

1. By the act of 20th January, 1840, section 2, the congress of Texas repealed all the laws of force, with the exception of certain acts therein enumerated, and introduced the common law of England, so far as it is not inconsistent with the constitution or the acts of congress then in force, to be the rule of decision in the republic. (Paschal's Dig., Arts. 804, 978, Notes 396, 418.) *The Indorsement Cases*, 693.

2. It is enough to say that neither the laws, statutes, nor the customs of any nation, with the exception of the common law as modified by our statutes, can have any force or validity as such. *Id.*

LAWYERS.

ATTORNEY AND CLIENT.

LEGAL TENDER.

1. Where a note was payable "in specie," or for a larger amount in "United States currency," and the judgment was rendered for the smaller amount "in specie," it was error, and the judgment was ordered to be reformed. *Flournoy* v. *Healy*, 590.

2. This court has decided the legal-tender act to be constitutional, and hence any judgment having a tendency to impair, impeach, or set aside the validity of this act would be, *pro tanto*, erroneous. (Shaw v. Trunsler, 30 Tex., 391.) *Id.*

3. The word "specie" in the judgment might be regarded as surplusage; yet as the word is calculated to mislead, the judgment ought to be reformed. The case of Windisch v. Gussett, 30 Tex., 744, is reconcilable with this principle. *Id.*

LICENSE.

1. By the amendatory act of 27th October, 1866, the person desiring to retail liquor is required to deliver to the county trearsurer a bond, payable to the county judge, conditioned, &c., and to pay into the county treasury a license tax, *at the rate* of $300 per annum, when the clerk of the county court is authorized to issue a license 'for the time he applies and pays for. (Acts of 27th November, 1866, p. 68; Paschal's Dig., 2d ed., Arts. 2061, 2064.) *Napier* v. *Hodges*, 287.

2. This license is indispensable, and is the only authority to the retailer to sell'such liquors in quantities less than a quart, under the law as it now stands. *Id.*

3. By another act, passed at the same session, (16th November, 1866,) the retailer who is pursuing, or about to pursue, this occupation of selling such liquors in quantities less than one quart, is assessed a tax at the rate of $300 per annum, for the benefit of the state treasury. (p. 91, sec 5.) And he is required by another act, approved 10th November, 1866, (p.

LICENSE *(continued.)*

142, sec. 10,) to make application to the assessor and collector, and to pay the amount to him, prior to pursuing such occupation, under a penalty of *fifty per cent.* and costs, for a failure to do so within five days thereafter. The legislature had the power to pass these laws, and they are are not inconsistent with each other.  *Napier* v. *Hodges*, 287.

4. Retailing, as defined by these several laws, is selling in quantities less than a quart.  *Id.*

5. By the constitutions, both of 1845 and 1866, it is declared that "the legislature shall have power to lay an income tax, and to tax all persons pursuing any occupation, trade, or profession ; provided that the term occupation shall not be construed to apply to pursuits, either agricultural or mechanical." (Paschal's Dig., Art. VII, sec. 27, pp. 67, 942, Note 201.) Retailing being an occupation which is pursued for profit, there is no limitation upon the legislature as to its powers of taxation over the subject, except the limitation imposed by its own discretion.  *Id.*

6. Two statutes, strictly in *pari materia*, enacted at the same session, are considered as one statute, and must be construed together ; and each must be upheld, unless their provisions are absolutely repugnant to each other.  And repeals by implication are not favored.  *Id.*

7. There is no repugnancy between the act of 27th October, 1866, and that of 6th November thereafter.  In the first, it was intended to guard against the abuses of the privilege of retailing, by requiring a bond with stringent conditions, and making it a misdemeanor for their violation. In the second, the main object seems to have been to raise revenue upon the subject of taxation, which it was supposed by the legislature would in all probability prove a profitable source of revenue.  *Id.*

8. The whole is an occupation tax, which, under the constitution, the legislature had the right to impose.  *Id.*, 288.

9. The 7th section of the act of 6th November, 1866, which declares that "all licenses taken out to pursue any taxable calling or occupation before the 1st day of January next shall expire on that day ; and if the occupation be one upon which tax is levied in section 5 hereof, the *pro rata* amount for the unexpired time shall be credited on the amount as levied by this act," applies to the tax to be received by the county court, and does not bear the inference that either tax was to be dispensed with.  *Id.*

10. The 10th section of the act of November 10, 1866, (p. 142,) for the assessment and collection of taxes, makes it manifest that the legislature contemplated that *licensed* retailers were the persons who were to pay the state tax to the assessors and collectors.  *Id.*

LIEN.

JUDGMENT LIEN.

1. Neither at common law nor by any statute of this state is a parol reservation in the sale of a personal chattel a lien upon the thing sold. *Gay* v. *Hardeman*, 245.

2. A lien is an agreement between the seller and buyer, upon a con-

LIEN (*continued.*)

siderabion or price, either in cash or upon a stipulated credit and a delivery of the property. When so delivered, the sale is consummated and the right of property becomes absolute in the buyer, and the seller has no longer any more control over it than the rest of mankind. *Gay* v. *Hardeman*, 245.

3. In all such cases, to establish the lien, a party must have actual or constructive possession of the property; but as soon as he surrenders that possession the lien is gone forever. *Id.*

4. The creditor cannot object to the sale of property by the debtor before his lien has attached to it. *Barrett* v. *Barrett's Adm'r*, 343.

LIMITATION.

1. Where the cause of action accrues upon the performance by the payee, the statute of limitation did not run until the completion of such condition. (Paschal's Dig., Art. 4604, Note 1017.) *Rose* v. *San Antonio and Mexican Gulf Railroad Company*, 49.

2. Where the writ of error was not sued out until after the expiration of two years from the rendition of the judgment the case was dismissed. (Paschal's Dig., Art. 4616, Note 1026.) *Shelley* v. *Southwick*, 125.

3. The stay law of 10th January, 1862, did not operate to extend the time in which writs of error might be sued out. (Paschal's Dig., Art. 5126 *et seq.*) *Pace* v. *Hollaman*, 158.

4. The legislature only designed to suspend those statutes which extinguished or set up a bar to the right of recovering on the cause of action. *Id.*

5. Where there was a mistake as to the quantity of land sold, unmixed with any ingredient of fraud, the statute of limitation did not commence to run until the discovery of the mistake, and the suit was well brought upon the warranty within four years after the discovery of the mistake. (Paschal's Dig., Art. 4604, Note 1017.) *Emerson* v. *Navarro*, 334.

LIQUOR.

LICENSE.

LOST INSTRUMENT.

EVIDENCE, 21.

LYING IN WAIT.

1. If the accused lie in wait for his adversary, and attack him when he is making no demonstrations, it is proper to exclude evidence of the injury, and even that the injured party had stabbed the accused. (Paschal's Dig., Art. 2270, Note 672.) *Gonzales* v. *The State*, 496.

2. Where the accused had seduced the wife of the deceased, and a correspondence ensued, in one letter of which the deceased implored him to leave the neighborhood, and not further insult him with his presence, saying, "If you do not, one or the other of us must die; but I will take no unfair advantage," whereupon the defendant waylaid him, and

XXXI—48

LYING IN WAIT *(continued.)*

 although implored by the defendant he fired and killed him, it was murder in the first degree within the 607th article of the code. (Paschal's Dig., Art. 2266, Note 672.) And bail was denied. *Ex parte Mosby*, 567.

MALICE.

 1. The distinction between express and implied malice has been thoroughly discussed in McCoy v. The State, 25 Tex., 33, and Ake v. The State, 30 Tex., 466. *Moore* v. *The State*, 572.

 2. Where the killing was without provocation or extenuating circumstances, it was the result of formed design, and bail was properly refused. (Paschal's Dig., Art. 2267, Note 672.) *Id.*

MANSLAUGHTER.

 See the history of the case, which justified a verdict for manslaughter, and might have justified a higher offense. (Paschal's Dig., Arts. 2250–2267, Notes 670–672.) *Cocker* v. *The State*, 498.

MARITAL RIGHTS.

  COMMUNITY PROPERTY.
  HUSBAND AND WIFE.
  MARRIED WOMEN.

MARRIAGE.

 1. In all Protestant countries marriage is almost universally regarded as a mere civil contract, subject to the control and regulation of the law of the state; nothing more is needed to constitute it a valid contract than capacity to contract, and mutual consent and mutual wills, expressed in the manner prescribed for its proper attestation and authentication. *Rice* v. *Rice*, 174.

 2. In Catholic countries, marriage being regarded as a sacrament, it is customary to require a solemnization by a priest. *Id.*

 3. It has been settled in Texas that, prior to the revolution, the ceremonies of the Roman Catholic religion had to be complied with to give validity to marriage, and if those rites were not observed the union was meretricious and without any legal sanction. *Id.*

 4. Marriages in Texas without the solemnization of the church were legalized by the ordinance of the 16th January, 1836, and the acts of the 5th June, 1837, and 5th February, 1841. (Paschal's Dig., Arts. 4662–4664, Notes 1056–1057a.) *Id.*

 5. These acts indicate not only the existence of irregular marriages while Texas was a Mexican province, and the necessity of some provision to mitigate and cure such social evils, but they were intended to legalize all other marriages where the parties were then living together in this relation, and to legitimate all children born of such marriages before or after the passage of these acts. *Id.*

 6. Where a man had married a wife before an *alcalde*, in 1831, with whom he lived two years and then separated from her, and was married

MARRIAGE (*continued.*)

to another in 1834, by a person without any official authority, and he continued to live with the second wife until 1857, when he deserted her and married a third, the legalizing acts of 1836, 1837, and 1841 made valid the second marriage, but not the first, and the third was adulterous. The property acquired during the second marriage was community property. *Rice* v. *Rice*, 175.

MARRIED WOMEN.

Community Property.

Husband and Wife.

1. The 9th section of the common law act of 20th January, 1840, reads thus: "The husband may sue either alone or jointly with his wife for the recovery of any effects of the wife; and, in case he fail or neglect so to do, she may, by the authority of the court, sue for such effects in her name." (Paschal's Dig., Art. 4636, Note 1043.) In such a suit the husband must state the capacity in which he sues, whether it be in his own right, or for the separate property of his wife. *City of Houston* v. *Schrimpf's Adm'x*, 667.

2. Article 4636 must be construed in connection with article 1427, which requires the names of the parties and the cause of action to be stated. (Paschal's Dig., Art. 1427, Note 536.) *Id.*

MERCHANT AND MERCHANT.

Bills, Notes, &c., 4, 15.

MILITARY GOVERNMENT.

Provisional Government.

By virtue of acts of congress justice is administered and the civil affairs of the government are carried on under the military supervision. *Tweedy* v. *Briggs & Yard*, 74.

MILITARY POWER.

Negroes, 3.

Ordinance.

A lieutenant of a subdivision of the fifth military district had no right to order a judge to dismiss a prosecution for felony pending in court. *The State* v. *McLane*, 260.

MISTAKE.

1. Mistakes, as well as frauds, are of equitable jurisdiction. *Emerson* v. *Navarro*, 334.

2. Mistakes of law are always relievable in a court of equity. *Id.*

3. Where a party sold a third of a league survey, both parties believing that the survey contained that quantity, but the survey lapped upon an older title, so that there was a failure of title for over two hundred acres, the vendee had the right to recover back the purchase-money in proportion to the loss. *Id.*

MISTAKE (*continued.*)

4. Where there was a mistake as to the quantity of land sold, unmixed with any ingredient of fraud, the statute of limitation did not commence to run until the discovery of the mistake, and the suit was well brought ·upon the warranty within four years after the discovery of the mistake. (Paschal's Dig., Art. 4604, Note 1017.) *Emerson* v. *Nevarro*, 334.

MONEY.

Money is a term used in a specific and also in a general and more comprehensive sense; in the latter it means wealth, the representative of commodities of all kinds. *Paul* v. *Ball*, 10.

MORTGAGE.

1. Where a deed of conveyance, a mortgage to secure the purchase-money, and a power of attorney to locate and sell a tract of land, were all given about the same time, and were between the same parties, the three instruments will be construed as one contract. *Eppinger* v. *McGreal*, 147.

2. Where a deed, a mortgage, and a power to sell, construed together, established that the intention was to have the purchaser locate and take possession of the land, and to purchase and pay for one-half of the land $4,500, and to secure this he executed a mortgage, but did not locate, (because another had already located it and obtained the grant,) did not enter into possession, and did not pay for the land, he cannot maintain an action for a specific performance to recover the land, or for any other relief after twenty years have elapsed. The fair presumption then is, that he either could not or would not comply at the proper time. *Id.*

MURDER.

CHARGE OF THE COURT, 1, 2.

LYING IN WAIT, 2.

MALICE.

NAME.

VARIANCE.

It is sufficient to charge that the christian name is unknown. *Wilcox* v. *The State*, 586.

NEGROES.

1. Where the question of the right of negroes to sit upon a jury did not appear otherwise than in a motion for a new trial it cannot be revised. *Pauska* v. *Daus*, 68.

2. The 1st section of the "civil rights" law gives negroes equal rights with whites to give evidence, and they are competent witnesses. (Paschal's Dig., Art. 5382.) *Ex parte Warren*, 143.

3. By the reconstruction laws the government of Texas is "provisional," and "subject in all respects to the paramount authority of the United States;" and, the commanding general having ordered that there should be no distinction on account of color as to witnesses, the court can make no distinction. (Paschal's Annot. Const., p. 282, § 3; p. 286, preamble, &c.) *Id.*

NEW TRIAL.

PRACTICE IN SUPREME COURT, 21–23.

1. Where the party moved for a new trial on the ground of newly-discovered evidence, but that evidence was only cumulative of facts already proved, and would not have changed the result, a new trial was properly refused. *Zeigler* v. *Stefanek*, 29.

2. Where the evidence shows that at most the defendant has been guilty of a violent assault, and yet the jury found that he was guilty of an assault with intent to murder, the court should have granted a new trial. *Montalvo* v. *The State*, 63.

3. Where the verdict was wholly unsupported by evidence a new trial ought to have been granted. *Smelser* v. *The State*, 95.

4. Where a party was convicted of manslaughter, and the statement of facts did not show that there was any proof that the homicide took place in the county, a new trial ought to have been granted. *Scott* v. *The State*, 409.

5. A motion for a new trial must be disposed of at the term at which it was made. (Paschal's Dig., Art. 1473, Note 569.) *Wilcox* v. *The State*, 587.

NON EST FACTUM.

1. When the suit is upon a note executed by the husband and wife, and the plea of *non est factum* is not sworn to, it is error to charge the jury upon the execution of the note or the authority to execute it. (Paschal's Dig., Art. 1443, Note 549.) *Johnston, McNeely & Clemons* v. *Jefferson*, 332.

2. The 86th section of the act to regulate proceedings in the district court provides, that "When any petition, answer, or other pleading shall be founded, in whole or in part, on any instrument or note in writing, charged to have been executed by the other party, or by his authority, and not alleged therein to be lost or destroyed, such instrument or note in writing shall be received as evidence, without the necessity of proving its execution, unless the party, by whom or by whose authority such instrument or note in writing is charged to have been executed, shall file his affidavit in writing, denying the execution thereof." (Paschal's Dig., Art. 1443, Note 549.) When the instrument (a wagoner's receipt) was signed by a single name, and the petition sets it out, and avers that it was executed as the partnership act of said L. and one T., if T. would deny it, he must do so under oath. *Lewis* v. *Lowery*, 663.

3. The statute is as extensive as it is possible to imagine. It does not include promissory notes, or bills of exchange, or notes for the payment of money, or property only, but " any instrument." *Id.*

4. It is not necessary that the suit should be based entirely upon the instrument, but it is sufficient, if the instrument form a part of the testimony, to make out the plaintiff's case. *Id.*

NON-RESIDENT.

ABSENCE.

NONSUIT.

    1. The plaintiff has the right to take a nonsuit at any time before the jury retires from the bar. (Paschal's Dig., Art. 1464, Note 562.) *Frois* v. *Mayfield*, 366.

    2. Even after the defendant has pleaded in reconvention the plaintiff may take a nonsuit, especially if the plea present no cause of action. (Paschal's Dig., Art. 3446, Note 797.) *Id.*

ORDINANCE.

    1. The 5th section of the ordinance of the convention of 1866 did not extend to the justification of those who, by military arrests, had forced their creditors to receive the Confederate currency in payment. (Paschal's Dig., p. 950, ord. XI, sec. 5.) *The Confederate Money Cases*, 675.

    2. This ordinance was designed to protect officers, state and Confederate, and persons acting under them, in the performance of "military or civil authority." *Id.*

PAROL EVIDENCE.

    EVIDENCE, 9–13, 24, 25.

PARTIES.

    ADMINISTRATOR, 3–6.

    INTERVENOR.

    1. Where S. executed a promise to pay money received from the guardian of his grandson, and, the grandson having died, leaving no heir but his mother, the right of property and action was cast upon the mother as effectually as if the paper had been assigned to her, and she, joined by her husband, had the right of action. *Spencer* v. *Millican*, 65.

    2. The statute requires the petitioner to plainly and distinctly set forth the cause of action. If the party sue in his representative character, he must aver such facts as show his authority. (Paschal's Dig., Art. 1427, Notes 526, 527.) *Beal* v. *Batte*, 371.

    3. The plaintiff has the right to make all persons interested in the subject-matter of the suit parties, whether they be residents or non-residents. But where one of the defendants, as administrator and heir, had conveyed all his interest in the land and set up no claim to it, he was improperly joined as a defendant. *Herrington* v. *Williams*, 448.

    4. And if the object was to call upon him to avouch and make good the title sold, or else to answer for the purchase-money received by him as administrator, then the mere publication against him was no sufficient service. *Id.*

    5. Where the suit was brought by N. G., and the defendant made no objection to the non-joinder of parties, the fact that the defendant, as a witness, swore, and the account showed, that the invoice was in the name of N. G. & Co., was no such variance as could benefit the defendant. *Wright* v. *Gussett*, 486.

PAYMENT.

    SHERIFF.

PENAL CODE.
    CRIMINAL CODE.

PENALTY.
    1. There was no necessity why the judgment allowing a penalty for an occupation tax, without having paid the license tax, should direct one-half to be paid into the state treasury. But an order to pay into the county treasury was error. (Paschal's Dig., Art. 5156.) *Tarde* v. *Benseman*, 277.
    2. No person can be punished unless the offense is defined and the penalty affixed by the written law of the state. (Paschal's Dig., Art. 1605.) *The State* v. *Foster*, 578.

PERSONAL ACTION.
    ABATEMENT, 6.

PETITION.
    A petition based upon a note should aver who executed or made and delivered it. (Paschal's Dig., Art. 1427, Note 537.) *Belcher* v. *Wilson*, 139.

PLEADINGS.
    EVIDENCE, 12, 13.
    1. It is a rule of pleading that all instruments shall be construed most strongly against the party making the same. *Swisher* v. *Hancock*, 262.
    2. The statute requires the petitioner to plainly and distinctly set forth the cause of action. If the party sue in his representative character, he must aver such facts as show his authority. (Paschal's Dig., Art. 1427, Notes 526, 527.) *Beal* v. *Batte*, 371.
    3. Where the defendants, by their answer, admitted the execution of the note, and took upon themselves to establish affirmatively the illegality of the note, in the same manner as if they had been plaintiffs, and had cited the payee of the note to appear and show cause why the note should not be canceled, the judgment could have been pleaded in bar to any suit that the payee might afterwards bring, had the decision of the court been adverse to the defendants. *Womack* v. *Shelton*, 592.

PRACTICE.
    ABATEMENT.
    APPEAL.
    APPEARANCE.
    ARBITRATION.
    ATTACHMENT.
    ATTORNEY AND CLIENT.
    BAIL.
    BAILEE.
    CERTIORARI.
    CHARGE OF THE COURT.

PRACTICE (*continued.*)

    CONFEDERATE MONEY.
    CONFESSIONS.
    CONFESSION OF JUDGMENT.
    CONSIDERATION.
    CONTRACT.
    COUNTY COURT, 3–6.
    CRIMINAL PROCEDURE.
    DIVORCE AND ALIMONY.
    EQUITY.
    EVIDENCE.
    FORFEITED RECOGNIZANCE, 1–3.
    HIRING SLAVES.
    HOMICIDE.
    INSTRUCTIONS.
    INTERVENOR.
    JURISDICTION.
    LIMITATION.
    MARRIED WOMEN.
    NON EST FACTUM.
    NONSUIT.
    PARTIES.
    PLEADINGS.
    RECONVENTION.
    SERVICE.
    STATEMENT OF FACTS.
    VARIANCE.
    WRIT OF ERROR.

1. Where the defendant himself requested the court to charge the jury that they would find the meaning of the words "current money," and, if the deposit was Confederate money, they would find the value of the same and render a verdict accordingly, the defendant will not be heard to complain that the court had given a charge of similar import. *Ziegler* v. *Stefanek*, 29.

2. Where the cause of action accrues upon the performance by the payee, the statute of limitation did not run until the completion of such condition. (Paschal's Dig., Art. 4604, Note 1017.) *Rose* v. *San Antonio and Mexican Gulf Railroad Company*, 49.

3. Where there was an exception to excluding the deposition of a certain witness, the bill of exceptions must show the materiality of the evidence. (Paschal's Dig., Art. 217, Note 280.) *Id.*

4. Where the evidence shows that at most the defendant has been guilty of a violent assault, and yet the jury found that he was guilty of an assault with intent to murder, the court should have granted a new trial. *Montalvo* v. *The State*, 63.

5. Where the verdict was wholly unsupported by evidence a new trial ought to have been granted. *Smelser* v. *The State*, 95.

6. A petition based upon a note should aver who executed or made

PRACTICE (*continued.*)

and delivered it. (Paschal's Dig., Art. 1427, Note 537.) *Belcher* v. *Wilson*, 139.

7. Where two suits had been consolidated, the judgment should have been an entirety. *Young* v. *Davidson*, 153.

8. Where the charge of the court was more favorable to the defendant than the evidence warranted, he has no right to complain. *Barbee* v. *Hail*, 161.

9. If a *certiorari* be issued without bond, the proceeding would be illegal; but if there has been an effort to give bond, the court should allow the applicant to execute a sufficient bond. (Paschal's Dig., Art. 468, Note 331.) *Edmiston* v. *Edwards*, 172.

10. Where no notice is taken of the demurrer, it is presumed to be abandoned. *Myers* v. *The State*, 173.

11. A claim against an estate, which has been presented to the administrator and rejected, is evidence, not of the truth of the claim, but of the fact that the claim has been rejected, so as to authorize suit. (Paschal's Dig., Art. 1310, Note 484.) *Goss* v. *Dysant*, 186.

12. In a suit upon a warranty of a chattel, the measure of damages is ordinarily the purchase-money and interest, and the fact that the payment was made in another chattel at an agreed price is the same as if made in money. *Id.*

13. The stamp required by the act of congress of 1862, now repealed, might as properly be upon the writ of attachment or summons as upon the petition, although the petition is the leading process in the suit. (Paschal's Dig., Arts. 1426, 1431, Note 543.) *Kennedy* v. *Morrison*, 207.

14. The object of the stamp law was to collect fifty cents revenue in every suit. *Id.*

15. An interlocutory judgment is an order between the commencement of the suit and a final judgment. *Id.*

16. The final judgment is the last or conclusive judgment, which settles the rights of the parties. *Id.*

17. The use for which a billiard table was kept ought to have been left to the jury. *Tarde* v. *Benseman*, 277.

18. Where there are two counts in an indictment, charging two degrees of the same offense, and the defendant fails to elect on which he will be tried, the jury may find him guilty of the degree charged, and the court will not disturb the verdict. *Bennett* v. *The State*, 303.

19. Where an affidavit for a continuance neither shows justification nor such facts as would reduce the killing to a lower degree of homicide, to overrule it is no error. (Paschal's Dig., Art. 2987, Note 736.) *Halbert* v. *The State*, 357.

20. To explain the circumstances which surround the parties, it would seem that things antecedent may be proved. *Pridgen* v. *The State*, 420.

21. In civil cases the court may review the whole record and affirm the judgment if the whole facts warrant it; but in criminal cases the denial of any legal right is sufficient cause of reversal. *Id.*, 421.

22. The effect of the ruling in this case was to say that the circum-

PRACTICE (*continued.*)

stances surrounding the parties developed on the trial were not sufficient to extenuate or justify notwithstanding the threats. But this was a question of fact for the jury, to be responded to under the charge of the court. *Pridgen* v. *The State*, 421.

23. No compliance with a law, rule, or act, designed to aid in the establishment of the independence of the Confederate States, can furnish any defense against a lawful demand. *Ransom* v. *Alexander*, 443.

24. If the plaintiff prove his account by the defendant, there is no reason why he should introduce his books of entry. *Wright* v. *Gussett*, 486.

25. It was not error to swear a Mexican witness upon the cross. *Gonzales* v. *The State*, 496.

26. The 1st section of the act of 1846, to regulate proceedings in the district court, declares that "no person who is an inhabitant of this state shall be sued out of the county where he has his *domicil*," with eleven exceptions. (Paschal's Dig., Art. 1423, Note 533.) Where it was clearly proved that the defendant's domicil was in the county of N. and he was sued in the county of C., the fact that he did business in the county of C. did not give jurisdiction, and the plea should have been sustained. *Blucher* v. *Milsted*, 621.

27. The court has absolute control of all interlocutory judgments or orders in every case until the final judgment.. *Hamilton* v. *Pleasants*, 638.


PRACTICE IN THE SUPREME COURT.

PRACTICE, 3, 21.

RAILROADS, 5.

REMITTITUR.

STATEMENT OF FACTS.

VARIANCE, 2.

1. If there be any fact in the evidence which is brought before us for revision from which a jury may reasonably draw the inference of the guilty intent charged, this court is never disposed to disturb the verdict of a jury. But if a case be wholly barren of every such fact, it is our duty to set aside all such findings. *Montalvo* v. *The State*, 63.

2. Where the charge of the judge was correct, the court refused to disturb a verdict which seemed to be against evidence, there being other equities which might have been replied. *Spencer* v. *Millican*, 65.

3. Even if it be true that the jury-list had not been made and the jury drawn, as required by article 3985 of Paschal's Digest, everything will be presumed in favor of the legality and regularity of the action of the court until the contrary appears. [Tweedy v. Briggs & Yard, *post* 74.] *Pauska* v. *Daus*, 67.

4. Every presumption will be indulged in favor of the proper action of the court until the error is made manifest. (Pauska v. Daus, *ante* 67, affirmed.) *Tweedy* v. *Briggs & Yard*, 74.

5. Where there was a mere clerical error in the writ, which might have been amended, but the defendant was silent in the court below and per-

PRACTICE IN THE SUPREME COURT (*continued.*)

mitted judgment to go by default, he cannot be heard to urge the mistake in the court above. *Allen* v. *Traylor*, 124.

6. He who was silent in the court below, where he ought to have spoken, and has thus permitted the opportunity of making his defense to pass, ought not to be first heard in this court. *Id.*

7. Where the writ of error was not sued out until after the expiration of two years from the rendition of the judgment, the case was dismissed. (Paschal's Dig., Art. 4616, Note 1026.) *Shelley* v. *Southwick*, 125.

8. The statute requires forty days after the perfection of an appeal or writ of error as the least time in which the party is required or permitted to file the record. The party is also allowed two years from the rendition of the judgment to prosecute error. (Paschal's Dig., Art. 4616, Note 1026.) *Kernaghan* v. *Hall*, 126.

9. A showing that the party applied for the record, but the clerk had no time to prepare it, is no sufficient excuse for not filing it in time. *Id.*

10. A judgment by default, which in general terms directs the sale of a tract of land, without describing it, is void, *pro tanto;* but this does not impair the money judgment, nor is it error of which the defendant can complain. *Gear* v. *Hart*, 135.

11. Where there was neither statement of facts, bill of exceptions, nor assignment of errors, the judgment was affirmed. *Gibbs* v. *Anthony*, 157.

12. Where the contract stipulates a particular rate of interest, (seven *per centum per annum*,) it is not error, of which the defendant can complain, to render judgment at that rate. (Paschal's Dig., Art. 3943, Note 933.) But, the case being before the court, it was reformed, so as to draw eight *per centum*. *Id.*

13. There being no statement of facts, no question can arise on the merits. *Myers* v. *The State*, 173.

14. Where the statement of facts is so imperfect that there is no doubt that material facts are omitted the verdict will never be disturbed, unless it be apparent from the record that some vital point in the controversy has been erroneously decided. (Paschal's Dig., Arts. 1490, 1581, Notes 582, 613.) *Poag* v. *Williams*, 193.

15. Where such facts as can be gleaned from the record leave no doubt that justice has been done, the verdict will not be disturbed. *Id.*

16. If the district court refuse to render judgment against the sureties, the supreme court will reform the judgment, and render it against all the obligors in the special bail bond. *Kennedy* v. *Morrison*, 207. [LINDSAY, J., dissented, and reviewed the whole subject.] *Id.*

17. Where the cause was tried before the court the decree may be reformed. *Raymond* v. *Cook*, 374.

18. The rules of this court require an assignment of errors, and in civil cases that rule will be enforced. (Paschal's Dig., Art. 1591, Note 618.) But although there be no assignment of errors, in a case affecting the life or liberty of the citizen we feel bound to see at least that the court had jurisdiction of the case; and where there was a motion for a

PRACTICE IN THE SUPREME COURT (*continued.*)

new trial, on the ground that there was no evidence to convict, the court will treat this as an assignment of errors, and examine the facts. (Paschal's Dig., Art. 3210.) *Scott* v. *The State*, 409.

19. As it would be proper to detain the accused until an indictment could be procured to suit the facts, the case was remanded to give an opportunity for an affidavit, should that be desired. (Paschal's Dig., Art. 2976.) *Marshall* v. *The State*, 471.

20. Where the facts were all submitted to the judge, who erroneously found the plea to the jurisdiction against the defendant, the court reversed and reformed the judgment. *Blucher* v. *Milsted*, 621.

21. Where the suit was by an apprentice, who had served his time, for damages against his master and for a balance for labor after the expiration of his time, and there was neither bill of exceptions nor statements of facts, yet the court discussed the findings of the jury and the charge of the court, and, giving every presumption in favor of the charge, sustained the judgment. *Kuhlman* v. *Blow*, 628.

22. Where the petition declared an item for $120, and the verdict was for $140, on that item the court allowed the seeming error (the difference might have been caused by interest) to be cured by *remittitur*. *Id.*

23. Where the court is clearly satisfied that the equity of the case has been reached, the verdict will not be disturbed. *Atkinson* v. *I. N. & M. A. Wilson*, 643.

24. Although a witness answer interrogatories by a christian name different from that written in the notice and *dedimus*, the answers ought not to be excluded if the defendant filed cross-interrogatories. *Id.*

25. Where the excluded answers could not have changed the result, the judgment will not be reversed because of their exclusion. *Id.*

26. Where the evidence sustained the charge of the court, and warranted the verdict as to the purpose of selling the defendant's property, the judgment will not be disturbed. *Harrison* v. *Harwood*, 651.

27. Where suit was on a note, and the defendant answered by demurrer only, and the parties submitted the case to the court, and there was neither bill of exceptions, statement of facts, nor motion for a new trial, there was nothing for revision, and the judgment was affirmed with damages. *Harbert's Adm'r* v. *Henley*, 666.


PRINCIPAL AND AGENT.

The ratification by the principal of the acts of his agent must be made with a full knowledge of all the facts and circumstances, or it will not be obligatory on the principal, although such facts and circumstances may have been innocently concealed or inadvertently misrepresented. *Vincent* v. *Rather*, 77.


PRINCIPAL AND SURETY.

Prior to the act of 5th February, 1858, relating to principal and surety, the co-surety, in an execution, who pays the debt of the principal, has the right of contribution against his co-surety; but he could not be sub-

PRINCIPAL AND SURETY (*continued.*)

rogated to the rights of the plaintiff in the execution as to the lien and levies; but since the passage of that act a surety who pays has these rights. (Paschal's Dig., Arts. 4783–4789, Notes 1070–1072.) *Raymond* v. *Cook*, 374.

PROBATE COURT.

ADMINISTRATOR'S SALE, 2, 3.

PROCESS.

Where the process was returnable on a day after the date of the writ, it was not in accordance with the statute, and the judgment by default was reversed. (Paschal's Dig., Art. 1431.) *Violand & McCarthy* v. *Saxel*, 283.

PROCLAMATION OF EMANCIPATION.

SLAVERY.

PROVISIONAL GOVERNMENT.

. By the reconstruction laws the government of Texas is "provisional," and "subject in all respects to the paramount authority of the United States;" and, the commanding general having ordered that there should be no distinction on account of color as to witnesses, the court can make no distinction. (Paschal's Annot. Const., p. 282, § 3; p. 286, preamble, &c.) *Ex parte Warren*, 143.

QUI TAM.

The assessor and collector of taxes of a county may sue in a *qui tam* action, as an informer, as well as another, and recover the penalties prescribed in the statute, "to be accounted for by him and paid into the state treasury." (Paschal's Dig., Arts. 5153, 5156.) *Tarde* v. *Benseman*, 277.

RAILROADS.

1. A promise to pay a railroad company a sum of money when it shall have constructed the road from L. to V., and kept the same in operation, conveying passengers and freight between said points for the period of one year, is for a valuable consideration and binding. *Rose* v. *The San Antonio and Mexican Gulf Railroad Company*, 49.

2. R. executed his notes to G., president of the board of commissioners of the Air-Line railroad, due at one and two years. Before they matured the president of the same company indorsed these notes to C. and W., who indorsed them to B., the plaintiff: *Held*, that as indorsee and holder of this negotiable paper before maturity, the plaintiff was not charged with any possible defense which R., the maker, might have against the corporation. (Paschal's Dig., Art., 222, Note 285.) *Blair* v. *Rutherford*, 465.

3. There was a clause in the charter which read as follow: "They (the

RAILROADS (*continued.*)

commissioners) shall receive no subscriptions to said stock unless five per cent. thereof in cash shall be paid to them at the time of subscribing, and should they receive subscriptions to said stock without payment, they shall be personally liable to pay the same to said corporation when organized." The fact that the commissioners did not exact the five per centum from the subscribers affords no defense to a stockholder who gave the note in suit for stock. The clause was not a condition precedent to the organization of the company, but a mere personal liability or penalty imposed on the commissioners if they should fail to collect the five per centum. This presupposes the existence of a corporation before the five per cent. is collected. *Blair* v. *Rutherford*, 465.

4. There was a discretion left to the commissioners as to how the liability of subscribers should be fixed. *Id.*

5. The members of the corporation could not complain of its own neglect or wrongful or fraudulent acts. Where all the facts were in the pleadings as well as in the statement of facts, and the jury found for the defendant because of an erroneous instruction, the court reversed and reformed, and rendered judgment for plaintiff. (Paschal's Dig., Art. 1562, Note 604.) *Id.*

RAPE.

1. Article 523 of the Penal Code thus defines rape: "Rape is the carnal knowledge of a woman without her consent, obtained by force, threats, or fraud; or the carnal knowledge of a female under the age of ten years, with or without consent, and with or without the use of force, threats, or fraud." (Paschal's Dig., Art. 2184.) In describing the offense the word "*female*" is as properly used as "*woman*," since, in their ordinary use and in the definition of the offense, they mean the same thing. (Paschal's Dig., Art. 1630.) *Robertson* v. *The State*, 36.

2. A charge that the defendant unlawfully assaulted L R. with intent to ravish her describes a felony. (Paschal's Dig., Arts. 2185, 2191.) *Id.*

REBELLION.

VOID LAWS.

The formal surrender of the belligerent force in this state took place on the 28th of May, 1865. *Clark* v. *The State*, 374.

RECOGNIZANCE.

1. When a defendant appeals in a case of misdemeanor, he must either be committed to jail or enter into a recognizance to appear before the district court to abide the judgment of the supreme court. (Paschal's Dig., Art. 3186, Note 770.) *Adler* v. *The State*, 61.

2. The requirements of the recognizance are prescribed in article 263 of the code; therefore it must state the time, place, and the offense, as well as the court in which the party is required to appear. (Paschal's Dig., Art. 2731, div. 3, Note 708; Payne v. The State, 30 Tex., 397; Wilson v. The State, 25 Tex., 171.) *Id.*

3. Where the defendant was convicted of an offense and appealed, but

RECOGNIZANCE (*continued.*)

the recognizance did not state the offense, nor any offense known to the law, this court has no jurisdiction, and the appeal was dismissed. (Paschal's Dig., Art. 2731, Note 708; Horton v. The State, 30 Tex., 191.) *Breeding* v. *The State*, 94.

4. The offense must be named in the recognizance, and it must be a crime against the laws of the state. *Hicklin* v. *The State*, 492.

RECONSTRUCTION LAWS.

PROVISIONAL GOVERNMENT.

RECONVENTION.

ATTACHMENT, 10.

1. It is doubtful whether a defendant can plead in reconvention a trespass by the plaintiff upon his land against an action of debt. (Paschal's Dig., Art. 3446, Note 797.) *Rose* v. *San Antonio and Mexican Gulf Railroad Company*, 49.

2. A plea in reconvention must show a good cause of action against the plaintiff. (Paschal's Dig., Art. 217, Note 280.) *Id.*, 50.

3. If in suing out an attachment the plaintiff was not actuated by malice towards the defendant, nor other motive than a desire to secure the payment of the debt sued upon, the rule of damages, if the attachment be dissolved, is the damages actually sustained. (Paschal's Dig., Art. 3446, Note 797.) *Clark* v. *Wilcox*, 323.

4. Where the defendant is sued upon a negotiable note, he cannot plead in reconvention, and recover against the holder the balance of an open account against the original payee of the note, even though he detained it after it became due. "Discounts against the assignor" do not mean that the assignee is liable for any balance over and above the amount of the note. (Paschal's Dig., Art. 221, Note 284.) *Reese* v. *Teagarden*, 642.

REGISTRATION.

EQUITY, 9, 12.

It is not necessary to the validity of a deed that it should be registered. The title passes by the execution of the deed, and it cannot be defeated except for fraud. The record of the deed rebuts the presumption of fraud, and if the deed be voluntary it is void as to subsequent creditors, but if made for a valuable consideration and the purchaser has acted in good faith, no moral principle can be invoked for interference with the title of the purchaser. *Barrett* v. *Barrett's Adm'r*, 344.

REMITTITUR.

Where the plaintiff in error assigned as error that the judgment against him was excessive, and the defendant remitted the excess in the supreme court, the judgment was reversed and reformed, leaving the costs to stand against the defendant in the district court, but giving him his costs in the supreme court. (Paschal's Dig., Art. 1562, Note 604.) *Butt* v. *Schrimpf*, 601.

REPEAL.
        JUDGMENT LIEN, 3, 4.


RETAILING.
        Retailing, as defined by these several laws, is selling in quantities less than a quart. *Napier* v. *Hodges*, 287.


REVOLUTION.
        There are three important eras in the jurisprudence of Texas: first, the laws of Mexico, which were in force until the revolution in 1836; second, the constitution of 1836, and the statutes introduced prior to 1840, together with the Mexican laws not thereby repealed; third, the common law introduced by the act of 20th of January, 1840. (Paschal's Dig., Arts. 804, 978, Notes 396, 418.) *Barrett* v. *Kelly*, 476.


RIPARIAN BOUNDARIES.
        SURVEYS, 1-6.


SEALS AND SCROLLS.
        COMMON LAW.
        1. The district court act of 1846 requires an appeal bond, but to effect the same thing by a writ of error it requires an obligation, while to obtain a distress warrant an instrument must be signed; the form in the attachment act uses a seal or scroll. (Paschal's Dig., Arts. 163, 1491, 1495, 5034; Read v. Levy, 30 Tex., 848.) *Courand* v. *Vollmer*, 397.
        2. From the fact that the act about conveyances required that a deed should be under seal, it is to be inferred that the same solemnity was not required for a bond. (Paschal's Dig., Art. 997.) *Id.*
        3. The act of 1858, concerning seals, reads as follows: "No scroll or private seal shall be necessary to the validity of any contract, bond, or conveyance, whether respecting real or personal property, except such as are made by corporations; nor shall the addition or omission of a scroll or seal in any way affect the force and effect of the same; and every contract in writing hereafter made shall be held to impart a consideration as fully and in the same manner as sealed instruments have heretofore done." (Paschal's Dig., Art. 5087, Note 1114.) This act repeals the common-law act as to contracts concerning property, and in its spirit extends to all money obligations, and was intended to dispense with all sealed instruments. *Id.*
        4. The words "real or personal property" apply to conveyances only. *Id.*, 398.
        5. The act regulating the writ of *certiorari* requires a bond, but it is not necessary that the bond should contain a seal. (Paschal's Dig., Art. 468, Note 331.) [Lindsay, J., dissenting, held that the scroll or seal was only dispensed with in private instruments, not in judicial proceedings.] *Id.*

SEDUCER.

1. Where a woman was indicted for *crim. con.* with a man, the declarations of the seducer are but hearsay evidence, and should not be admitted. *Spencer* v. *The State*, 64,

2. The seducer is not a competent witness against the woman seduced. *Id.*

SERVICE.

ABATEMENT.

DIVORCE AND ALIMONY, 3.

1. The sheriff's return must show that he delivered to the defendant a copy of the citation and of the petition. (Paschal's Dig., Art. 1433, Note 545.) *Belcher* v. *Wilson*, 139.

2. Where one defendant was not shown to be legally served and one was shown not to have been served at all, the entire judgment was reversed, although only two out of three prosecuted error. *Id.*

3. The 140th section of the district court act, in reference to the service of a writ of error, reads as follows: "And if the party is a non-resident of the state, or cannot be found, the citation may be served on the attorney of record." (Paschal's Dig., Art. 1495, Note 587, p. 371.) The fact to authorize service on the attorney must be averred in the petition. The mere fact that the defendant cannot be found is not enough. *McLamore* v. *Heffner*, 189.

4. The failure of the clerk of the district court to copy the return of a sheriff upon a summons, whereby the judgment was reversed and the defendant in error lost his debt, makes the clerk liable for the amount, and the substantial. averment of the facts, and that the defendant had become insolvent, are a sufficient statement of the cause of action. *Clark* v. *Wilcox*, 322.

5. The return of the sheriff was in these words: "Came to hand the 5th of April, 1860; executed on the 7th of the same month by delivering in person to Andrew Herron a certified copy of the petition and a copy of this writ." This was a sufficient compliance with the statute. (Paschal's Dig., Art. 1433, Note 545.) *Id.*

6. "The time and manner of service" does not mean a useless narrative of facts, but only that a copy of the process and petition were delivered to the defendant himself and when. (Paschal's Dig., Arts. 1507, 5121, Notes 593, 1122.) *Id.*, 323.

7. The return of the sheriff need not follow the very language of the statute, if it set forth the substantial facts necessary to a good service. *Id.*

8. The return need not set forth that the person served was the defendant, if he be correctly named. (Brown v. Robertson, 28 Tex., 555.) *Id.*

9. It is necessary that a summons should recite the names of all the defendants to an action, even though a copy of the petition be served, which petition named all the defendants. (Paschal's Dig., Art. 1430, Note 542.) *Battle* v. *Eddy*, 368.

10. The 13th section of the act to regulate proceedings in the district court allows a defendant to waive service in writing. (Paschal's Dig.,

XXXI—49

SERVICE (*continued.*)

Art. 1432, Note 544.) It is no objection that the waiver was dated before the petition is filed. *Battle* v. *Eddy*, 368.

11. Where an indorser was sued, but not served, it is immaterial that the judgment by default took no notice of him. *Id.*

12. The court may obtain jurisdiction by service of process, acknowledgment of service, or voluntary appearance without service. (Paschal's Dig., Arts. 25, 1432, 1433, 1477, Notes 223, 544, 545, 573.) *Womack* v. *Shelton*, 592.

13. A writ, dated 19th December, 1866, was directed "to the sheriff of Gonzales county." It was not fatal to the writ that it was not directed to "the sheriff or any constable," as required by the amendatory act of 12th November, 1866. (Paschal's Dig., 2d ed., Art. 1430.) *Carroll, Jr.* v. *Peck*, 649.

SHERIFF.

SERVICE, 4–8.

1. By his official bond a sheriff is bound to make "due return of all process and precepts to him lawfully directed," and to "pay over all sums of money collected by him, by virtue of any such process or precept, to the persons to whom the same are due, or their lawful attorney." (Paschal's Dig., Art. 5109, Note 1119.) A payment to the plaintiff in execution of all money collected on it, including costs, would answer the the condition. *De la Garza* v. *Carolan*, 387.

2. For any actual injury to the clerk for not collecting and paying over his fees, the sheriff and his sureties are liable in an action upon the official bond, or the clerk might sue the sheriff alone in a common-law action for money had and received. *Id.*

3. Neither the clerk nor any private person, except the plaintiffs in execution, is entitled to the summary remedy by motion against the sheriff and his sureties by statute. (Paschal's Dig., Arts. 3781, 3796, 5106, Notes 872, 884; De la Garza v. Booth, 28 Tex., 478. Decided otherwise in Little v. Guest, 30 Tex., 1.) *Id.*

4. In a suit upon a sheriff's bond the measure of damages is the actual injury sustained, which is the amount of money collected and not paid over, with interest from the date of demand of payment. (De la Garza v. Booth, 28 Tex., 478.) In such a suit the statutory damages allowed upon a summary motion cannot be given. *Id.*, 388.

5. The plaintiff in an execution is entitled to demand the whole proceeds of the execution from the sheriff, embodying all the taxation of costs against the defendant. This is his indemnity for his liability to the officers of the court for the costs which he may have either actually paid them in the progress of the suit, or which he may have secured to them in a bond for costs. *Id.*

SLAVERY.

1. MORRILL, C. J.—The constitution of the United States provides that "no person shall be deprived of  *  *  property without due process of

SLAVERY (*continued.*)

law;" that "congress shall have power to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water;" "to raise and support armies;" and "make rules for the government of the land and naval forces." So that, if the people of Texas were citizens of the United States during the rebellion, they could not be deprived of their property without due process of law. If they were a part of another state or a *de facto* government, and they and their property were captured by the forces of the United States, it belonged to congress and not to the commander-in-chief of the army to make rules concerning those captures. In either case the proclamations, military orders, or whatever else they may be called, can have no force or effect upon any other than the men subject to the commander, unless such proclamations and orders are based upon an act of congress. *The Emancipation Cases*, 504.

2. The powers of government are distributed into three co-ordinate branches. There is no majesty except the majesty of the law. *Id.*

3. The right to condemn or confiscate the property of enemies rests not upon the declaration of war or upon modern usage, but legislative will, to be found in acts of congress; and if there be no such legislation, the power of condemnation does not exist. (Livingston v. Moon, 7 Pet., 546; Brown v. The United States, 8 Cranch, 110.) *Id.*

4. The power to declare war includes the exercise of all the ordinary rights of belligerents, and congress may therefore pass suitable laws to embrace them. But until laws of condemnation have been passed, no private citizen can enforce any such rights, and the judiciary is incapable of giving them any legitimate operation. *Id.*

5. But the congress of the United States have declared their will as to the disposition of slaves. As early as the 6th of August, 1861, and the 17th day of July, 1862, the congress of the United States passed "An act to confiscate property used for insurrectionary purposes," and an act entitled "An act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes." (11 Stats., 589.) The 9th section of this last act provided that "All slaves of persons who shall hereafter be engaged in rebellion against the government of the United States, &c., escaping from such persons and taking refuge within the lines of the army, and all slaves captured from such persons or deserted by them and coming under the control of the government of the United States, shall be deemed captives of war, and shall be forever free of their servitude, and not again held as slaves." This, as well as all the other sections of the act, was prospective, and the fourteen different sections of the act contain full and ample "rules concerning captures on land and water." The congress, by this act, virtually negatives the power of any other branch of the government to do what the constitution authorizes that body alone to do. The act specially declares the slaves captives of war, and bases their freedom on the fact that their owners "were engaged in rebellion against the government of the United States," and it does not free any others. This same act, in

SLAVERY (*continued.*)

the 7th and 8th sections, contemplated "due course of law" against the owners of the property, and, of course, the freedom of the slave was dependent upon the disloyalty of the owner, as found by the court. *The Emancipation Cases*, 504.

6. As the proposed XIIIth amendment to the constitution was passed by congress on the 1st day of February, 1865, and as it is to be presumed that the congress supposed that the requisite number of states would ratify it, which was really done previous to the 18th December, 1865, hence there was no necessity to convict their owners of treason to free the slaves. By this amendment not only the slaves of the disloyal, but of the loyal also, were free, and on the 18th of December, 1865, slavery ceased to exist, and freedom was established coextensive with the United States. *Id.*, 505.

7. This proclamation was a war measure, and did not operate presently upon the slaves. It was not founded in the constitution, and it was duly claimed for the commander-in-chief of the armies. *Id.*

8. In the case before the court, the vendor, in January, 1865, sold and delivered a slave to the vendee, who in consideration thereof executed a promissory note for the payment. In the other case, a slave at the same time was hired for a year, and a promissory note given in consideration of the hire. As there was nothing illegal in the transaction, the notes were not void for illegality. The consideration is represented as having failed. It is not pretended that at the time of the contract there was no consideration. Each party had the same means of knowing the future condition of the slave, and acted upon his own ideas as to the result of the war. That the cause which proved mortal to slavery would soon sweep over the land was apparent to some and disbelieved by others. There was, however, no breach in the contract on the part of the vendor at the time of the sale. And though the vendor guarantied the subject of sale—a slave for life—and the slave in the same year was made free by the superior power, inasmuch as at the time the sale was made he was a slave for life, yet, if his freedom was occasioned afterwards, not by the vendor, but by the sovereign power of the nation, the vendor did not violate his contract. *Id.*

9. The question is, who was the owner at the time the slave became free? "*Res perit suo domino.*" *Id.*

10. The pecuniary loss must be borne by those who were the owners of such slaves at the time of their emancipation; for the emancipation of the slaves during the year was the artificial death of the slaves, and operated as would their natural death; therefore the defendant is liable for the hire during the whole year. The loss in the other case was a *vis major*, and it fell upon the vendee, who was in possession, and not upon the vendor, to whom the note for the price was due. *Id.*

11. LINDSAY, J., concurred.—Slavery did exist in fact and in law until its overthrow by the actual force of the national arms. It originated in force; it was destroyed by force. *Id.*, 506.

SLAVERY (*continued.*)

12. The effect of the President's proclamation was to liberate the slaves under the national control, and to pledge the faith of the government as to the remainder. The liberation was the effect of capture. *The Emancipation Cases*, 506.

13. The proclamation could not, *proprio vigore*, manumit the slaves. It required the power of the conquering forces. The liberation in Texas took effect from the date of the surrender of the insurgent forces, and the proclamation of that fact by the commanding general, dated 19th June, 1865. By general understanding, that was the day of jubilee of the freedom of the slaves in Texas. Until this final surrender in Texas, the traffic in slaves was lawful. *Id.*

14. The destruction of slavery was a *vis major*, and those in possession at the final application of the power had to sustain the loss. *Id.*

15. It is not conceded that the XIIIth amendment was necessary to destroy slavery in the revolted states. This was settled by the surrender. This amendment finished the work throughout the entire nation. *Id.*

16. The notes being given after the proclamation in 1863, but before the 19th June, 1865, were recoverable. *Id.*

17. LATIMER, J., concurred.—[The clerk informs the *Reporter* that Latimer's opinion had unfortunately been lost.] *Id.*

18. HAMILTON, J., dissented.—The real question is, was a sale of negroes in Texas after the 1st of January, 1863, opposed to the solemnly declared will and policy of the United States government, and had it the right, under existing circumstances, to declare such policy? If these questions are to be answered in the affirmative, then it is unnecessary to do more than add, that they should receive no aid from loyal courts to carry them into execution. *Id.*

19. By the terms of President Lincoln's proclamation of January 1, 1863, the high purpose of the government was, in solemn form, made known to the citizens of the government and to the nations of the earth, that slavery should cease in the states and districts which it embraced, provided effect could be given to it by force of arms; and that this declaration of purpose was authoritative and warranted by the constitution as a measure of war, and was carried into full effect by the success of the national arms. *Id.*

20. From the fact of a civil war and a *de facto* government here in Texas, I deduce the right of the national government to declare and effect the emancipation of the slaves. *Id.*

21. War is that state in which a nation prosecutes its right by force. Civil war includes every war between one and the same political society. In such a war, the parties are forced to accord to each other the rights of belligerents; and to such wars the public laws of nations are in many respects applicable. *Id.*

22. After the recognition of the Confederate States as belligerents by the proclamation of the Queen of England, of the 13th May, 1861, a citizen of a foreign power is estopped to deny the existence of a war, with all its consequences, as regards neutrals. They cannot ask a court

SLAVERY (*continued.*)

to affect a technical ignorance of the existence of a war which all the world acknowledges to be the greatest civil war known in the history of the human race, and thus cripple the arm of the government and paralyze its power by subtle definitions and ingenious sophisms. (The Prize Cases, 2 Black, 669.) *The Emancipation Cases*, 507.

23. After quoting largely from the Prize Cases, the judge says: From these authorities, which I have so freely quoted, and from my knowledge of the character, magnitude, and duration of the war, the manner in which it was conducted by the parties engaged in the contest, with all the prominent incidents connected with it to its close—of which, as a matter of public history, I must take judicial knowledge—I am at no trouble to determine that it was a "civil war" of vast proportions, in which the contesting parties respectively were entitled to and were accorded all the rights of belligerents, according to the established public law of nations; and, as resulting from this necessarily, that the successful belligerent may rightfully claim and exercise all the powers accorded to a conqueror under the laws of war. *Id.*

24. A government in fact was erected, complete in the organization of all its parts, with sufficient resources of men and money to carry on a civil war of unexampled dimensions. * * The so-called Confederate States were in the possession of many of the highest attributes of government. *Id.*

25. The revolting states did practically, not legally, withdraw from the Union by severing their political connection with it; they did expel from their limits the flag of the United States, its courts and officers, civil and military, and erected a new government in its stead, with a constitution, a president, a congress, a judiciary, and officers, state and confederate; organized vast armies, equipped and put them in the field, and for four years contested the palm of final victory with the United States on more than three hundred bloody fields, in a war which is admitted to have been the most gigantic of modern times. It is too late for those who were engaged on the Confederate side to insist now that they have always been in the Union, and that, therefore, the condition of the revolting states has not been changed. *Id.*

26. It is too late for the United States to dispute the fact of secession, or a partial disruption of the government in the revolting states during the period of the war. *Id.*

27. In the meantime it must be remembered that the United States government lost none of its rights, authority, or jurisdiction over the territory and people of the insurgent states by reason of their withdrawal; it was only prevented by force for a time from exercising them. *Id.*

28. The rebellion was carried on in the interest of slavery. It was in fact a contest between freedom and slavery, and which demanded every energy and resource which the executive possessed or could command to sustain even the existence of the government; and after long deliberation and advice it was determined to make war upon slavery. *Id.*, 508.

29. After reciting the preliminary proclamation of the 22d of Septem-

SLAVERY (*continued.*)

ber, the proclamation of the 1st of January, 1863, he proceeds: "Now, therefore, I, Abraham Lincoln, President of the United States, by virtue of the power in me vested, as commander-in-chief of the army and navy of the United States, in time of actual armed rebellion against the authority and government of the United States, and as a fit and necessary war measure for suppressing said rebellion, do, on this 1st day of January, 1863, and in accordance with my purpose so to do, publicly proclaimed for the full period of one hundred days from the day first above mentioned, order and designate, as the states and parts of states wherein the people thereof respectively are this day in rebellion against the United States, the following, to wit," (then mentioning the states and parts of states, including Texas,) proceeds: "And by virtue of the power and for the purpose aforesaid I do order and declare, that all persons held as slaves within said designated states and parts of states are, and henceforward shall be, free;" and then this noblest paper since the declaration of independence by our forefathers, and which, like that, was to be sustained and enforced at the cost of blood and treasure, concludes with this solemn assertion and invocation, "and upon this act, sincerely believed to be an act of justice, warranted by the constitution upon military necessity, I invoke the considerate judgment of mankind and the gracious favor of Almighty God." *The Emancipation Cases,* 508.

30. The war powers in the constitution cited. *Id.*

31. It is a well-established rule of the public law of nations that "from the moment one state is at war with another it has, on general principles, a right to seize on all the enemy's property, of whatever kind and wheresoever found, and to appropriate the property thus taken to its own use or to that of the captors." (Lawrence's Wheaton's Int. Law.) *Id.*

32. This proclamation of emancipation, thus warranted by the laws of war, fully expressed the will of the United States government, as a belligerent, upon the subject embraced in it. It was, that from and after that date the former slaves in the insurrectionary states and districts (including Texas) should thenceforth be forever free. *Id.*

33. The proclamation depended upon the success of the arms of the United States. But they did succeed, and that gave it effect from its date. *Id.*

34. After the proclamation, to engage in the traffic of slaves was to violate the public policy of the United States. It was an illegal dealing, about which neither party will receive relief. *Id.*

35. The question here is, not as to the moment of time when the former slaves in Texas actually obtained their freedom by the events of the war, but it is, will the courts now aid in carrying out and enforcing contracts against the public policy of the government, pronounced in the most solemn form, as both sovereign and belligerent, in a great civil war? *Id.*

36. The XIIIth amendment applied to those states and parts of states not embraced in the President's proclamation. *Id.*, 509.

CALDWELL, J., concurred in the dissent of HAMILTON, J.

SPECIAL BAIL.

Where the defendant had given special bail in an attachment proceeding, and judgment went against the defendant, the court had to decide as a final act whether judgment should be rendered against the sureties, and the refusal to so render was final, from which the plaintiff could appeal. (Paschal's Dig., Arts. 152, 153.) *Kennedy* v. *Morrison*, 207.

SPECIE.

LEGAL TENDER.

SPECIFIC ARTICLES.

Where, in consideration of a tract of land sold, the defendant gave his note for four thousand pounds of picked cotton, which he failed to pay, the measure of damages was the highest market value of the cotton from the maturity of the note until the day of trial. (Paschal's Dig., Note 283, p. 144.) *Brasher* v. *Davidson*, 190.

STALE DEMAND.

Where the owner of the junior title did not attack the older title for over twenty years, and then the attack was not by record evidence, but by parol, the objection should be considered as stale. *Barrett* v. *Kelly*, 476.

STAMP.

INTERNAL REVENUE.

STATEMENT OF FACTS.

1. Where the statement of facts is so imperfect that there is no doubt that material facts are omitted the verdict will never be disturbed, unless it be apparent from the record that some vital point in the controversy has been erroneously decided. (Paschal's Dig., Arts. 1490, 1581, Notes 582, 613.) *Poag* v. *Williams*, 193.

2. Where such facts as can be gleaned from the record leave no doubt that justice has been done, the verdict will not be disturbed. *Id.*

3. A statement of facts which is made up and filed after the adjournment of the term is no part of the record. *Hicklin* v. *The State*, 492.

4. The 135th section of the act of 1846, to regulate proceedings in the district court, prescribes the mode and practice in regard to a statement of facts. (Paschal's Dig., Art. 1490, Note 582.) *Id.*

5. These various duties of the clerks, the attorney general, and the supreme court, could not be allowed if the appellant may give notice of appeal and then be allowed an indefinite time to file his statement of facts. *Id.*

6. Where there is no statement of facts properly in the record, and nothing to be considered but the facts, a motion to dismiss in the supreme court ought to prevail. *Id.*

STAY LAWS.

1. The stay law of 10th January, 1862, did not operate to extend the time in which writs of error might be sued out. (Paschal's Dig., Art. 5126 *et seq.*) *Pace* v. *Hollaman*, 158.

2. The legislature only designed to suspend those statutes which extinguished or set up a bar to the right of recovering on the cause of action. *Id.*

3. The stay law of 1866 is unconstitutional, upon the principle decided in Jones v. McMahan *et al.*, 30 Tex., 719. *Earle* v. *Johnson*, 164.

4. The note fell due 9th June, 1861; the suit was commenced 25th November, 1861; no citation was issued against the maker until 17th November, 1865; and no citation ever issued against the indorser; the first stay law was passed 7th December, 1861, the 2d section whereof excludes parties "who have cases now pending in court." (Paschal's Dig., Art. 5127.) The law did not arrest the process, and the court must presume that the plaintiff countermanded its issuance. The liability of the indorser was not fixed. (Paschal's Dig., Art. 229, Note 290.) *Hoffman* v. *Cage*, 595.

STREAMS.

IRRIGATION.

SURVEYS, 1–6.

SUMMARY PROCEEDINGS.

SHERIFF, 4–5.

SUMMONS.

SERVICE, 4, 9, 13.

SUPREME COURT.

PRACTICE IN SUPREME COURT.

STATEMENT OF FACTS.

Where an appeal was sent from Medina (which was assigned to the session of the supreme court at Austin) to the session at Galveston, it was, on the motion of the attorney general, dismissed. *Goodside* v. *The State*, 566.

SURRENDER.

The formal surrender of the belligerent force in this state took place on the 28th of May, 1865. *Clark* v. *The State*, 374.

SURVEYS.

1. When a fresh-water stream is made the boundary between two riparian possessors, the middle of the stream is the lineal partition between them, unless, by the express terms of the grant to the first possessor, this conclusion of law is excluded. *Müller* v. *Landa*, 265.

2. Where the same vendor had verbally sold on one side of the river, if it be claimed that by a subsequent deed on the other side of the river he excluded the above rule, the deed ought clearly to show it. *Id.*

SURVEYS (*continued.*)

3. Where the calls in a deed are clear and explicit, and the monuments can be found by ordinary rules of interpretation, parol proof cannot be allowed to vary the legal import of the words and to change the natural position of the lines called for. *Müller* v. *Landa*, 265.

4. The language, " thence along said extension (of a street) till it crosses the most northern spring of the Comal springs," meant the extension of the south side of the street, and not the line which the surveyor might run across the stream. *Id.*

5. The lines of a survey do not alway have a mathematical definition, length without breath; they are as broad as the rivers and passways, which are appropriated as monuments for public as well as for private convenience, and when so used in adjusting the legal rights of parties by them, the center or middle of them, whether a river, a creek, a spring, or a passway, fixes the limitation of the rights of parties, unless otherwise expressly provided for in the feoffment. *Id.*

6. Where a party, believing that he has the exclusive right to a stream, obtains an injunction to restrain its use, and it turns out that he is mistaken, he is not necessarily liable to vindictive damages, but only to such actual damages as the party enjoined may have sustained. *Id.*

SWINDLING.

In an indictment for swindling, under article 773 of the Penal Code, it is necessary to aver that the offense was committed feloniously. (Paschal's Dig., Art. 2425.) *The State* v. *Small*, 184.

TAXES.

LICENSE.

1. The assessor and collector of taxes of a county may sue in a *qui tam* action, as an informer, as well as another, and recover the penalties prescribed in the statute, "to be accounted for by him and paid into the state treasury." (Paschal's Dig., Arts. 5153, 5156.) *Tarde* v. *Benseman*, 277.

2. There was no necessity why the judgment, allowing a penalty for an occupation tax, without having paid the license tax, should direct one-half to be paid into the state treasury; but an order to pay into the county treasury was error. (Paschal's Dig., Art. 5156.) *Id.*

3. As the statute provides that the suit may be brought before any court of competent jurisdiction, and the general jurisdiction of the district court extends to all cases of escheats and forfeiture, it had jurisdiction of an amount under $100. (Paschal's Dig., Const., Art. IV, p. 57, sec. 10, Note 182.) *Id.*

4. If a billiard table be kept for "occupation," the occupation was subject to the license tax imposed by the statute; because those "pursuing any occupation, trade, or profession," are by the constitution subject to a license tax. (Paschal's Dig., p. 942, Art. VII, sec. 27.) *Id.*

5. Trade or profession imports a profitable pursuit, and, if the billiard table was kept for amusement and not for profit, it was not subject to taxation. *Id.*

THEFT.
>CRIMINAL CODE, 1–3.
>INDICTMENT, 6, 7, 10.

THIRTEENTH AMENDMENT.
>SLAVERY, 6, 15, 36.

THREATS.
>HOMICIDE, 5–10.

TRANSCRIPT.
>APPEAL, 5, 6.

TRESPASS TO TRY TITLE.
>EQUITY, 15.
>Where the questions of improvements and the value of the use and occupation were left to the jury, which found for the plaintiff, but found neither good faith nor value of use and occupation, and the question of title was a pure matter of law, the court refused to disturb the verdict. (Paschal's Dig., Arts. 5300, 5307, Notes 1147, 1153.) *Cannon* v. *Murphy*, 406.

TRIAL OF THE RIGHT OF PROPERTY.
>A claim case under the statute (Paschal's Dig., Art. 5310, Note 1155) cannot be consolidated with an injunction suit, though all the parties in the injunction suit (save the wife of one defendant in the execution) are parties to the execution. But if, after the consolidation, the claimant dismiss the claim suit without objection, the erroneous consolidation is no longer in the record, the claim bond is no longer before the court, and the cause must be tried upon its equities. *Raymond* v. *Cook*, 374.

TRUSTEE.
>1. Where the trustee to sell to pay a mortgaged debt died, the court had the power to appoint a successor, upon the familiar principle that a trust shall not fail for want of a trustee. *Buchanan* v. *Hart*, 647.
>2. When the trustee dies, and the creditor goes into equity for the appointment of a successor, the costs are taxable against the plaintiff, to come out of the trust fund, not to the defendant. *Id.*, 648.

UMPIRE.
>The umpire, whether selected by the parties or the clerk, is authorized to act as an arbitrator. (Paschal's Dig., Art. 65, Note 248.) *King & Co.* v. *Grey*, 22.

VARIANCE,
>1. In an indictment for theft, the description of the party whose property was stolen by the initials of his christian name is sufficient. The question could only arise as a matter of variance, not upon the sufficiency of the indictment. *The State* v. *Black*, 560.

VARIANCE (*continued.*)

2. Where the petition was founded upon a joint and several promissory note, executed by four defendants, and also prayed for a foreclosure of a mortgage upon a lot, being part of another lot, whereon was S's store, but, in the effort to describe the lot, the petition only called for two rectangular lines, and the mortgage, which was attached as an exhibit, only called for three lines, omitting the northern line, and calling for the closing line as a diagonal, instead of the last line of a parallelogram, and the only defense was a demurrer, setting forth special causes, having no reference to these mistakes, and a general denial, and the cause was submitted to the judge, who overruled the demurrer, and rendered a money judgment against all the defendants, and a decree of foreclosure for the sale of the lot by proper descriptive calls: *Held*, that the general demurrer ought to have been sustained, and the plaintiff allowed to amend his descriptive calls and to aver a mistake in the mortgage, (if it was correctly copied;) also *held*, that the court could not presume in favor of the judgment, because there was no predicate laid in the pleadings for proof which would support the decretal order of sale of a lot not described in the pleadings; and, because of the error in the foreclosure, the whole judgment was reversed, and the court below instructed to allow an amendment. *Schmidt* v. *Mackey*, 659.

## VENDOR AND VENDEE.

1. Where a vendee purchases from a vendor in possession of and using certain billiard tables, and there was nothing on the records of the county contradicting this presumed and publicly-avowed ownership, it seems that he has a better right than the owner who permitted his property to be thus publicly possessed. *Neale* v. *Sears*, 105.

2. It is not necessary that the rightful owner shall be guilty of fraud in permitting such use of his property. He more properly comes under the classification of the rule that, where one or two innocent persons must suffer, he who trusted most should suffer most. *Id.*

3. By tacitly assenting to the assumed ownership of property by the person in possession, and thus inducing a lender to treat it as a security, the rightful owner is legally and equitably precluded from asserting his ownership to the detriment of the *bona fide* lender or innocent purchaser *Id.*

4. A purchaser, with notice, takes the rights of his vendor and no more, and if the vendor only held the equitable title in trust, the vendee likewise holds as trustee. *Houghton* v. *Marshall*, 196.

5. The vendees of the homestead stand in the same relation to the original vendor as the husband and wife who conveyed stood. And if there be a balance due, the vendee, upon discharging it, becomes the absolute owner. *Id.*

## VENDOR'S LIEN.

1. It is recognized as a correct principle of law, that a vendor of real estate has an equitable lien thereon to secure the payment of the pur-

VENDOR'S LIEN (*continued.*)

chase-money, and this lien exists against the vendee and all subsequent purchasers, with notice, actual or constructive. (1 Tex., 329; 4 Tex., 13; 12 Tex., 13; Story's Eq. Jur., §§ 1224–1230.) *Autrey* v. *Whitmore*, 623.

2. But as the administrator who sells the real estate of his intestate is required to take a mortgage upon the property sold to secure the payment of the purchase-money, if he fail to do so, although the fact of the note be recited in the deed, the vendor's lien is not retained, and it cannot be enforced against a purchaser from the vendee. *Id.*

VOID LAWS.

All laws passed to aid the rebellion were void. The law authorizing fines and forfeitures to be paid in that currency was in aid of the rebellion, and void. (Texas v. White & Chiles, 25 Tex. Supp., 467.) *Boone* v. *The State*, 557.

VOLUNTARY CONVEYANCES.

CONVEYANCES, 1, 3, 4.

WAR.

ESTRAYS, 2–4.
SLAVERY.
SURRENDER.

War is that state in which a nation prosecutes its right by force. Civil war includes every war between one and the same political society. In such a war the parties are forced to accord to each other the rights of belligerents; and to such wars the public laws of nations are in many respects applicable. *Id.*

WATER.

IRRIGATION.

WILLS.

1. By the will of the testator he bequeathed his real estate to sundry persons, giving certain parcels to "the family of Andrew Paul," (who was the testator's deceased brother,) and thereafter disposing of sundry sums "of money" to certain of his next of kin. The residuary clause reads as follows: "The remainder of *money* I may have at the time of my decease I will and bequeath, in equal amounts, to Mrs. Hannah Wilson, Robert Wilson, Matthew Wilson, James M. Paul, and the family of Andrew Paul, deceased: "*Held*, that money meant not only the cash on hand at the time of the testator's death, but also the money due on notes, mortgages, and accounts; that it was not the intention of the testator to die intestate as to any of his effects; and that the whole *residuum* of the estate passed to these devisees: *Held*, also, that the children of Andrew Paul (six in number) took *per stirpes*, and not *per capita*, with the other persons named; and that the *residuum* was correctly divided into

WILLS (*continued.*)

five shares, of which the family of Andrew Paul received one share. *Paul* v. *Ball*, 10.

2. Where there is doubt as to the subject and the object of a will, the court must so interpret it as to arrive at the intentions of the testator, and there can be no better rule than to examine all the dispositions. *Id.*

3. The common-law rules of interpretation are necessarily modified by our peculiar statutes. *Paul* v. *Ball*, 10.

4. In adopting the common-law, Texas has not adopted any English statute in aid of that system. (Paschal's Dig., Art. 978, Note 418.) *Id.*

5. Money is a term used in a specific and also in a general and more comprehensive sense; in the latter it means wealth, the representative of commodities of all kinds. *Id.*

6. In such a will it is a safe rule to give such an interpretation as would be in harmony with the statutes of descent and distribution and of wills. (Paschal's Dig., Arts. 3419, 3425, 5365, Notes 783, 789, 1166.) *Id.*

7. "The family of Andrew Paul, deceased," and "the children of Andrew Paul, deceased," are convertible terms, and they take according to the statute, or in allusion thereto, as the representative of the father, the deceased brother of the testator. *Id.*

8. Where a proper interpretation of the will can be gathered from its context it would be improper to admit parol evidence of any other intention of the testator than that expressed in the writing itself. *Id.*, 11.

WITNESS.

1. Where a woman was indicted for *crim. con.* with a man, the declarations of the seducer are but hearsay evidence, and should not be admitted. *Spencer* v. *The State*, 64.

2. The seducer is not a competent witness against the woman seduced. *Id.*

WORTHLESS CURRENCY.

CONFEDERATE MONEY.

WRIT.

SERVICE, 13.

WRIT OF ERROR.

SERVICE, 3.

1. Where the writ of error was not sued out until after the expiration of two years from the rendition of the judgment the case was dismissed. (Paschal's Dig., Art. 4616, Note 1026.) *Shelley* v. *Southwick*, 125.

2. The statute requires forty days after the perfection of an appeal or writ of error as the least time in which the party is required or permitted to file the record. The party is also allowed two years from the rendition of the judgment to prosecute error. (Paschal's Dig., Art. 4616, Note 1026.) *Kernaghan* v. *Hall*, 126.

WRIT OF ERROR (*continued.*)

3. A showing that the party applied for the record, but the clerk had no time to prepare it, is no sufficient excuse for not filing it in time. *Kernaghan* v. *Hall*, 126.

4. The 140th section of the act to regulate proceedings in the district court does not, in words, require the petition to state the residence of the opposite party; but, from the fact that the clerk is required to direct the writ to the sheriff of the county where the opposite party is alleged to reside, there is a virtual requirement that the residence should be alleged. (Paschal's Dig., Art. 1495, Note 587.) *Daugherty* v. *Cartwright*, 284.

5. A petition for a writ of error, which merely gives the names of the parties and the year when the judgment was rendered, is insufficient. *Id.*

6. The 1st section of the act of 14th February, 1860, amending the several acts regulating proceedings in the district court, reads as follows: "No writ of error, to remove a cause from the district to the supreme court, shall in any case issue unless the plaintiff in error give bond, with sufficient security, for all the costs which may accrue in the supreme court and which may have accrued in the district court." (Paschal's Dig., Art. 1517, Note 599.) Where the bond was every other way in form, except it read, "at the —— term, 1866," &c., the court said: "As there is no bond, jurisdiction does not attach, and the cause is stricken from the docket. *Id.*

7. Where, from an affidavit of counsel and the appearance of the bond found in the record, the signatures had been attached after the approval by the clerk, and the amount of the penalty and the condition had been changed, the presumption in favor of the clerk's certificate is removed, and, the court being satisfied that the bond found in the record was in fact a blank, the case was dismissed for want of a bond. *Hart* v. *Mills*, 304.

8. The amendment to the district court act of 1858 reads as follows: "No writ of error, to remove a cause from the district to the supreme court, shall in any case issue, unless the plaintiff in error give bond, with sufficient security, for all the costs which may accrue in the supreme court and which may have accrued in the district court." (Paschal's Dig., Art. 1517.) This section, taken in connection with the act of 13th of May, 1846, requires the bond to be executed within two years after the judgment sought to be revised has been rendered. *Id.*

9. The writ-of-error bond is a condition precedent, to be performed by the plaintiff in error, and it is an indispensable authority to the clerk for the issuance of the writ. *Id.*

10. Both the bond and the petition for a writ of error are indispensable, and they must be filed by the clerk of the district court in the county where the judgment was rendered. *Id.*

11. Filing a bond in the supreme court would not be a compliance with the law. *Id.*

12. Where the petition for a writ of error substantially complies with the statute, and the bond conforms to the law, a motion to dismiss will not be sustained. (Paschal's Dig., Art. 1495, Note 587.) *Tolle* v. *Correth*, 362.